Public Copy – Sealed Material Deleted

## ORAL ARGUMENT SCHEDULED FOR JULY 2, 2019

Nos. 19-5068, 19-5100, 19-5102 & 19-5103

In The

# 𝕯nited 𝕾tates 𝕮ourt of 𝕬ppeals for the 𝕯istrict of 𝕮olumbia 𝕮ircuit

IN RE: SEALED CASE

On Appeal from the United States District Court
for the District of Columbia

## JOINT APPENDIX

Zia M. Faruqui
David Goodhand
Assistant United States Attorneys
555 4ᵗʰ Street NW
Washington, D.C. 20530
zia.faruqui@usdoj.gov
david.goodhand2@usdoj.gov

*Counsel for Appellee the United States*

Leslie Paul Machado
Brian W. Stolarz
LECLAIRRYAN, PLLC
2318 Mill Road, Suite 1100
Alexandria, VA 22314
Ph: 703.647.5946
Fx: 703.647-5951
brian.stolarz@leclairryan.com
leslie.machado@leclairryan.com

*Counsel for Appellant* ▮▮▮

Sarah Levine
Hank B. Walther
Alex Potapov
Cormac Early
Daniel D. Benson
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
Ph: 202.879.3939
Fx: 202.626.1700
sllevine@jonesday.com

*Counsel for Appellant* ▮▮▮

Daniel Levin
WHITE & CASE LLP
701 Thirteenth Street NW
Washington, DC 20005
daniel.levin@whitecase.com

*Counsel for Appellant* ▮▮▮

*Additional Counsel on Inside Cover*

Owen C. Pell
Jacqueline L. Chung
WHITE & CASE LLP
1221 Avenue of the Americas
New York, N.Y. 10020-1095
opell@whitecase.com
jacqueline.chung@whitecase.com

*Counsel for Appellant* ████
████████████████

Christopher K. Pelham
Lillian He
Qiang Xue
JONES DAY
4th Floor
27 Zhongshan Dong Yi Road
Shanghai 200002, China
Ph: +86.21.2201.8000
Fx: +86.21.5298.6569
cpelham@jonesday.com

Henry Klehm III
Samidh Guha
JONES DAY
250 Vesey Street
New York, NY 10281-1047
Ph: 212.326.3939
Fx: 212.755.7306
hklehm@jonesday.com

*Counsel for Appellant* ████
████████████████

## TABLE OF CONTENTS

|   | **DOCUMENT** | **PAGE** |
|---|---|---|
| 1. | Memorandum Opinion, Mar. 18, 2019 | 1735 |
| 2. | Memorandum Opinion and Order Granting Government's Motion for Civil Contempt, Apr. 10, 2019 | 1844 |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| *In re* GRAND JURY INVESTIGATION OF POSSIBLE VIOLATIONS OF 18 U.S.C. § 1956 AND 50 U.S.C. § 1705 | Miscellaneous Case Nos. 18-175, 18-176 and 18-177 (BAH)  Chief Judge Beryl A. Howell |

## MEMORANDUM OPINION

In December 2017, the United States Attorney for the District of Columbia served two Chinese banks—Bank One and Bank Two—with a grand jury subpoena, and a third Chinese bank—Bank Three—with an administrative subpoena.[1] All three subpoenas are for records of transactions for [REDACTED], a now-defunct Hong Kong based front company for North Korea's state-run [REDACTED]. Each bank refused to comply. Almost a year later, on November 29, 2018, the government moved to compel each bank's compliance with their respective subpoena. *See* Gov't Mot. Compel. Produc. Docs. Req. Via *Bank of Nova Scotia* Subpoenas–Bank One ("Gov't Mot.–Bank One"), ECF No. 1 (No. 18-175); *See* Gov't Mot. Compel. Produc. Docs. Req. Via *Bank of Nova Scotia* Subpoenas–Bank Two ("Gov't Mot.–Bank Two"), ECF No. 1 (No. 18-176); Mot. Compel. Produc. Doc. Req. Via Administrative Subpoena ("Gov't Mot.–Bank Three"), ECF No. 1 (No. 18-177).

Consistent with the parties' agreed upon briefing schedule, on January 7, 2019, each bank filed an opposition, supported by voluminous attachments, to the government's motion. *See* Bank One's Opp'n to Gov't Mot. Compel ("Bank One's Opp'n"), ECF No. 6 (No. 18-175);

---

[1] Bank One is [REDACTED]; Bank Two is [REDACTED]; and Bank Three is [REDACTED].

1

Material Under Seal Deleted

Bank Two's Opp'n to Gov't's Mot. Compel ("Bank Two's Opp'n"), ECF No. 3 (No. 18-176);

Bank Three's Opp'n to Gov't's Mot. Compel ("Bank Three's Opp'n"), ECF No. 4 (No. 18-177).

The government then filed a single omnibus reply, on February 4, 2019, with its own

attachments. *See* Gov't's Omnibus Reply Supp. Mots. Compel Prod. ("Gov't's Reply"), ECF

No. 14 (No. 18-175).[2]  Each bank was permitted to file a sur-reply, and each of those, with more

attachments, was submitted on February 26, 2019.  *See generally* Bank One's Sur-Reply

Opposing Mot. Compel ("Bank One's Sur-Reply"), ECF No. 18 (No. 18-175); Bank Two's Sur-

Reply Opposing Mot. Compel ("Bank Two's Sur-Reply"); ECF No. 12 (No. 18-176); Bank

Three's Sur-Reply Opposing Mot. Compel ("Bank Three's Sur-Reply"), ECF No. 12 (No. 18-

177).  In support of the banks, the Chinese Ministry of Justice ("MOJ") submitted two letters

addressed to the Court.  *See, e.g.*, Bank One's Opp'n, Ex. 3, Jan. 6, 2019 MOJ Ltr., ECF No. 6-3

(No. 18-175); Bank One's Sur-Reply, Ex. 3, Feb. 26, 2019 MOJ Ltr., ECF No. 18-4 (No. 18-

175).

Following a March 5, 2019 hearing with the government and all three banks, the

government and two of the banks—Bank One and Bank Two—were permitted to submit

supplemental briefing on a personal jurisdiction issue specific to each bank.  The government's

supplemental briefs were filed on March 8, 2019, *see* Gov't's Suppl. Br. Personal Jurisdiction–

Bank One ("Gov't's Suppl.–Bank One"), ECF No. 29 (No. 18-175); Gov't's Suppl. Br. Personal

Jurisdiction–Bank Two ("Gov't's Suppl.–Bank Two"), ECF No. 25 (No. 18-176), and each

bank's response was filed on March 12, 2019, *see* Bank One's Suppl. Br. Personal Jurisdiction

("Bank One's Suppl."), ECF No. 30 (No. 18-175); Bank Two's Suppl. Br. Personal Jurisdiction

("Bank Two's Suppl."), ECF No. 26 (No. 18-176).

---

[2]      The same reply is docketed at ECF No. 7 in Case No. 18-176 and ECF No. 10 in Case No. 18-177.

Material Under Seal Deleted

Upon consideration of this weighty record, and for the following reasons, each of the

government's three motions is granted.

## I.      BACKGROUND

The three subpoenas in this matter pertain to an investigation into [REDACTED].  *See*

Gov't Mot.–Bank One at 1[3]; Gov't Mot.–Bank Three at 1.  As noted, [REDACTED] was a

Hong Kong based front company for North Korea's [REDACTED].  Gov't Reply, Ex. 1, Decl.

of Special Agent of the Federal Bureau of Investigation ("FBI Decl.") ¶ 9, ECF No. 14-1 (No.

18-175).  The now-defunct front company purportedly was established by [REDACTED], a

North Korean national, and [REDACTED], a Chinese national.  *Id.*

### A.      [REDACTED] Transactions for [REDACTED]

Between October 2012 and January 2015, [REDACTED] used [REDACTED] for United

States dollar transactions totaling $105,339,483.59.  Gov't Mot.–Bank One at 2; *accord*

Gov't Mot.–Bank Three at 2.  Of that money, $45,779,669.50 traveled through a United States

correspondent bank account of Bank One, which is a Chinese bank with [REDACTED] United

States branches.  Gov't Mot.–Bank One at 2–3; Bank One's Opp'n at 1.[4]  The Chinese

government, or its affiliated enterprises, own [REDACTED] of Bank One.  *See* Bank One's

Opp'n at 17 n.13; *see also* Gov't Reply, Ex. 2, Decl. of Professor of Law at George

Washington University Law School ("Gov't Expert Decl.") ¶ 99, ECF No. 14-2 (No. 18-175).

Another $1,627,909.34 went through a correspondent bank account of Bank Two, which also is a

Chinese Bank with a United States branch.  Gov't Mot.–Bank One at 2–3; Bank Two's Opp'n

---

[3]      The government's motion to compel production from Bank One and the motion to compel production from Bank Two are identical.  For ease, only one of those motions is cited in this Memorandum Opinion.
[4]      A correspondent account is "an account established to receive deposits from, make payments on behalf of a foreign financial institution or handle other financial transactions related to such institution."  31 U.S.C. § 5318A(e)(1)(B).

Material Under Seal Deleted

at 4.  The Chinese government has a [REDACTED] ownership stake in Bank Two.  Gov't's

Expert Decl. ¶ 100.  Finally, $57,931,904.75 was shuttled through a United States correspondent

account of Bank Three, which is a Chinese bank without any United States branch, but which

maintains [REDACTED] correspondent accounts in the United States.  Gov't's Mot.–Bank

Three at 2–3; Bank Three's Opp'n, Decl. of General Manager of [REDACTED] for Bank Three

("Bank Three GM Decl.") ¶¶ 7, 10, ECF No. 4-2 (No. 18-177).  At least [REDACTED] of Bank

Three's publicly traded shares are held by the Chinese government.  *Id.* ¶ 9.

      Many of these transactions were made after the Treasury Department's Office of Foreign

Assets Control ("OFAC"), on [REDACTED], "designated" the [REDACTED] pursuant to

Executive Order 13382.  *See* Actions Taken Pursuant to Executive Order 13382, [REDACTED].

Executive Order 13382 authorizes the Secretary of State, the Secretary of Treasury, or "other

relevant agencies," to designate, after consulting with their counterpart and the Attorney General,

any individual or entity as having engaged "in activities or transactions that have materially

contributed to, or pose a risk of materially contributing to, the proliferation of weapons of mass

destruction or their means of delivery," as having "provided, or attempted to provide, financial,

material, technological or other support for" any such transaction, or as being "owned or

controlled by, or acting or purporting to act for or on behalf of" any already-designated

individual or entity.  *See* Blocking Property of Weapons of Mass Destruction Proliferators and

Their Supporters, Exec. Order 13382, 70 Fed. Reg. 38567 (July 1, 2005).  As a designated entity,

the [REDACTED]'s property interests in the United States are blocked, meaning that the

[REDACTED]'s property may not be "transferred, paid, exported, withdrawn, or otherwise dealt

Material Under Seal Deleted

in." *Id.*; *see also* 31 C.F.R. § 544.201.[5]  Designated entities may apply to OFAC for a license

exempting certain property from being blocked.  31 C.F.R. §§ 501.801–808, 504.501–508.

Based on [REDACTED]'s transactions through the United States financial market, the

government is investigating [REDACTED] for three crimes: (1) money laundering, in violation

of 18 U.S.C. § 1956; (2) violating an order issued under the International Economic Emergency

Powers Act, such as Executive Order 13382, which is a violation of 50 U.S.C. § 1705; and (3)

violating the Bank Secrecy Act.  *See* Gov't's Mot.–Bank One at 4–5; *accord* Gov't's Mot.–Bank

Three at 5.

###    B.    The Investigatory Subpoenas

In aid of that investigation, on December 26, 2017 the United States Attorney for the

District of Columbia sent Bank Three a subpoena under 31 U.S.C. § 5318(k)(3).  *See* Bank Three

GM Decl., Ex. 1, Admin. Subpoena, ECF No. 4-2 (No. 18-177).[6]  That statutory provision

authorizes the Secretary of the Treasury and the Attorney General to "issue a summons or

subpoena to any foreign bank that maintains a correspondent account in the United States and

request records related to such correspondent account, including records maintained outside of

the United States relating to the deposit of funds into the foreign bank."  31 U.S.C.

§ 5318(k)(3)(A)(i).  The subpoena sent to Bank Three sought all records, including "(a) signature

cards; (b) documentation of account opening; (c) account ledger cards; (d) periodic account

statements; (e) due diligence (including invoices); and (f) records (copied front and back) of all

items deposited, withdrawn, or transferred," "from January 1, 2012, through the present,"

---

[5]    [REDACTED] also have been designated.  *See* Notice of OFAC Sanctions Actions, [REDACTED] (designating [REDACTED]); Notice of OFAC Sanctions Actions, [REDACTED] (designating [REDACTED]); Notice of OFAC Sanctions, [REDACTED] (designating [REDACTED]).

[6]    This provision was enacted through the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act) Act of 2001, Pub. L. 107-56, § 319, 115 Stat. 272, 312–14 (2001).

Material Under Seal Deleted

"relating to correspondent banking transactions for [REDACTED]" and "relating to

correspondent banking transactions" for a specified account thought to be used by

[REDACTED]. *See* Admin. Subpoena.

The next day, Bank One's and Bank Two's local branch each received identical grand

jury subpoenas. *See* Gov't Mot. Bank One at 5; *see also* Bank One's Opp'n, Ex. 1, Grand Jury

Subpoena, ECF No. 6-1 (No. 18-175). Those subpoenas commanded that a representative of

each bank appear to testify before the grand jury, and bring before the grand jury records,

including "(a) signature cards; (b) documentation of account opening; (c) account ledger cards;

(d) account statements; (e) due diligence (including invoices); and (f) records (copied front and

back) of all items deposited, withdrawn, or transferred," dated between January 1, 2012 and

December 26, 2017, related to any account belonging to [REDACTED] or related to a specific

account believed to be associated with [REDACTED]. *See* Grand Jury Subpoena.

## C.     Negotiating Alternatives to the Subpoenas

In January 2018, representatives from Bank Three met with the China Banking

Regulatory Commission ("the Commission") and the People's Bank of China ("People's Bank"),

which together regulate Chinese banking, about the subpoena and were told that the only way

under Chinese law that the bank could comply was through the process established under the

Agreement Between the Government of the United States of America and the Government of the

People's Republic of China on Mutual Legal Assistance in Criminal Matters ("MLAA"), June

19, 2000. *See* Bank Three GM Decl. ¶¶ 18–20. In March 2018, Bank Three representatives

again met with Chinese officials, including officials from the Commission, the People's Bank,

and the MOJ, the latter of which is designated under the MLAA as the Chinese authority

responsible for MLAA communications. *See* Bank Three GM Decl. ¶ 20; MLAA Art. 2. The

Chinese authorities repeated that Bank Three should ask the United States government to request

the subpoenaed records through the MLAA process and informed Bank Three that the MOJ

would respond quickly to an MLAA request.  Bank Three GM Decl. ¶¶ 20a, 20b.  The MOJ's

advice was memorialized in a March 22, 2018 letter sent to Bank Three, which relayed that the

MOJ would timely review and handle an MLAA request.  Bank Three GM Decl., Ex. 2, Mar. 22,

2018 MOJ Ltr., ECF No. 4-2 (No. 18-177).  The same letter explained that if Bank Three

"provide[s] relevant client information to the U.S. DOJ directly, the banking regulatory

authorities will impose administrative penalties and fines on you, and you may bear civil or

criminal liabilities depending on your situation." *Id.*

Still in March 2018, United States counsel for Bank Three shared the MOJ's letter with,

and sent a letter on behalf of Bank Three, to the United States government explaining that Bank

Three had been advised that under Chinese law, the MLAA is the exclusive vehicle for the bank

to produce the requested records.  Bank Three GM Decl. ¶ 23; Bank Three's Opp'n, Decl. of

Bank Three's U.S. Counsel ("Bank Three U.S. Counsel Decl."), Ex. 3, Mar. 23, 2018 U.S.

Counsel Ltr., ECF No. 4-1 (No. 18-177).  Bank Three's counsel assured the United States

government that the MOJ "would quickly respond to such a [MLAA] request" and that the bank

was "ready and willing to provide [the records] to MOJ," Mar. 23, 2018 U.S. Counsel Ltr. at 1,

having taken steps to preserve the requested records, *id.* at 2.

Bank One claims to have expressed a willingness to facilitate an MLAA request around

the same time.  Bank One's Opp'n at 3–4.  Additionally, Bank Two "has given its assurances

that it will produce the requested documents within days of a request through the MLAA."  Bank

Two's Opp'n at 16.

Following these communications, a delegation from the Department of Justice visited China—once in April 2018 and again in August 2018—to discuss "China's repeated failure to respond to MLAA requests—which necessitated the United States to proceed through *Bank of Nova Scotia* subpoenas and other authorities under U.S. law." Gov't's Reply, Ex. 3, Decl. of Associate Director of the Office of International Affairs of Department of Justice's Criminal Division ("DOJ Decl.") ¶ 17, ECF No. 14-3 (No. 18-175). These discussions did not result in the production of the requested documents.

### D.    The Government's Motions to Compel

As already outlined, in November 2018, the United States government filed a motion to compel compliance with each of the three subpoenas. *See generally* Gov't's Mot.–Bank One; Gov't's Mot.–Bank Two; Gov't's Mot.–Bank Three. Briefing continued through the end of February 2019, at which time the banks all filed a sur-reply. *See generally* Bank One's Sur-Reply; Bank Two's Sur-Reply; Bank Three's Sur-Reply.

While briefing was underway, the MOJ sent two letters to the Court. In the first, the MOJ committed to "timely review and handle the requests for assistance sought by DOJ in accordance with the [MLAA] and applicable domestic law. For the request in line with the [MLAA], China will provide the assistance to the United States accordingly." *See,* Jan. 6, 2019 MOJ Ltr. at 4. In the second, the MOJ restated that "if the DOJ makes a MLA[A] request in the present case, the MOJ will promptly review and process it. To be more specific, if such a US request complies with the applicable provisions of the [Law of the People's Republic of China on International Legal Assistance in Criminal Matters] and the MLAA, the MOJ will promptly transfer the request to Competent Authorities of China for further review and execution." Feb. 26, 2019 MOJ Ltr. at 3.

On March 5, 2019, the Court held a hearing with all three banks. Following the hearing, the government, Bank One, and Bank Two submitted supplemental briefing about whether those two banks, in the process of seeking authorization from the Board of Governors of the Federal Reserve System ("Federal Reserve") to open United States branches, had filed a consent to personal jurisdiction that covered this matter. *See generally* Gov't's Suppl.–Bank One; Gov't's Suppl.–Bank Two; Bank One's Suppl.; Bank Two's Suppl.

With the briefing and hearing now complete, the motions are ripe for resolution.

## II.    LEGAL STANDARD

If compliance with a grand jury subpoena "would be unreasonable or oppressive," a court may quash or modify the subpoena. FED. R. CRIM. P. 17(c)(2). A subpoena might be unreasonable or oppressive if compliance would violate foreign law. *In re Grand Jury Subpoena*, 912 F.3d 623, 633 (D.C. Cir. 2019). Issues of foreign law are questions of law and, as the parties relying on foreign law, the banks must show that Chinese law would prevent compliance with the court's order. *Id.* (citing *In re Sealed Case*, 825 F.2d 494, 498 (D.C. Cir. 1987)); *see also United States v. R. Enterprises, Inc.*, 498 U.S. 292, 301 (1991) ("[A] grand jury subpoena issued through normal channels is presumed to be reasonable, and the burden of showing unreasonableness must be on the recipient who seeks to avoid compliance.").

As for the administrative subpoena, the court's role "is a strictly limited one." *Resolution Tr. Corp. v. Thornton*, 41 F.3d 1539, 1544 (D.C. Cir. 1994). Courts "consider only whether 'the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant.'" *Id.* (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)). "Accordingly, a court must look to the authorizing statute in determining whether a given subpoena may be enforced." *United States v. Apodaca*, 251 F. Supp. 3d 1, 8 (D.D.C.

9

2017); *see also United States v. Newport News Shipbuilding & Dry Dock Co.*, 837 F.2d 162,

165–66 (4th Cir. 1988) ("Here, the subpoena is deficient because it exceeds the proper scope of

DCAA's statutory authority.").  Yet, the Court's inquiry "is neither minor nor ministerial."

*Resolution Tr. Corp.*, 41 F.3d at 1544.

## III.    DISCUSSION

The government's motions to compel compliance present two principle issues: First,

whether the subpoenas are enforceable, which, in turn, depends on whether the banks are subject

to this Court's jurisdiction and whether the subpoena issued to Bank Three exceeds the

government's authority under 31 U.S.C. § 5318.  Second, even if the subpoenas are enforceable

against the three banks, whether such enforcement is reasonable, as a matter of international

comity.  Those issues are addressed in that order.

### A.    Personal Jurisdiction

To direct an entity, or its representative, to come before a grand jury, the district court

must have personal jurisdiction over the entity.  *In re Sealed Case* ("*Sealed Case II*"), 832 F.2d

1268, 1272 (D.C. Cir 1987) *abrogated on other grounds by Braswell v. United States,* 487 U.S.

99 (1988).  That limitation on a court's authority to proceed against a party enforces the

Constitution's Due Process Clauses.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564

U.S. 915, 923 (2011).  As explained below, each bank is subject to the personal jurisdiction of

this Court because both Bank One and Bank Two have consented to the exercise of such

jurisdiction and, even if those two banks had not given consent, all three banks have sufficient

minimum contacts with the relevant forum, which here is the United States, for the exercise of

such jurisdiction.

### 1.     *Consent to Jurisdiction by Bank One and Bank Two*

For two of the banks—Bank One and Bank Two—personal jurisdiction is

straightforward: each has consented to personal jurisdiction.  Those two banks, while applying to

the Federal Reserve to open a branch in the United States, "consent[ed] to the jurisdiction of the

federal courts of the United States and of all United States governmental agencies, departments

and divisions for purposes of any and all claims made by, proceedings initiated by, or obligations

to, the United States, the Board, and any other United States governmental agency, department or

division, in any matter arising under U.S. Banking Law."  Gov't's Suppl.–Bank One, Ex. A.,

Consent to Jurisdiction–Bank One at 1, ECF No. 29-1 (No. 18-175); *accord* Gov't's Suppl.–

Bank Two, Ex. A., Consent to Jurisdiction–Bank Two, ECF No. 25-1 (No. 18-176).[7]  Each

consent expressly defines "U.S. Banking law" to include, among other things, the Bank Secrecy

Act.  *See* Consent to Jurisdiction–Bank One at 2–3 n.2; Consent to Jurisdiction–Bank Two at 1–2

n.2.   Those consents apply here, the government argues, because the subpoenas have been

issued in conjunction with an investigation into possible violations of the Bank Secrecy Act,

namely: 31 U.S.C. § 5318.  Gov't's Suppl.–Bank One at 3–4; Gov't's Suppl.–Bank Two at 3–4.[8]

Bank One argues that consent to the "jurisdiction of the federal courts of the United

States" does not mean what it says, but rather means "consent to the jurisdiction of *some* federal

court (e.g., a federal court having a connection to the matter at issue) though not necessarily *any*

*and every* federal court."  Bank One's Suppl. at 4 (emphasis in original).[9]  The limitation that

---

[7]      The only difference between the relevant language in the two consents is that Bank One's consent refers to the "Board," while Bank Two's refers to the "Board of the Governors of the Federal Reserve System."
[8]      These consents were discovered at the Court's prodding.  *See* Min. Order (Mar. 4, 2019).  Although the government did not learn of the consents in time to discuss them in the motions to compel, the government has not waived the argument that the banks' consents apply here since the government had no reason to know of the banks' consents, which were in the custody of the banks themselves and the Federal Reserve.
[9]      Bank One also argues that the consents violate the "unconstitutional conditions doctrine," Bank One's Suppl. at 3–4, which prevents "the government from coercing people into giving [enumerated rights] up," or from "burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them,"

Bank One tries to read into the consent does not exist.  Additionally, in this case, for reasons

explained in Section III.A.2, *infra*, federal judicial districts cannot be distinguished for purposes

of personal jurisdiction.

Bank Two, for its part, tries to avoid the consent by arguing that the Bank Secrecy Act

cannot apply here because [REDACTED] is not a financial institution under the Bank Secrecy

Act, the Bank Secrecy Act does not apply extraterritorially to an entity, like [REDACTED],

without United States operations, and the consent should be read as limited only to instances in

which the bank itself is accused of wrongdoing.  Bank Two's Suppl. at 6–7.  Bank Two's

arguments elide too much context.  First, [REDACTED] is not the only subject of the

investigation.  [REDACTED] is another.  Second, the government's investigation is still before

the grand jury.  At this stage, the government need not prove violations of the Bank Secrecy Act,

or who may have violated the statute, for the enforcement action to arise under United States

banking law.  "[T]o establish jurisdiction for purposes of enforcing a grand jury subpoena, the

[government] need not prove what would be necessary to confer jurisdiction over the companies

for purposes of trial. . . .  [S]o stringent a requirement 'might well invert the grand jury's

function, requiring that body to furnish answers to its questions before it could ask them."

*Sealed Case II*, 832 F.2d at 1274 (quoting *In re Grand Jury Proceedings (Harrisburg Grand

Jury 79-1)*, 658 F.2d 211, 214 (3d Cir. 1981)); *accord In re Grand Jury Subpoena*, 912 F.3d at

632; *see also In re M.H.*, 648 F.3d 1067, 1071 (9th Cir. 2011) ("M.H. argues that–for a number

---

*Koontz v. St. Johns River Water Management Dist*, 570 U.S. 595, 604, 606 (2013); *see also Autor v. Pritzker*, 740
F.3d 176, 181 (D.C. Cir. 2014) ("Even though a person has no 'right' to a valuable governmental benefit and even
though the government may deny him the benefit for any number of reasons, . . . [it] may not deny a benefit to a
person on a basis that infringes his constitutionally protected interests.").  So, for example, the government cannot
condition a benefit, such as a land use permit, on the relinquishment of a right that is less valuable than the benefit;
the unconstitutional conditions doctrine would prohibit such "[e]xtortionate demands."  *Koontz*, 740 F.3d at 604–05.
Bank One makes no effort to illuminate why a narrow consent to jurisdiction in exchange for the right to access the
United States financial market is coercive.

Material Under Seal Deleted

of reasons—[a Bank Secrecy Act regulation] does not apply to him, so he is not required to

comply with the grand jury's subpoena . . . .   But at this point in its investigation, the

Government need not prove the regulation or the [Bank Secrecy Act] apply.").  Finally, nowhere

does the consent's text suggest that the bank must itself be the entity investigated for violating

United States banking law.  Simply put, the motions to compel are "proceedings initiated by . . .

the United States . . . in [a] matter arising under U.S. Banking law."

　　　In short, both Bank One and Bank Two have expressly consented to the exercise of

personal jurisdiction in this proceeding.

### 2.　Each Bank Has Sufficient Minimum Contacts with the Relevant Forum for the Exercise of Personal Jurisdiction

　　　If, however, the consent forms are ineffectual, Bank One and Bank Two are on similar

footing as Bank Three, which has never has submitted any consent to the Federal Reserve.  In

that case, personal jurisdiction over the banks may take one of two forms: "general or all-purpose

jurisdiction" or "specific or case-linked jurisdiction."  *Goodyear*, 564 U.S. at 919.  Here, the

government argues only that the banks are subject to specific personal jurisdiction in this Court.

Gov't Mot.–Bank One at 9–10 n.7; Gov't Mot.–Bank Three at 10 n.9.  Specific personal

jurisdiction has two prerequisites: the entity must have "[1] certain minimum contacts with [the

forum] such that [2] the maintenance of the suit does not offend traditional notions of fair play

and substantial justice."  *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014).  A court may

exercise specific jurisdiction over an entity only as to matters that "aris[e] out of or relat[e] to the

defendant's contacts with the *forum*."  *Bristol-Myers Squibb Co. v. Superior Court of Cal., S.F.

Cty.*, 137 S. Ct. 1773, 1780 (2017) (emphasis in original).  "In other words, there must be 'an

affiliation between the forum and the underlying controversy, principally, [an] activity or an

occurrence that takes place in the forum State and therefore is subject to the State's regulation."
*Id.* (quoting *Goodyear*, 564 U.S. at 919).

Each of the three banks contests that the necessary contacts with District of Columbia are present and therefore each contends that being subjected to jurisdiction in the District of Columbia is unfair. The government considers the banks' focus on the District of Columbia as misplaced since the relevant forum for consideration of personal jurisdiction is the United States as a whole. Gov't Mot.–Bank One at 10; Gov't Mot.–Bank Three at 10. The Court is persuaded that the government is correct and that the banks' contacts with the United States are the measure of whether personal jurisdiction may be exercised here.

*a)    Defining the Relevant Forum*

The first step in determining whether a party has adequate contacts for personal jurisdiction is identifying the forum with which the contacts must be assessed. For a case subject to the Fourteenth Amendment's Due Process Clause, personal jurisdiction depends on the party's "relationship to the forum State." *Bristol-Myers Squibb*, 137 S. Ct. at 1779. Conversely, for a case governed by the Fifth Amendment's Due Process Clause, the relevant forum is the United States. *Livnat v. Palestinian Authority*, 851 F.3d 45, 54–55 (D.C. Cir. 2017). As the D.C. Circuit explained in *Livnat*, "[t]he only difference in the personal-jurisdiction analysis under the two Amendments is the *scope* of the relevant contacts: Under the Fourteenth Amendment, which defines the reach of state courts, the relevant contacts are state-specific. Under the Fifth Amendment, which defines the reach of federal courts, contacts with the United States as a whole are relevant." *Id.* at 55 (emphasis in original).

Which constitutional amendment governs depends on how service may be accomplished. *See Livnat*, 851 F.3d at 54 (explaining that the constitutional analysis was governed by Fifth

14

Material Under Seal Deleted

Amendment because Federal Rule of Civil Procedure 4(k)(2), rather than Rule 4(k)(1), applied).

When the "court exercises personal jurisdiction by virtue of a federal statute authorizing

nationwide service of process" the Fourteenth Amendment, and thus the "requirement of

'minimum contacts' with a forum state is inapplicable." *S.E.C. v. Bilzerian*, 378 F.3d 1100,

1106 n.8 (D.C. Cir. 2004). Instead, the Fifth Amendment applies. *Livnat*, 851 F.3d at 54; *see*

*also Abelesz v. OTP Bank*, 692 F.3d 638, 655–56 (7th Cir. 2012) ("Plaintiffs have attempted to

support general personal jurisdiction over MKB and OTP by examining all of their contacts with

the United States as a whole . . . . Under Rule 4(k)(2) of the Federal Rule of Civil Procedure,

plaintiffs may do so, at least regarding their claims arising under federal or international law.");

*United Elec. v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1085 (1st Cir. 1992) ("When a district

court's subject matter jurisdiction is founded upon a federal question, the constitutional limits of

the court's personal jurisdiction are fixed, in the first instance, not by the Fourteenth Amendment

but by the Due Process Clause of the Fifth Amendment."); *Wultz v. Islamic Republic of Iran*

("*Wultz I*"), 755 F. Supp. 2d 1, 32 (D.D.C. 2010) (ruling that the Fifth Amendment governed

personal jurisdiction for case brought under Antiterrorism Act, which includes a national-

service-of-process provision).

  The Fifth Amendment controls here, the government contends, because the Court's

power to enforce the three subpoenas derives from federal authority permitting nationwide

service of process. *See* Gov't's Mot.–Bank One at 10 ("When considering specific personal

jurisdiction under a federal statute that allows for nationwide service, such as a grand jury

subpoena, the forum for which a court examines the party's contacts is the entire United States,

rather than a specific district."); Gov't's Mot.–Bank Three at 10 ("When considering specific

personal jurisdiction under a federal statute that allows for nationwide service, such as an

administrative subpoena issued pursuant to 31 U.S.C. § 5318(k)(3), the forum for which a court examines the party's contact is the entire United States, rather than a specific district."). The merits of the government's position are considered first for the grand jury subpoenas and second for the administrative subpoena.

i)  *Grand Jury Subpoenas*

Bank One's and Bank Two's initial opposition briefs each challenged being subject to this Court's exercise of personal jurisdiction, but, at best, each ignored that the United States might be the relevant forum for minimum contacts.[10]  Bank One conceded "avail[ing] itself of the U.S. banking system to process certain transactions," but argued that availment did not matter for personal jurisdiction because "the discovery sought in the Subpoena is not limited to those transactions . . . ."  Bank One's Opp'n at 6.  In certain respects, Bank One's brief actually signaled agreement that the relevant forum is the United States.  *See* Bank One's Opp'n at 4–5 ("In cases involving the enforcement of a grand jury subpoena, courts need not look to a state's long-arm statute when the subject of a grand jury's investigation is the possible violation of federal statutes.").  Similarly, Bank Two contested this Court's jurisdiction because the bank's contact with the District of Columbia is incidental to the records sought.  Bank Two's Opp'n at 38–39.  As an initial matter, then, these two banks have waived any argument against the United States being the relevant forum.  *In re Asemani*, 455 F.3d 296, 300 (D.C. Cir. 2006) ("Asemani's first argument . . . is waived because it was made for the first time in his reply brief.").

Only in their sur-replies did Bank One and Bank Two offer a response to the government's contention that the jurisdictional forum is the United States.  Even indulging those belated arguments, they fail on the merits.  In its sur-reply, Bank One notes that the government

---

[10]    In an egregious mischaracterization, Bank One's sur-reply suggests that its opposition to the government's argument that the United States is the appropriate forum was "implicit."  Bank One's Sur-Reply at 3 n.1.

is investigating possible violations of 18 U.S.C. § 1956, 50 U.S.C. § 1705, and 31 U.S.C. § 5318,

and that none of those three statutes permits nationwide service of process.  Bank One's Sur-

Reply at 3.  Similarly, Bank Two argues that "to the extent that the Government can identify

applicable federal criminal statutes that permit nationwide services of process, it still would need

to demonstrate that these statutes permit the exercise of jurisdiction over non-parties who are not

accused of having violated the statutes."  Bank Two's Sur-Reply at 11.  Those criminal statutes,

however, are irrelevant.  This is an action to enforce subpoenas and, thus, jurisdiction depends on

whether the subpoenas may be served nationwide.  *See Gucci America Inc. v. Weixing Li* ("*Gucci*

*II*"), 768 F.3d 122, 142 n.21 (2d Cir. 2014) (identifying Federal Rule of Civil Procedure

45(b)(2)'s national service provision as the relevant authority for whether jurisdiction depends on

contacts with the entire United States); *see also In re Sealed Case*, 141 F.3d 337, 340–41 (D.C.

Cir. 1998) (determining jurisdiction to transfer a motion to quash a civil subpoena based on text

of Federal Rule of Civil Procedure 45).

     Relegated to a single sentence of a footnote, *see* Bank One's Sur-Reply at 4 n.2, Bank

One conveys an understanding that jurisdiction here does not turn on the specific crimes the

grand jury is investigating, but rather is a function of Federal Rule of Criminal Procedure 17,

which governs federal grand jury subpoenas, *see* Dep't of Justice Manual § 9-11.140

("Subpoenas in Federal proceedings, including grand jury proceedings, are governed by Rule 17

of the Federal Rule of Criminal Procedure.").  Under that procedural rule, "[a] subpoena

requiring a witness to attend a hearing or trial may be served at any place within the United

States."  FED. R. CRIM. P. 17(e).  Plainly, a grand jury subpoena may be served nationwide.

     Still, Bank One maintains that Federal Rule of Criminal Procedure 17(e) does not apply

here because that rule "allow[s] nationwide service only for subpoenas to compel attendance at a

hearing or trial." Bank One's Sur-Reply at 4 n.2. Bank One's argument is bewildering because

the subpoena Bank One received was a "Subpoena to Testify before a Grand Jury," which

commanded a witness "to appear in this United States district court at the time, date, and place

shown below." *See* Grand Jury Subpoena. While the subpoena also required the witness to

bring documents, *id.*, a criminal subpoena may include such an order. *See* FED. R. CRIM. P.

17(c). In the end, compelling Bank One to comply might result only in the production of

documents, but that is true only as a matter of courtesy. The government's cover letter, sent with

the subpoena, communicated that, "if it is more convenient for you, you may send the requested

records to the undersigned United States Attorney in lieu of personally appearing before the

Grand Jury on the date indicated." *See* Bank One's Opp'n, Ex. 1, Grand Jury Subpoena Ltr.,

ECF No. 6-1 (No. 18-175).

     At bottom, Federal Rule of Criminal Procedure 17(e) allows for the grand jury subpoena

that Bank One and Bank Two each received to be served nationwide. Therefore, personal

jurisdiction depends on each banks' contacts with the United States.

### ii) Administrative Subpoena

     Like Bank One and Bank Two, Bank Three's initial opposition brief gave short-shrift to

the possibility that the relevant jurisdictional forum is the United States. While Bank Three

spent several pages discounting its contact with the District of Columbia, *see* Bank Three's

Opp'n at 11–15, the bank spent just a single footnote attacking that personal jurisdiction to

enforce an administrative subpoena that can be served nationwide depends on national contacts,

*id.* at 15 n.4. D.C. Circuit precedent, Bank Three insisted, did not support the government's

position. *Id.* On that front, Bank Three is wrong. *See Bilzerian*, 378 F.3d at 1106 n.8 ("The

Circuit has held that the requirement of 'minimum contacts' with a forum state is inapplicable

where the court exercises personal jurisdiction by virtue of a federal statute authorizing

nationwide service of process. . . .  In such circumstances, minimum contacts with the United

States suffice." (citing *Briggs v. Goodwin*, 569 F.2d 1, 8–10 (D.C. Cir. 1980) *rev'd sub nom. on*

*other grounds, Stafford v. Briggs,* 444 U.S. 527 (1980)); *see also Bricklayers & Trowel Trades*

*Int'l Pension Fund v. Kel-Tech Constr., Inc.*, 319 F. Supp. 3d 330, 339 (D.D.C. 2018) (citing

*Bilzerian* for same conclusion); *Bally Gaming, Inc. v. Kappos*, 789 F. Supp. 2d 41, 45–46

(D.D.C. 2011) (same).

    In light of this precedent, Bank Three's sur-reply changes course, arguing that 31 U.S.C.

§ 5318(k)(3)(A) "does *not* expressly authorize nationwide service."  Bank Three's Sur-Reply at

20 (emphasis in original).  That tardy argument is waived.  *In re Asemani*, 455 F.3d at 300

("Asemani's first argument . . . is waived because it was made for the first time in his reply

brief.").

    Even if not waived, the argument Bank Three advances is unpersuasive.  A subpoena

under 31 U.S.C. § 5318(k)(3)(A)(ii) may be served "on the foreign bank in the United States if

the foreign bank has a representative in the United States."  That text does not introduce

geographic limits on where in the United States service may be accomplished.  True, service may

be accomplished in the United States only "if the foreign bank has a representative in the United

States," but that language is not meaningfully restrictive as all foreign banks that maintain a

correspondent account in the United States "shall maintain . . . the name and address of a person

who resides in the United States and is authorized to accept service of legal process for records

regarding the correspondent account."  31 U.S.C. § 5318(k)(3)(B)(i).  That provision permits the

representative to reside anywhere in the United States.  Thus, together, the statute requires that

19

Material Under Seal Deleted

all foreign banks with a correspondent account in the United States must have a representative in

the United States, and service may be accomplished wherever that representative is stationed.

Comparing 31 U.S.C. § 5318(k)(3) against other parts of the same section, in Bank

Three's view, reinforces the bank's restrictive reading. Bank Three's Sur-Reply at 21. Just the

opposite is true. Under 31 U.S.C. § 5318(a)(3), (4), the Secretary of Treasury may summon the

representative of a financial institution to appear and produce a subset of the institution's

financial records. That summons "may require that books, papers, records, or other data stored

or maintained at any place be produced at any designated location in any State or in any territory

or other place subject to the jurisdiction of the United States not more than 500 miles distant

from any place where the financial institution or nonfinancial trade or business operates or

conducts business in the United States." 31 U.S.C. § 5318(c)(1). Thus, Congress expressly

limited service provisions elsewhere in the statute. Similar territorial limits are notably absent

from 31 U.S.C. § 5318(k)(3), reflecting an intended broader reach.

Elsewhere in the statute, the Attorney General is authorized to initiate compliance

proceedings against a financial institution's representative if the financial institution refuses the

Secretary of Treasury's summons issued under 31 U.S.C. § 5318(a)(3), (4). *Id.* § 5318(e).

Process for the compliance proceeding "may be served in any judicial district in which such

person may be found." *Id.* § 5318(e)(5). Bank Three sees this text as the sort of express

authorization of nationwide service missing from 31 U.S.C. § 5318(k)(3), Bank Three's Sur-

Reply at 21, but permitting service in "in any judicial district" is no broader than permitting

service "in the United States." Moreover, the statute explicitly confers jurisdiction over the

compliance proceeding to the court sitting either where "the investigation which gave rise to the

summons is being or has been carried on; the person summoned is an inhabitant; or the person

20

Material Under Seal Deleted

summoned carries on business or may be found." *See* 31 U.S.C. § 5318(e)(2). Bank Three

considers this a "broad jurisdictional provision" and underscores that "no such broad language—

indeed, no language specifically addressing personal jurisdiction—exists in Section 5318(k)."

Bank Three's Sur-Reply at 21. Yet, Bank Three has turned the actual import of 31 U.S.C.

§ 5318(e)(2) upside down. Section 5318(e)(2) *limits* jurisdiction to three districts, despite 31

U.S.C. § 5318(e)(5)'s nationwide service provision. No similar limits were attached to a

proceeding to enforce a subpoena under 31 U.S.C. § 5318(k)(3).

     Thus, Congress provided for nationwide service of a subpoena issued to a foreign bank

that maintains a correspondent account in the United States. Personal jurisdiction over Bank

Three, like Bank One and Bank Two, depends on the bank's contacts with the United States.

*b)*    *Minimum Contacts*

     Moving to each bank's United States contacts, personal jurisdiction exists only if each

bank has "'purposefully availed itself of the privilege of conducting activities within the forum

State' or [] purposefully directed its conduct into the forum States." *Bristol-Myers Squibb*, 137

S. Ct. at 1785–86 (quoting *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 877 (2011)).

For purposes of jurisdiction to enforce a subpoena, the government need only show "that there is

a reasonable probability it will succeed in establishing the fact necessary for the exercise of

jurisdiction." *Sealed Case II*, 832 F.2d at 1274 (quoting *Marc Rich & Co. v. United States*, 707

F.2d 663, 770 (2d Cir. 1983)).

     The government hangs personal jurisdiction here on the banks having "availed

themselves of the privileges of conducting transactions in U.S. dollars via correspondent

accounts in the United States." Gov't's Mot.–Bank One at 12; *accord* Gov't's Mot.–Bank Three

at 12–13. In particular, between October 2012 and January 2015, [REDACTED] conducted: 323

21

Material Under Seal Deleted

transactions through Bank One's United States correspondent account, worth $45,779,669.50,
*see* Gov't's Mot.–Bank One at 2–3; *see also* FBI Decl. ¶ 13; 15 transactions through Bank Two's
United States correspondent account, worth $1,627,909.34, *see* Gov't's Mot.–Bank One at 2–3;
*see also* FBI Decl. ¶ 13; and 388 transactions through Bank Three's correspondent account,
worth $57,931,904.75, *see* Gov't's Mot.–Bank Three at 2–3; *see also* FBI Decl. ¶ 13.

      Previously, the D.C. Circuit has described a bank that does "considerable business in the
United States" as "plainly [having] the 'minimum contacts' with this country to establish
jurisdiction." *Sealed Case II*, 832 F.2d at 1273 n.3.  Given that the banks' respective opposition
briefs fixated on contacts with the District of Columbia, none disputed that the correspondent
banking activity qualifies as purposeful availment of the United States.  Instead, to the extent any
discussed national contacts, Bank One admitted that it "has availed itself of the U.S. banking
system to process certain transactions."  Bank One's Opp'n at 6.  Similarly, Bank Two, to create
distance from the District of Columbia, highlighted that "[t]o the extent [Bank Two] has any
contacts with the United States it is with New York, not Washington D.C."  Bank Two's Opp'n
at 38.  Finally, Bank Three confessed to "maintain[ing] correspondent accounts with banks in the
United States, including the account identified in the subpoena, to process U.S. dollar
transactions."  Bank Three's Opp'n at 4 (citing Bank Three GM Decl. ¶ 10); *id.* at 14–15 ("The
government also suggests that this Court has personal jurisdiction because [Bank Three] has
engaged in transactions through its correspondent account in New York. . . .  But those
transactions have no nexus to the District of Columbia and thus cannot give rise to personal
jurisdiction there.").  Of course, since the relevant forum is the United States, each bank's
connections with any part of the country suffice.

Bank Three cites one case from this district ruling that "[t]he Court . . . is at a loss as to

how the existence of [correspondent] bank accounts in *New York* can possibly establish the

banks' presence in the *District of Columbia*."  Bank Three's Opp'n at 14 (quoting *Day v. Cornér*

*Bank (Overseas) Ltd.*, 789 F. Supp. 2d 150, 156 (D.D.C. 2011) (emphasis in original).  *Cornér*

*Bank* is irrelevant twice over.  First, the quoted passage pertained to general jurisdiction.  *Cornér*

*Bank*, 789 F. Supp. 2d at 155–57.  That same distinction renders two other cases Bank Three

cites inapt.  *See In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 680 (2d Cir. 2013)

("Furthermore, we conclude that the alleged use of correspondent bank accounts and the

maintenance of a website that allows account holders to manage their accounts are insufficient to

support the exercise of general personal jurisdiction over NCB."); *Abelesz*, 692 F.3d at 658

("[M]any courts have soundly rejected the suggestion that a correspondent banking relationship

is sufficient to support general jurisdiction over a foreign defendant.").  Second, in *Cornér Bank*

the Court engaged in a personal jurisdiction analysis under the Fourteenth, rather than the Fifth,

Amendment.  *Cornér Bank,* 789 F. Supp. 2d at 155 (treating the District of Columbia as the

relevant jurisdictional forum); *id.* at 157 ("Because this case is before the Court based on

diversity jurisdiction . . . the Court looks to DC's long-arm statute.").

Of course, the banks' United States banking activity must relate to the matter over which

the Court will exercise jurisdiction.  *See Bristol-Myers Squibb*, 137 S. Ct. at 1786.  Without that

connection, jurisdiction is missing.  *See Leibovitch v. Islamic Republic of Iran*, 852 F. 3d 687,

690 (7th Cir. 2017) (refusing to exercise personal jurisdiction because "subpoenas issued in this

case are not tailored to the banks' presence or activities in the United States"); *Wultz I*, 755 F.

Supp. 2d at 33–34 (D.D.C. 2010) (distinguishing between banks with knowledge that customer

accounts were funding terrorist activity and banks without such knowledge for purposes of

personal jurisdiction over banks sued under the Antiterrorism Act); *Tamam v. Fransabank Sal*,

677 F. Supp. 2d 720, 727–28 (S.D.N.Y. 2010) (rejecting specific personal jurisdiction despite

correspondent banking activity because the complaint did not allege that any of the defendants

transferred money through the correspondent accounts). The opposite, however, also is true:

correspondent banking activity suffices for specific personal jurisdiction when the exercise of

that jurisdiction pertains to the correspondent banking activity. *See Licci ex rel. Licci v.

Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170–71 (2d Cir. 2013) (concluding that personal

jurisdiction existed based on correspondent banking activity when use of correspondent accounts

were "part of the principal wrong at which the plaintiffs' lawsuit is directed"); *Gucci America,

Inc. v. Weixing Li* ("*Gucci III*"), 135 F. Supp. 3d 87, 97–99 (S.D.N.Y. 2015) (finding that court

had jurisdiction to enforce Rule 45 subpoena against Bank of China for records evidencing

conduct directly related to the alleged injury); *Correspondent Servs. Corp. v. J.V.W. Inves. Ltd.*,

120 F. Supp. 2d 401, 405 (S.D.N.Y. 2000) (finding that when correspondent banking activity "is

at the very root of the action" it may "give[] rise to personal jurisdiction"). Each subpoena in

this case seeks records about [REDACTED]'s use of the three banks' correspondent accounts to

conduct transactions in the United States. Indeed, [REDACTED]'s use of the United States

financial system is "the gravamen of this case." Gov't Reply at 11.

Accordingly, the subpoenas are directly related to the minimum contacts that permit the

exercise of jurisdiction.

c)    *Fair Play and Substantial Justice*

Finally, the exercise of personal jurisdiction over any of the banks must not "offend

traditional notions of fair play and substantial justice." *Goodyear*, 564 U.S. at 923. Said

differently, the parties must have "fair warning that a particular activity may subject them to the

24

jurisdiction of a foreign sovereign." *Livnat*, 851 F.3d at 48. Whether jurisdiction is fair and just

accounts for "the burden on the defendant, the interest of the forum State, and the plaintiff's

interest in obtaining relief" as well as "efficient resolution of controversies" and "the procedural

and substantive policies of other nations whose interests are affected by the assertion of

jurisdiction." *Asahi Metal Industry Co., Ltd. v. Superior Court of Cal., Solano Cty.*, 480 U.S.

102, 113, 115 (1987). Any party that has constitutionally sufficient contacts with a forum "must

present a compelling case that the presence of some other considerations would render

jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

     Generally, the banks advance that the exercise of jurisdiction here would be unfair

because the potential upshot of jurisdiction is a burdensome order compelling the production of

records that are housed in China, *see* Bank One's Opp'n at 7, and cannot be disclosed without

violating Chinese law, *see id.* at 8; Bank Two's Opp'n at 38; Bank Three's Opp'n at 16.

Imposing such a burden is unnecessary, in the banks' view, given that the MLAA is an efficient

alternative, *see* Bank One's Opp'n at 9–10; Bank Two's Opp'n at 38; Bank Three's Opp'n at 16–

17. Additionally, forcing the banks to divulge client information undermines China's interests in

a secure banking system, *see* Bank One's Opp'n at 8, and might lead to reciprocal consequences,

Bank Three's Opp'n at 17.

     None of the banks' own interests, or those of China, match the United States' much

stronger interest in the exercise of jurisdiction. Consequently, subjecting the banks to this

Court's jurisdiction is, simply put, not unfair. Indeed, two of the banks consented to personal

jurisdiction for matters arising under United States banking law. *See* Consent to Jurisdiction–

Bank One; Consent to Jurisdiction–Bank Two. Beyond that, each bank has funneled over a

million dollars through the United States on behalf of [REDACTED]. As the Second Circuit has

Material Under Seal Deleted

said about such correspondent banking activity, "[i]t should hardly be unforeseeable to a bank

that selects and makes use of a particular forum's banking system that it might be subject to the

burden of a lawsuit in that forum for wrongs related to, and arising from, that use." *Licci*, 732

F.3d at 171–72.  As another Judge on this Court has held, "[w]ith regard to [Bank of China's]

capacity to foresee suit in the District of Columbia, the Court notes that [Bank of China] is a

sophisticated international financial institution that plaintiffs allege 'has branches in California

and New York, does extensive business throughout the United States[,] and holds significant

assets in the United States.' . . .  As such, it is reasonable to presume that [Bank of China] is fully

aware of U.S. law concerning financial institutions . . . ." *Wultz I*, 755 F. Supp. 2d at 34.  All the

same considerations hold here.

Nor would enforcement impose onerous logistical burdens on any of the banks.  The

government has offered Bank One and Bank Two the option of simply mailing the requested

records.  *See* Grand Jury Subpoena Ltr. ("Although you are not required to do so, if it is more

convenient for you, you may send the requested records to the undersigned United States

Attorney in lieu of personally appearing before the Grand Jury on the date indicated.").

Similarly, the administrative subpoena calls only for Bank Three to produce records.  Admin.

Subpoena ("Compliance can be made by mailing the requested documents via courier . . . .").

None of the banks contends that locating those records will be difficult.  To the contrary, Bank

Two has given assurances that the requested documents can be collected in days, *see* Bank

Two's Opp'n at 16; Bank Two's Sur-Reply at 3, and Bank Three "took steps to collect and

preserve documents" shortly after receiving the subpoena, *see* Bank Three GM Decl. ¶ 14;

*accord* Mar. 23, 2018 U.S. Counsel Ltr. at 1–2.  Bank One estimated that the documents could

be collected within 30 days.  Mar. 5, 2019 Tr. at 47:3–7, ECF No. 28 (No. 18-175).  With the

Material Under Seal Deleted

documents already, or easily, collected, now the banks need only put them in the mail, hardly a

burden.  To the extent that further legal issues will arise from enforcement of the subpoenas, the

well-resourced banks are all fully able to ensure adequate representation of their interests.

Additionally, for reasons discussed more thoroughly in Section III.C.2, *infra*, the

remainder of the banks' specific arguments are unavailing: the risk that any of the banks will be

penalized in China for complying with the subpoenas is overblown; the United States, which

seeks these records as part of an investigation into North Korea's nuclear weapons program, does

not have an alternative route to obtain them since the MLAA, at least for banking records, is

unproductive; and while China does have a legitimate interest in a sound financial system,

Chinese law permits the disclosure of banking records in analogous circumstances and therefore

appreciates that banking systems do not crumble because the government can obtain some

records for law enforcement purposes.

*     *     *     *     *

All told, each bank has purposefully availed itself of the United States financial market

through correspondent banking activity, including transactions on behalf of [REDACTED].  The

subpoenas are for records related to that activity.  Nothing about the exercise of jurisdiction is

unjust under those circumstances.

### B.    Statutory Authority for Administrative Subpoena

Separate from personal jurisdiction, Bank Three argues that the 31 U.S.C. § 5318(k)(3)

subpoena it received is unenforceable because the subpoena goes beyond what the statute

permits.  In other words, the bank contends that the inquiry is not within the agency's authority.

*See Resolution Tr. Corp.*, 41 F.3d at 1544.

Under the USA Patriot Act, Congress authorized the Attorney General and Secretary of

Treasury to subpoena records from a foreign bank that maintains a correspondent account in the

27

Material Under Seal Deleted

United States, but only "records related to such correspondent account, including records maintained outside the United States relating to the deposit of funds into the foreign bank." 31 U.S.C. § 5318(k)(3)(a)(i). According to Bank Three, the subpoena in this case, which requests "[a]ll documents relating to correspondent banking transactions for [REDACTED]" as well as "[a]ll documents relating to correspondent banking transactions for" a specific account number, *see* Admin. Subpoena, "is not restricted to 'records related' to a correspondent account 'in the United States,' but rather appears to address *any* correspondent account, including accounts located abroad that have no relation to the United States." Bank Three's Opp'n at 33 (emphasis in original); *see also* Bank Three's Sur-Reply at 4. Bank Three has correspondent accounts in countries other than the United States, and the subpoena covers those accounts too. Bank Three's Sur-Reply at 4. Additionally, Bank Three continues, the subpoena, by encompassing signature cards, account ledgers cards, account statements, and due diligence records for the target account and transactions, is not limited to records related to Bank Three's correspondent account in the United States. Bank Three's Opp'n at 35; Bank Three's Sur-Reply at 4.[11]

Two flaws erode the strength of Bank Three's contention. First, the bank's insistence that every record encompassed by the subpoena must itself "relate to" a correspondent bank account in the United States entirely ignores the final clause of 31 U.S.C. § 5318(k)(3)(a)(i), which authorizes subpoenas for "records maintained outside the United States relating to the deposit of funds into the foreign bank." Bank Three cites that clause at the outset of its

---

[11]      Bank Three also asserts that "the subpoena is overly broad because the documents it requests are not tailored to any reasonable timeframe." Bank Three's Opp'n at 36. Yet, the subpoena goes back only to 2012. [REDACTED]'s correspondent banking activity stretches back until at least October 2012, and [REDACTED] was designated in [REDACTED]. As the government explains, "[l]aw enforcement needs to review records prior to the initial and final months of known U.S.-dollar transfers to learn where and how [REDACTED] initially drew in and then ultimately sent out illicit proceeds from its [Bank Three] account." Gov't's Reply at 39 (citing FBI Decl. ¶¶ 76–77). This explanation for why the government is seeking records from 2012 "is not 'obviously wrong'" and thus "must be accepted." *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1089 (D.C. Cir. 1992) (quoting *FTC v. Carter*, 636 F.2d 781, 787–88 (D.C. Cir. 1980)).

opposition, *see* Bank Three's Opp'n at 2, but otherwise ignores it.  The bank's sur-reply is no

better.  *See* Bank Three's Sur-Reply at 3–6.  Indeed, under the disregarded final clause, a

subpoena for records revealing the source of funds that [REDACTED] deposited into Bank

Three and then funneled through the United States correspondent account, which might include

records without a direct tie to the United States account, are accessible.  As the government

argued at the hearing, the final clause appreciates that "bank records can't be looked at in a

vacuum, that money doesn't just appear there. . . .  [T]he flow of funds are related. . . .  [S]o

when there is a foreign currency transaction that occurs in China, and that's what infuses the

money into the account that illegally sends money here, absolutely that's related."  Mar. 5, 2019

Tr. at 92:14–24.  Drilling down on the connection, cash deposits, for example, which would be

documented in bank statements, are one way [REDACTED] might have funded the accounts

used to launder money through the United States.  FBI Decl. ¶ 48; *see also id.* ¶¶ 36–47

(explaining how North Korean front companies smuggle cash to fund payments via

correspondent accounts).  Intrabank transfers and foreign currency deposits are two other ways.

*Id.* ¶¶ 49–56.  Records capturing those deposits are precisely the type that the statute permits the

government to subpoena.

    Second, Bank Three's argument that the subpoena overreaches because it seeks signature

cards, account ledgers cards, account statements, and due diligence records, among other

records, none which relate to a correspondent account, glosses over "a key feature of the

investigation—[REDACTED] solely existed as a front company for [REDACTED]."  Gov't's

Reply at 29 (citing FBI Decl. ¶¶ 8–10); *accord id.* at 37.  No part of [REDACTED] can be

separated from the ploy to put money through the United States financial market.  Some of the

subpoenaed records—such as signature cards—facilitated that effort, other records—such as

ledgers, account statements, and due diligence—evidence aspects of that effort.[12]  All, however,

relate to the correspondent account or to [REDACTED]'s deposit of funds into its Bank Three

account.

Only one other court, the District of Oregon, has reviewed whether a subpoena issued

under 31 U.S.C. § 5318(k)(3) exceeds the scope of that statute.  *See United States v. Sedaghaty*,

No. CR 05-60008-HO, 2010 WL 11643384, at *5–6 (D. Or. Feb. 26, 2010).  In *Sedaghaty*, the

government was investigating "allegations of a false tax return and the failure to report money

leaving the country."  *Id.* at *1.  One defendant allegedly had withdrawn $130,000 in traveler's

checks and a $21,000 cashier's check from a bank in Oregon.  *Id.*  That defendant, and one other,

then flew to Saudi Arabia, without reporting the currency exiting the country, and cashed the

checks in a Saudi bank that had United States correspondent accounts.  *Id.*  In the subsequent

year's tax return, the withdrawn funds were reported as having been spent on a prayer house or

returned to their original source.  *Id.*  As part of the related investigation, a subpoena, under 31

U.S.C. § 5318(k)(3), was sent to the Saudi bank for records including, signature cards, customer

applications, ledger cards, bank statements, deposits, withdrawals, and those reflecting the

---

[12]      That the USA Patriot Act authorizes access to a large array of records is unsurprising.  Even before the
terrorist attacks of September 11, 2001, problems related to correspondent banking were on Congress's radar.  A
Senate report from February 2001 identified foreign jurisdictions that combined weak banking practices with access
to the United States financial market through correspondent accounts as "attractive venues for money launderers
seeking banks to launder illicit proceeds and move funds into bank accounts in other countries."  MINORITY STAFF
OF S. SUBCOMM. ON INVESTIGATIONS, 107TH CONG., REP. ON CORRESPONDENT BANKING: A GATEWAY FOR MONEY
LAUNDERING * 31 (2001).  Sure enough, the Congressional findings for Title III of the USA Patriot Act, which
enacted provisions such as the authority for the administrative subpoena in this case, included that "correspondent
banking facilities are one of the banking mechanisms susceptible in some circumstances to manipulation by foreign
banks to permit the laundering of funds by hiding the identity of real parties in interest to financial transactions," and
that "United States anti-money laundering efforts are impeded by outmoded and inadequate statutory provisions that
make investigations, prosecutions, and forfeitures more difficult, particularly in cases in which money laundering
involves foreign persons, foreign banks, or foreign countries."  *See* USA Patriot Act § 302(a)(6), (8), 115 Stat. at
296–97.  Correspondingly, an announced purpose of Title III was "to provide a clear national mandate for subjecting
to special scrutiny those foreign jurisdictions, financial institutions operating outside of the United States, and
classes of international transactions or types of accounts that pose particular, identifiable opportunities for criminal
abuse."  USA Patriot Act § 302(b)(4), 115 Stat. at 297.

cashing of the checks. *Id.* at *5. The bank objected, contending the records related to the

defendant's personal account. *Id.* at *6. The government, on the other hand, argued that the

request related to the defendant's "negotiation of the financial instruments at the center of the

investigation" and that those instruments "were issued in U.S. dollars by U.S. banks and that the

negotiation of those instruments inevitably related to correspondent accounts in the United

States." *Id.* The court granted the government's motion to compel as to records directly related

to the cashing of the cashier's and traveler's checks that had been issued by the United States

banks, as well as to bank statements, ledger cards, and information about deposits and

withdrawals into the account, but only "to the extent any documents related to the cashier's

check and traveler's checks or otherwise to correspondent accounts with United States banks."

*Id.* The motion to compel was not granted as to signature cards and customer applications. *Id.*

    While Bank Three prefers that this Court outright deny the motion to compel based on

the subpoenas purported overbreadth, *see* Mar. 5, 2019 Tr. at 89:2–22, curtailing the subpoena, *a

la Sedaghaty*, is the fall back suggestion, *id.* at 90:6–8. Why the District of Oregon narrowed the

subpoena and denied access to signature cards and customer applications, is not explained in the

opinion. Two differences between that case and this one, however, jump off the page. There,

the bank argued that some of the account records were for the target's personal account, in which

case not all records were necessarily related to the correspondent banking activity. To the extent

that may have animated the Court's thinking, no similar risk applies here. Additionally, records

"related to the deposit of funds into the foreign bank" were not at issue as the investigation

involved tracing how already identified financial instruments had been cashed. For each reason,

the limits imposed by the *Sedaghaty* Court should not be imposed here.

Material Under Seal Deleted

Accordingly, the subpoena issued to Bank Three is within the authority conferred under

31 U.S.C. § 5318(k)(3)(A)(i).  That subpoena can be enforced.

### C.    Comity

Authority to enforce the subpoenas is just step one.  Step two is whether the court should

exercise that authority to enforce the subpoenas.  When an enforcement order would create a

"true conflict" between domestic and foreign law, the Court should consider, as a matter of

international comity, whether to abstain from exercising its authority.  *See Hartford Fire Ins. Co.*

*v. California*, 509 U.S. 764, 798–99 (1993) (ruling that without a "true conflict between

domestic and foreign law," there was "no need in this litigation to address other considerations

that might inform a decision to refrain from the exercise of jurisdiction on grounds of

international comity"); *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist.*

*of Iowa*, 482 U.S. 522, 555 (1987) (Blackmun, J., concurring in part and dissenting in part)

("[T]he threshold question in a comity analysis is whether there is in fact a true conflict between

domestic and foreign law.  When there is a conflict, a court should seek a reasonable

accommodation that reconciles the central concerns of both sets of laws.").  The party relying on

foreign law to establish a conflict, "assumes the burden of showing that such law prevents

compliance with the court's order."  *In re Grand Jury Subpoena*, 912 F.3d at 633.

Here, determining whether compelling the banks to comply with the subpoenas would

create a "true conflict" is the easy part.  The government concedes that complying with the

respective subpoenas exposes each bank to legal penalties in China.  Gov't's Reply at 14

(agreeing that, "at least to some degree," Chinese law prohibits the banks from complying with

the subpoenas); *id.* at 20 (agreeing that "compliance with the extant subpoenas 'might violate

certain Chinese regulations and lead to administrative sanctions'" (quoting Gov't's Expert Decl.

¶ 10a)).  Resolving the comity concerns is a murkier matter, however.  On that issue, the parties

disagree as to whether circuit precedent dictates the outcome.  Assuming the answer is no, the

parties also disagree on the proper approach to, and resolution of, comity concerns in this case.

These issues are addressed in turn.

### 1.    *Circuit precedent*

The banks contend that *In re Sealed Case* ("*Sealed Case I*"), 825 F.2d 494 (D.C. Cir.

1987), is on all fours with this case, and thus the comity analysis should begin and end there.

Bank One's Opp'n at 16–18; Bank Two's Opp'n at 22–26; Bank Three's Sur-Reply at 16–18.  In

*Sealed Case I*, the D.C. Circuit reviewed an order holding a bank owned by Country X in

contempt for refusing to produce records in response to a grand jury subpoena.  825 F.2d at 495.

The records, which were sought in connection with a "grand jury investigation into an alleged

scheme by a number of American citizens and business entities to launder money" were held in

the bank's Country Y branch and Country Y's bank secrecy laws made responding to the

subpoena a criminal offense.  *Id.*  Out of concern for "basic principles of international comity,"

the Circuit reversed the contempt order.  *Id.* at 499.  Although the opinion did not set out a

standard, a constellation of factors were decisive in the Court's reasoning: the "sanctions

represent an attempt by an American court to compel a foreign person to violate the laws of a

different foreign sovereign on that sovereign's own territory," *id.* at 498; the contemnor "is not

itself the focus of the criminal investigation in this case but is a third party that has not been

accused of any wrongdoing," *id.*; "the bank is not merely a private foreign entity, but is an entity

owned by the government of Country X," *id.*; "the government concedes that it would be

impossible for the bank to comply with the contempt order without violating the laws of Country

Y on Country Y's soil," *id.*; and "the grand jury is not left empty-handed by today's decision," a

reference to the Court's ruling that the bank's manager could be compelled to testify, *id.* at 499.

33

Material Under Seal Deleted

Yet, the Court also explained that "[i]f any of the facts we rest on here were different, our holding could well be different." *Id.*

*Sealed Case I*'s caveat comports with the Supreme Court's treatment of international comity as a principle that depends on "prior scrutiny in each case of the particular facts, sovereign interests, and likelihood that resort to [alternative] procedures will prove effective." *Societe Nationale*, 482 U.S. at 543–44. The particular facts "relevant to any comity analysis" include: "(1) the importance to the . . . litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." *Id.* at 544 n.28 (citing factors from the RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 442(1)(c)).

In this case, the government discredits *Sealed Case I*, which was decided two months after *Societe Nationale*, because the Circuit's opinion did not explicitly reference the factors that *Societe Nationale* deemed "relevant to any comity analysis." Gov't Mot.–Bank One at 27; *accord* Gov't Mot.–Bank Three at 28. That *Sealed Case I* did not explicitly cite those factors does not mean that the D.C. Circuit was unaware of, or neglected, that recent Supreme Court decision and *Sealed Case I* is still good law in this circuit. Still, *Societe Nationale* matters as to whether *Sealed Case I* dictates a result here: should any of the factors deemed relevant by the Supreme Court differ between *Sealed Case I* and this case, then the particular constellation of facts here must be freshly considered.

34

Material Under Seal Deleted

Indeed, two critical circumstances, drawn from *Societe Nationale*'s factors, distinguish this matter from *Sealed Case I*. First, the investigation in *Sealed Case I* pertained to "an alleged scheme by a number of American citizens and business entities to launder money." 825 F.2d at 495. The precise nature and purpose of the illegal scheme is unknown to the modern reader, but the degree to which non-compliance with a subpoena related to money laundering by American citizens—a domestic law enforcement matter—implicates national interests hardly compares to the national security interests and associated potential harm caused by non-compliance with a subpoena related to an investigation into funding a state-sponsor of terrorism's nuclear weapons program, which poses catastrophic risks. *See* FBI Decl. ¶¶ 6a–f, 8–10.

Second, in this investigation the government insists that without compelling compliance, the requested information is out of reach. Gov't's Mot.–Bank One at 26; *accord* Gov't's Mot.–Bank Three at 27. The banks vigorously dispute the accuracy of the government's assertion, with each bank highlighting the commitments from the MOJ that any MLAA request will be timely reviewed and handled. Bank One's Opp'n at 19; Bank One's Sur-Reply at 10–11; Bank Two's Opp'n at 25–26; Bank Two's Sur-Reply at 10; Bank Three's Sur-Reply at 17. While the banks have made commitments to turn over the requested records to the MOJ, and the MOJ has made commitments to timely review the records, whether those records ever arrive in the United States is less certain. Close scrutiny reveals that the MOJ's commitments in this case are not so firm.

The first MOJ letter about this case, sent to Bank Three in March 2018, committed to "review[ing] and handl[ing] [an MLAA] request timely in accordance with the [MLAA] and relevant PRC laws." Mar. 22, 2018 MOJ Ltr. The MOJ's next two letters, each sent in 2019 and addressed directly to this Court, proclaim that "[t]he MOJ would timely review and handle the

35

Material Under Seal Deleted

requests for assistance sought by DOJ in accordance with the [MLAA] and applicable domestic laws.  For the request in line with the [MLAA], China will provide assistance to the United States accordingly," Jan. 6, 2019 MOJ Ltr. at 4, and that if "DOJ makes a MLA[A] request in the present case, the MOJ will promptly review and process it.  To be more specific, if such a US request complies with the applicable provisions of the [Law of PRC on International Legal Assistance in Criminal Matters] and the MLAA, the MOJ will promptly transfer the request to Competent Authorities of China for further review and execution," Feb. 26, 2019 MOJ Ltr. at 3.

The caveats in the MOJ letters—that the requests must comply with the MLAA and Chinese law—do not refer to simple ministerial matters.  By their own admission, Chinese officials have not always been satisfied with MLAA requests from the United States government. *Id.* at 6–7.  Additionally, the United States government has been disappointed before in a case in which the MOJ "indicated that they would act on the MLAA request and cooperate in the investigation," only to leave the MLAA requests unanswered.  DOJ Decl. ¶ 13c.  Even Bank Two acknowledges that the MOJ's representations about compliance are no guarantee.  Bank Two's Opp'n at 19 (suggesting that the government should have made an MLAA request so that, if nothing else, the Court "would know by now that such a request was futile").  As discussed at more depth in the comity analysis that follows, *see* Section III.C.2.d., *infra*, the MOJ's purported willingness to comply with an MLAA request in this case might be concrete enough to weigh against enforcing the subpoena, but the MOJ's caveats, as well as the United States' past MLAA experience, mean that unlike *Sealed Case I,* nothing guarantees that without compelling compliance the "grand jury is not left empty-handed."  *Sealed Case I*, 825 F.2d at 499.[13]

---

[13]    The government emphasizes a third basis to distinguish *Sealed Case I*: the subpoena recipient there would have been compelled to violate the laws of a third country.  *See* Gov't's Reply at 32–33.  That distinction, however, supplies a reason both for and against compelling compliance.  On the one hand, unlike the banks here, which are based in, and partially owned by, China, the Country X bank could not be sure that Country Y would show restraint

For those two reasons, *Sealed Case I* alone does not direct the outcome here.[14]

### 2. Balancing the Comity Factors

Without precedent squarely on point, the Court's comity analysis must scrutinize "the particular facts, sovereign interests, and likelihood that resort to [alternative] procedures will prove effective." *Societe Nationale*, 482 U.S. at 544. At a minimum, that analysis encompasses the five restatement factors that the Supreme Court has said "are relevant to any comity analysis." *Id.* at 544 n.28. Again, those are: "the importance to the investigation or litigation of the documents or other information requested; the degree of specificity of the request; whether the information originated in the United States; the availability of alternative means of securing the information; and the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 442(c)(1).[15] The government considers those five factors the entirety of the comity analysis. Gov't's Mot.–Bank One at 20; Gov't's Mot.–Bank Three at 20. The banks, drawing from Second Circuit case law, introduce two other relevant factors: "hardship of the party facing conflicting legal obligations and whether that party has

---

when considering whether to punish the bank. Mar. 5, 2019 Tr. at 33:21–34:2. In this light, the case for enforcement is stronger here than in *Sealed Case I*. On the other hand, as Bank Three argues, compelling a bank to violate its "own nation's law is *more* prejudicial to international comity." Bank Three Sur-Reply at 18. A Country X bank can shutter the Country Y portion of its business; a Chinese bank cannot leave China. Mar. 5, 2019 Tr. at 79:5–22. In this light, the case for enforcement was stronger in *Sealed Case I* than here.

[14]     Contrary to the government's position, nor does *Sealed Case II*, alone, dictate the outcome here. *See* Gov't's Reply at 32–34 ("*Sealed Case II* controls this case, not *Sealed Case I*."). In *Sealed Case II*, the D.C. Circuit rebuffed a grand jury witness's argument that, as a matter of comity, the witness should not be held in contempt for failing to comply with a subpoena. 832 F.2d at 1283. In reaching this conclusion, the D.C. Circuit noted that it was "not clear from the Witness' brief that Swiss law forbids the companies or their custodians from complying with the subpoena even in regard to documents located in Switzerland." *Id.* Moreover, to the extent the witness, an American citizen, faced prosecution in Switzerland, that prosecution depended on the witness' voluntary return to Switzerland. *Id.* at 1273, 1283. Thus, the Court had no reason to abdicate its "power to order any party within its jurisdiction to testify or produce documents." *Id.* at 1283–84.

[15]     Since *Societe Nationale*, the Restatement of Foreign Relations Law has been updated, but the relevant factors have not changed. *See* RESTATEMENT (FOURTH) OF FOREIGN RELATIONS LAW § 426 cmt. a.

demonstrated good faith in addressing its discovery obligations." *Linde v. Arab Bank, PLC*, 706
F.3d 92, 110 (2d Cir. 2013); *see also* Bank One's Opp'n at 21 (listing the seven Second Circuit
factors as the relevant standard); Bank Two's Opp'n at 17 (same); Bank Three's Opp'n at 18–19
(same).  The government tepidly resists inclusion of the latter two factors, reading *Societe
Nationale* to have "deemed only Restatement § 442's *five* factors 'relevant' to the comity
analysis," Gov't's Reply at 30 n.21 (emphasis in original).  *Societe Nationale*'s list, however,
was not exclusive.  *See Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1476 (9th
Cir. 1992) (noting that *Societe Nationale*'s "list of factors is not exhaustive").  Other factors
might be relevant too.

Although never having articulated neatly the comity standard, the D.C. Circuit has
endorsed the Second Circuit's two additional factors.  Returning to *Sealed Case I*, the D.C.
Circuit distinguished two cases in which the Eleventh Circuit affirmed enforcement of subpoenas
against foreign entities for records held abroad as instances in which the contemnor had not acted
in good faith.  *Sealed Case I*, 825 F.3d at 498 (distinguishing *In re Grand Jury Proceedings*, 691
F.2d 1384 (11th Cir. 1982) and *In re Grand Jury Proceedings Bank of Nova Scotia*, 740 F.2d
817, 826 (11th Cir. 1984)).  The banks' good faith, then, is properly considered.  So too is the
hardship that compliance would impose.  On that issue, the D.C. Circuit, again in *Sealed Case I*,
wrote:

> A decision whether to enter a contempt order in cases like this one raises grave
> difficulties for courts. We have little doubt, for example, that our government and
> our people would be affronted if a foreign court tried to compel someone to violate
> our laws within our borders. The legal expression of this widespread sentiment is
> found in basic principles of international comity. But unless we are willing simply
> to enter contempt orders in all such cases, no matter how extreme, in utter disregard
> of comity principles, we are obliged to undertake the unseemly task of picking and
> choosing when to order parties to violate foreign laws. It is conceivable that we
> might even be forced to base our determination in part on a subjective evaluation
> of the content of those laws; an American court might well find it wholly

> inappropriate to defer to a foreign sovereign where the laws in question promote,
> for example, torture or slavery or terrorism.

825 F.2d at 498–99. Explicitly, the D.C. Circuit recognized that unless courts are to disregard

comity entirely, courts must decide when to enforce an order that will conflict with foreign law.

The hardship of the conflict is an essential part of that analysis.[16]

Thus, whether, as a matter of comity, enforcing the subpoenas here would be

unreasonable depends on application of the seven factors that the Second Circuit has clearly

articulated and the D.C. Circuit has, at least implicitly, endorsed.[17] Those seven factors are

considered *seriatim*.

a)    *Importance to the Investigation of the Requested Information*

To begin, the government avows the "[t]he subpoenaed documents are the foundation of

the United States' investigation" as without the records "the government lacks visibility as to the

identities of the financial facilitators behind this scheme, the source of the illicit funds into these

accounts, where remaining funds may have been transferred, and the banks' roles in facilitating

such activities." Gov't's Mot.–Bank One at 21; *accord* Gov't's Mot.–Bank Three at 21–22.

More specifically, the records are necessary, for example, because North Korea, using "third-

country intermediaries," relies on "bulk cash smuggling and other illicit activity that supports,

among other things, its proliferation of [weapons of mass destruction] technology and missile

systems," FBI Decl. ¶¶ 40–41. Bank statements and cash deposits will allow investigators to

trace these inflows and outflows of cash, information the government cannot otherwise access.

---

[16]    Bank One cites pieces of this passage for the conclusion that the D.C. Circuit has instructed *against* evaluating when a foreign law is worthy of respect. Bank One's Sur-Reply at 8. Reading the full text demonstrates that Bank One's conclusion is backward. The D.C. Circuit, although appreciating the unseemliness of the task, understood that evaluating foreign laws is integral to any comity analysis.

[17]    Bank One argues that Restatement (Third) of Foreign Relations § 442(2) instructs that sanctions should not ordinarily be imposed against a witness who fails to produce records that are located in a country that prohibits disclosure of the records. Whether or not this is a case for application of the ordinary rule, the Court is not reviewing a motion to hold the banks in contempt. Contempt proceedings may follow but have not yet arrived.

Material Under Seal Deleted

*Id.* ¶¶ 36, 48.  Additionally, records of intrabank transfers into or out of [REDACTED]'s account

will disclose co-conspirators, which, again, is information the government cannot otherwise

access.  *Id.* ¶¶ 49–51.  Bank statements and records are needed also "to determine if any U.S.

Dollar [REDACTED] accounts were used to convert foreign currency to/from U.S. dollar," *id.*

¶ 53, and the extent to which Chinese bank officials knowingly facilitated payments for North

Korea's benefit, *id.* ¶ 59.

      The banks do not dispute that the requested records would contain the information that

the government describes or that such information would further the investigation.  *See* Bank

One's Opp'n at 22 (admitting that Bank One "cannot speak directly to what documents the

Government may think it does or does not need as part of its grand jury investigation"); Bank

Two's Opp'n at 18 (assuming "that the documents sought by the U.S. are important to the grand

jury").  The Court, thus, agrees that the records are essential to the investigation underway.

      Nevertheless, "the Government waited nearly an entire year after the issuance of the

Subpoena to file its Motion."  Bank One's Opp'n at 22; *accord* Bank Two's Opp'n at 18.

Moreover, the government "declined to pursue an MLAA request" as an alternative means of

seeking the documents.  Bank Two's Opp'n at 18.  Although the delay and decision to forgo a

possible means for obtaining the records suggest that the current investigation is not urgent,

those facts are not as damning as appears at first blush.  In between issuing the subpoenas and

filing the motions to compel, the Department of Justice twice sent a delegation to China to

discuss China's responsiveness to MLAA requests.  DOJ Decl. ¶ 17.  Moreover, the Department

of Justice was engaged in intra- and inter-agency deliberations during the interim about the most

prudent way to secure the records.  *Id.* ¶ 18; FBI Decl. ¶ 80.  Treading lightly on a matter

implicating delicate diplomatic considerations should not be held against the government.

Material Under Seal Deleted

On this record, the first factor favors the government.  If the government's lack of alacrity might otherwise have tempered how heavily this factor tilts to the government, other considerations indicate that caution should not be so ruinous.

> ### b)       Specificity of the Request for Information

As to the second factor, the subpoenas are tailored to specific financial records, for a defined date range, at banks [REDACTED] is known to have used to launder funds.  *See* Grand Jury Subpoena; Admin. Subpoena; *see also* FBI Decl. ¶ 9.  Bank Two concedes that "[t]he request is reasonably specific."  Bank Two's Opp'n at 18.  Bank One agrees in part, appreciating that the subpoenas seek records "related only to one entity and one account for a specific time period," but argues that the subpoena is too broad because "it requests production of *all* records" related to [REDACTED], which sweeps in "documents unrelated to the alleged illicit U.S. dollar payments made by [REDACTED] for the benefit of the North Korean government."  Bank One's Opp'n at 22–23.[18]

As the government points out, "[REDACTED] solely existed as a front company for [REDACTED]."  Gov't's Reply at 29 (citing FBI Decl. ¶¶ 8–10).  Thus, contrary to Bank One's position, all [REDACTED] records relate to the conduct under investigation.  Given the nature of that investigation, the subpoenas hardly could be narrower.  Other courts have found subpoenas that seek information limited to accounts known to be connected to the matter under investigation satisfactorily specific.  *See Gucci Am., Inc. v. Weixing Li* ("*Gucci I*"), No. 10 CIV 4974 RJS, 2011 WL 6156936, at *6 (S.D.N.Y. Aug. 23, 2011), *vacated,* 768 F.3d 122 (2d Cir.

---

[18]      Bank Three, for its part, does not argue as part of the comity analysis that the records request is too broad. The bank did advance that argument in relation to whether the subpoena exceeded the government's authority under 31 U.S.C. § 5318(k)(3)(A)(i).  Insofar as those arguments also could be considered in the comity context, they are unavailing for the same reasons already discussed.

2014)[19]; *see also Nike, Inc. v. Wu* (*"Nike II"*), 349 F. Supp. 3d 346, 365 (S.D.N.Y. 2018) (finding

subpoena sufficiently specific because "the plaintiffs had connected the counterfeiting activities

with certain accounts located at the subpoenaed banks").

This factor supports enforcement of the subpoenas.

c)      *Origin of the Information*

The documents at issue here originated in China.  The government concedes that this

factor counsels for respecting principles of international comity.  Gov't Mot.–Bank One at 21;

Gov't Mot.–Bank Three at 22.  No further discussion is needed.

d)      *Alternative Means of Obtaining the Information*

As to the fourth factor, the parties' disagreement is quite pronounced.  The MLAA

between the United States and China commits the countries to providing assistance "in

proceedings related to criminal matters," including "providing originals, certified copies or

photocopies of documents, records or articles of evidence." MLAA Arts. 1, 2.  While

acknowledging that the MLAA "remains an effective law-enforcement tool in some

investigations," the government adds that "China has not provided—via the MLAA channel—

records similar to those subpoenaed by the grand jury in this investigation in at least 10 years."

Gov't Mot.–Bank One at 21–22; *accord* Gov't Mot.–Bank Three at 22.  Conversely, the

banks say that China's responsiveness to MLAA requests has not been so poor and, in any event,

both the banks and the MOJ have committed to responding to an MLAA request in this case.

Bank One's Opp'n at 23–26; Bank One's Sur-Reply at 19–20; Bank Two's Opp'n at 15–16, 19;

Bank Two's Sur-Reply at 5–8; Bank Three's Opp'n at 29–33; Bank Three's Sur-Reply at 15–16.

---

[19]      While the Second Circuit vacated this opinion for the district court to reconsider personal jurisdiction over
the Bank of China in light of intervening Supreme Court precedent, the circuit "discern[ed] no abuse of discretion"
in the district court's "comity analysis pursuant to § 442 of the Restatement (Third) for Foreign Relations Law."
*Gucci II*, 768 F.3d at 141.

42

Material Under Seal Deleted

As a threshold matter, enforcing the subpoenas does not require that the government resort first to the MLAA's evidence sharing mechanisms. *Societe Nationale*, 482 U.S. at 542–43; *Sealed Case II*, 832 F.2d at 1283. Indeed, the Supreme Court has not imposed a rule of first resort because "[i]n many situations" procedures like those of the MLAA will be "unduly time consuming and expensive, as well as less certain to produce needed evidence." *Societe Nationale*, 482 U.S. at 542. Nevertheless, enforcing a subpoena that compels conduct in violation of foreign law may be ill-advised if investigators have alternative means to obtain the same information. *Sealed Case I*, 825 F.2d at 499; *see also Richmark*, 959 F.2d at 1475 ("If the information sought can easily be obtained elsewhere, there is little or no reason to require a party to violate foreign law.").

Historical precedent offers good reason for the United States to suspect that the MLAA, for records like those sought in this case, is not a real alternative. The Associate Director for the Department of Justice's Office of International Affairs of the Criminal division, which is the United States office responsible for making and receiving MLAA requests, explained that the MLAA "has been helpful in some limited circumstances," but not when it comes to bank records. DOJ Decl. ¶¶ 1, 6, 8. Over the last decade, the United States has made approximately 50 MLAA requests to China for bank records, only 15 of which have produced any response. *Id.* ¶ 9. Of those 15, most have been incomplete, untimely, or failed to include certification needed for the records' admissibility in a United States court. *Id.* At times, China's response was only a summary of the requested records. *Id.* ¶ 11. Currently, the United States has 40 MLAA requests pending, including the United States' ten most recent MLAA requests, 22 of which are for bank records. *Id.* ¶¶ 10, 13, 13a.

43

The MOJ has only a slightly different take on the history.  By that agency's telling,

China, between 2015 and 2017, sent the United States evidence about financial accounts on eight

occasions.  Jan. 6, 2018 MOJ Ltr. at 3–4.  In response to the DOJ declaration, the MOJ identifies

one occasion in which China responded to a 2017 MLAA request and notes that in another case,

when China took several years to respond to an MLAA request, the two countries had been

communicating about the request in the interim.  Feb. 26, 2019 MOJ Ltr. at 6–7.[20]  At bottom,

the historical precedent described in the DOJ declaration, to which the MOJ offers only a meager

response, inspires little confidence that the MOJ would respond to an MLAA request, let alone

on a timely and complete basis.  *See Nike II*, 349 F. Supp. 3d at 366 (recognizing the MOJ's

"historical precedent" of failing to answer Hague Convention requests); *Wultz v. Bank of China

Ltd.* ("*Wultz II*"), 910 F. Supp. 2d 548, 557–58 (S.D.N.Y. 2012) (finding the MOJ's past

practices validate concerns that Hague Convention requests are not viable alternative to

subpoena).

Still, the banks insist that this case is different because the banks and the MOJ have

committed to respond to an MLAA request.  Indeed, Bank Two "has given its assurances that it

will produce the requested documents within days of a request through the MLAA," Bank Two's

Opp'n at 16; *accord* Bank Two's Sur-Reply at 3, and Bank Three "took steps to collect and

preserve documents" days after receiving the subpoena, Bank Three GM Decl. ¶ 14.  Bank One's

commitments are less concrete, but that bank represents that it offered in Spring 2018 to

cooperate with an MLAA request, Bank One's Opp'n at 10, 22, 25, and could have the records

ready in 30 days, Mar. 5, 2019 Tr. at 47:3–7.

---

[20]    The MOJ letter also flags the United States' less-than-remarkable history of responding to MLAA requests,
Feb. 26, 2019 MOJ Ltr. at 7, a fact merely showing that neither country is satisfied with the other's performance
under the MLAA.

Material Under Seal Deleted

Since receiving the subpoenas, the banks have acted in good faith and the sincerity of their willingness to comply is not questioned.  The banks' compliance, however, gets the government only part way to the records sought. The MOJ's compliance, as well as that of other Chinese authorities, also is necessary, and that cooperation is doubtful.  Through three letters, the MOJ has expressed how it will handle an MLAA request in this case.  The first, the MOJ's March 2018 letter to Bank Three, explained that the MOJ would "review and handle [an MLAA request] timely in accordance with the [MLAA] and relevant PRC laws."  Mar. 22, 2018 MOJ Ltr.  The second, a January 2019 letter addressed to the Court, said that the MOJ "would timely review and handle the requests for assistance sought by the DOJ in accordance with the [MLAA] and applicable domestic laws.  For the request in line with the [MLAA], China will provide the assistance to the United States accordingly."  Jan. 6, 2019 MOJ Ltr. at 4.  The third, a follow up letter to the Court, explained that "if the DOJ makes a MLA[A] request in the present case, the MOJ will promptly review and process it.  To be more specific, if such a US request complies with the applicable provisions of the [Law of the PRC on International Legal Assistance in Criminal Matters] and the MLAA, the MOJ will promptly transfer the request to Competent Authorities of China for further review and execution."  Feb. 26, 2019 MOJ Ltr. at 3.  The MOJ provided assurances about its own promptness but not about other Chinese government components' review process.  Nor did the MOJ promise that the response would be usable to the United States government but preemptively invited the United States to "make a supplement[al] request or clearly express the requirements, and we will timely process and respond to that request."  *Id.*

These MOJ letters harm the banks' case more than help.  First, the MOJ's third letter clarifies that the MOJ is not the last level of Chinese review.  So even if the banks' and the

MOJ's commitments are sound, other Chinese agencies will be involved.  Those authorities have

made zero commitments in this case.  Second, the MOJ assures that even if initial production

does not generate records usable in an American court, the MOJ will consider supplementary

requests.  That back and forth, which might never culminate in the release of usable records,

could take years.  *See* DOJ Decl. ¶¶ 9, 13a; Feb. 26, 2019 MOJ Ltr. at 7.  Third, the MOJ's final

letter introduces a separate Chinese law—the International Legal Assistance in Criminal

Matters—that any MLAA request must satisfy.  That law puts both the MOJ and "the National

Supervisory Committee, the Supreme People's Court, the Supreme People's Procuratorate, the

Ministry of Public Security, the Ministry of State Security and other departments . . . in charge of

international criminal judicial assistance," and makes those government agencies "responsible

for examining and handling . . . criminal judicial assistance requests made by foreign countries."

Bank Two's Opp'n, Decl. of Professor of Law and Vice Dean at Peaking University Law School

("Bank Two Expert Decl."), Ex. B-18, International Criminal Judicial Assistance Law at Art. 6,

ECF No. 3-21 (No. 18-176).  That law also imposes independent requirements upon any country

making a request of China for criminal legal assistance related to the collection of evidence.  *Id.*

at Art. 28–Art. 30.  Whether China might use this law to stall any response to an MLAA request

is, at best, unknown.

Moreover, the government has been down this road before.  In August 2016, the

Department of Justice prepared and sent an MLAA request for bank records related to Dandong

Hongxiang Industrial Development Co., Ltd., another agent of North Korea. FBI Decl. ¶¶ 14–16,

71.  During an August 12, 2016 meeting, "Chinese authorities nominally agreed to work jointly

with the U.S. authorities and requested a working group meeting to further discuss cooperation

with DOJ officials familiar with the [Dandong] investigation."  *Id.* ¶ 72.  Despite that assurance,

Chinese officials did an about-face two weeks later, and advised that China would not cooperate. *Id.* ¶ 73; *see also* DOJ Decl. ¶ 13c. A new MLAA request was sent in April 2017, and the Department of Justice still has not received a response. FBI Decl. ¶ 74; DOJ Decl. ¶ 13c. The Department of Justice no longer needs to take overtures of China's willingness to assist the United States' with investigations into North Korea seriously.

Why not, Bank Two, asks, make the government try at least one last time to explore the MLAA route given that, "the MOJ's credibility with this Court and every other federal court would be at issue if it did not fulfill its commitment." Bank Two's Sur-Reply at 7. Despite the facial reasonableness of this suggestion, forcing such a request would be ill-conceived. The United States and China have different interests as to North Korea. FBI Decl. ¶¶ 80–81. Allowing China to gum up United States' investigations by dictating how the United States can pursue evidence, especially when the two countries' interests are not aligned, is antithetical to sound law enforcement. *Id.* ¶ 83. Furthermore, in some instances the United States needs access to records without Chinese authorities taking a first pass. *Id.* ¶ 84. Finally, banks with knowledge that their records might be subject to a federal subpoena, without the shield of the MLAA slow-down process, would have a greater incentive to take care that their customers were not violating United States criminal laws. *Id.* ¶ 85. These policy rationales instruct against forcing the government to pursue an MLAA.

For the foregoing reasons, the government does not have a viable alternative and China should not be allowed to hold United States' law enforcement priorities hostage under the pretense of anticipated MLAA compliance. This factor favors the government and enforcement of the subpoenas.

47

e)    *Interests of Sovereigns in Conflict*

Marching on to the fifth factor, the United States' interest in this case pertains to national security: "how North Korea, a nuclear armed state that is a state sponsor of terrorism, financed its weapons of mass destruction program in spite of extant sanctions."  Gov't Mot.–Bank One at 24; *accord* Gov't Mot.–Bank Three at 25.  Consequently, non-enforcement would undermine a critical national interest.

The banks have different responses.  Bank Three "does not dispute that the United States has a strong interest in combating money laundering and enforcing international sanctions," Bank Three's Opp'n at 23, but argues that compelling production may frustrate those interests by having a "chilling effect on future communications by Chinese bank," *id.* at 24 (quoting *Wultz v. Bank of China Ltd.*, 942 F. Supp. 2d 452, 467 (S.D.N.Y. 2013)).  Conversely, Bank One and Bank Two each suggest that no interest of the United States is undermined if the motions to compel are denied because the United States has an alternative means of accessing the same records.  Bank One's Opp'n at 26; Bank Two's Opp'n at 20.

Non-enforcement of the subpoenas would undermine the United States' interests a great deal.  First, the argument that no interest of the United States would be undermined because the United States has an alternative means of obtaining the same records is misdirected.  Beside being factually incorrect, that argument bleeds together the fourth and fifth factors.  Whether the government has alternative ways of getting the documents is a stand-alone consideration and not a reason to discount whether non-enforcement would undermine the United States' interests.  Indeed, if the availability of an alternative were given the dispositive significance that Bank One and Bank Two suggest, none of the remaining factors would have to be considered.  The consequence would be a *de facto* rule of first resort to any international treaty despite the

48

Material Under Seal Deleted

Supreme Court having rejected such a rule, at least when, as here, the relevant treaty does not

contain exclusivity language.  *Societe Nationale*, 482 U.S. at 544 ("We therefore decline to hold

as a blanket matter that comity requires resort to Hague Evidence Convention procedures . . . .");

*see also* DOJ Decl. ¶ 7 ("The MLAA contains no provision stating that it shall be the exclusive

mechanism for the parties to obtain evidence from one another.").  As for Bank Three's

argument that compelling disclosure would actually harm the United States' national security

interest, this is a point to which the Executive Branch is owed some deference.  *United States v.*

*Davis*, 767 F.2d 1025, 1035 (2d Cir. 1985) ("We must therefore accord some deference to the

determination by the Executive Branch—the arm of the government charged with primary

responsibility for formulating and effectuating foreign policy—that the adverse diplomatic

consequences of the discovery request would be outweighed by the benefits of disclosure.").

Thus, for this factor, non-enforcement is properly considered an impediment to the United

States' national security interests.

On the other side of the balance, the government characterizes China's national interest

as "protecting the [purported] right to privacy incorporated into its bank secrecy laws."  Gov't's

Mot.–Bank One at 24–25 (quoting *In re Grand Jury Proceedings*, 691 F.2d at 1391)); *accord*

Gov't's Mot.–Bank Three at 25–26.  That characterization of the Chinese interest implicated

here, the banks say, is too dismissive.  Rather, China's interest is "upholding its bank secrecy

laws, which are designed to protect customer privacy, maintain customer confidence in

commercial banks, and ensure the stability of the country's financial system."  Bank Two's

Opp'n at 19 (citing Bank Two Expert Decl. ¶ 13, ECF No. 3-3 (No. 18-176)).  Bank Three paints

with a similar brush, describing China's interest as "promoting confidence in a developing

banking system."  Bank Three's Opp'n at 23.  Finally, Bank One cites a number of laws that an

order compelling compliance would violate—including "banking laws and regulation,

cybersecurity laws, administrative regulations, criminal and judicial assistance laws"—and adds

that "[s]uch an outcome would undoubtedly undermine the legitimate interest of a foreign

sovereign." Bank One's Opp'n at 26–27.

China's interest in the development of a sound banking system is legitimate, contrary to

the government's assertions otherwise, Gov't's Reply at 18, and bank secrecy laws protect that

interest. Nevertheless, China's interest would not be undermined by enforcement of the

subpoenas. Under Chinese law, Chinese banks may disclose bank records to a "competent

organ" if that organ has presented to the bank a notice required by Chinese regulation. Bank

Two Expert Decl. ¶ 19. Competent organs include "judicial organs, administrative organs,

military organs and public institutions exercising administrative functions." *Id.* ¶ 20. While

allowing for limited disclosure to Chinese authorities does not mean that similar disclosure to

United States authorities would be legal under Chinese law, these exceptions reflect that even

Chinese authorities recognize that bank secrecy can co-exist with limited disclosure to

government agencies. Therefore, insofar as the laws at issue here further China's interest in a

stable banking system, disclosure to the United States in response to an investigatory subpoena is

not a detriment to that interest. Other courts have drawn a similar inference from Chinese laws

permitting disclosure of bank records to the Chinese government. *See In re Grand Jury*

*Proceedings*, 532 F.2d at 408 ("Field seeks to prohibit a United States grand jury from obtaining

information that would have been obtainable by officials there for their own investigations.

Since the general rule appears to be that for domestic investigations such information would be

obtainable, we find it difficult to understand how the bank's customers' rights of privacy would

be significantly infringed simply because the investigating body is a foreign tribunal."); *Tiffany*

50

*(NJ) LLC v. Forbse*, No. 11 CIV 4976 NRB, 2012 WL 1918866, at *8 (S.D.N.Y. May 23, 2012)

("The fact that numerous Chinese government organs are vested with the power to override the

confidentiality provisions only underscores the notion that the secrecy laws were not designed to

protect Chinese citizens who engage in unlawful behavior.").

In sum, the non-enforcement of the subpoenas would undermine the United States

national security interests and not undermine any articulated Chinese interest.  This factor

heavily favors enforcement of the subpoenas. *See Wultz II*, 910 F. Supp. 2d at 559 ("The interest

of the United States in depriving international terrorist organizations of funding that could be

used to kill American citizens strongly outweighs the interest of a foreign nation in bank secrecy

laws and the abstract or general assertion of sovereignty."); *id.* ("[T]he Chinese interest in

building confidence in its banking industry does not encompass an interest in protecting the

confidentiality of those who participate in the funding of international terrorism.").

### f)      *Hardship on the Party Facing Conflicting Obligations*

For the sixth factor, the parties' disagreement on the facts relevant to hardship is

narrower than the parties might concede.  Administrative fines, by the government's account, are

possible if the banks comply with the subpoenas. *See* Gov't's Expert Decl. ¶¶ 25, 29, 30.  Civil

liability, however, according to the government, is off the table because the banking customer—

[REDACTED]—is defunct.  *Id.* ¶¶ 10b, 13, 20.  None of the three banks contest how

[REDACTED]'s status changes the risk of *civil* liability.  *See* Bank One's Sur-Reply at 7–8;

Bank Two's Sur-Reply at 3–5; Bank Three's Sur-Reply at 11–15; *see also* Bank One's Sur-

Reply, Ex. 1, Suppl. Decl. of Bank' One's Expert ("Suppl. Bank One Expert Decl.") ¶ 49, ECF

No. 18-2 (No. 18-175) ("The defunct status of the account holder does not provide immunity for

such banks from administrative penalties by administrative authorities or criminal charges."); *see*

*generally* Bank Two's Sur-Reply, Decl. of Partner at [REDACTED] ("Suppl. Bank Two Expert

Decl."), ECF No. 12-3 (No. 18-176) (submitting declaration about Bank Three's possible

exposure without discussing civil liability); Bank Three's Sur-Reply, Suppl. Decl. of Bank

Three's U.S. Counsel, Ex. 1, Feb. 25, 2019 Bank Three's Chinese Counsel's Ltr. ("Feb. 25, 2019

Bank Three Ltr."), ECF No. 12-1 (No. 18-177) (same).  That leaves disputed two issues germane

to hardship: (1) how likely are the three banks, given the Chinese government's ownership stake

in each, to face *severe* administrative penalties, and (2) for the same reason, how likely are the

banks, or their employees, to face criminal penalties.

      According to the banks, responding to the subpoenas requires that the banks disregard a

litany of Chinese laws which impose fines up to "RMB 500,000 Yuan"—which converts roughly

to $74,000—for unauthorized inquiries into bank accounts and for the unlawful dissemination of

banking information.  *See* Bank One's Opp'n, Decl. of Attorney at [REDACTED] ("Bank One

Expert Decl.") ¶¶ 50, 52, 75, ECF No. 6-2 (No 18-175); Bank Two Expert Decl. ¶¶ 17b, 24–25,

27; Bank Three U.S. Counsel Decl., Ex. 1, Jan. 7, 2019 Bank Three's Chinese Counsel's Ltr.

("Jan. 7, 2019 Bank Three Ltr.") at 6, 8–10, ECF No. 4-1 (No. 18-177).[21]  Moreover, unlawful

disclosure of client information might lead to suspension or revocation of banking licenses.

Bank One Expert Decl. ¶¶ 51, 57; Bank Two Expert Decl. ¶ 25.  The MOJ also declares that the

if the banks comply they "will be subject to administrative penalties such as fines, suspension of

banking operation and revocation of license and so on . . . ."  Jan. 6, 2019 MOJ Ltr. at 2–3.  The

banks' state ownership will not insulate them from punishment, the banks insist, as state-owned

---

[21]     The relevant laws include Article 73 of China's Commercial Banking Law, Article 40 of the Regulation on
Credit Investigation, Article 28 of the Corporate Deposit Regulations, Article 32 of the Anti-Money Laundering
Law, and Article 64 and 66 of China's Cybersecurity Law.  Bank One Expert Decl. ¶¶ 50, 52, 57; Bank Two Expert
Decl. ¶ 17b, 24–25, 27; Jan. 7, 2019 Bank Three Ltr. at 6, 8–10.

banks have been sanctioned before. *See* Jan. 7, 2019 Bank Three Ltr. at 10; Feb. 25, 2019 Bank

Three Ltr. at 4; Suppl. Bank One Expert Decl. ¶ 13.

   Although the banks cite multiple laws which would support the imposition of

administrative penalties, actual examples, or the lack thereof, of penalties having been imposed

against a bank in comparable cases has swung other Courts' analysis of whether the imposition

of penalties is likely. *Compare Nike I*, 349 F. Supp. 3d at 340 ("[T]he cases cited by [the bank's

expert], 'are plainly inapposite to the facts of the case at bar[,] . . . [as] the Bank[s] ha[ve] cited

no specific instance in which a Chinese financial institution was punished for complying with a

foreign court order directing the production of documents." (quoting *Gucci I*, 2011 WL

6156939)) *with Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. 143, 158 (S.D.N.Y. 2011)

("Unlike *Milliken,* the Banks here have cited Chinese cases in which a commercial bank was

held liable to its customer after turning over the individual's funds or information to a third

party."). Here, while the banks list laws authorizing severe administrative penalties and insist

their ties to the government are not immunizing, none points to any example in which a state-

owned Chinese enterprise has faced severe repercussions for responding to the order of a foreign

court. Of the banks' examples of fines imposed against government-affiliated Chinese banks,

only one is for a case in which a bank disclosed customer information—although not in

compliance with a foreign court order—and, in any event, of the examples, only one fine

exceeded 400,000 Renminbi. Bank One Expert Decl. ¶¶ 54–56; Bank Two Expert Decl. ¶ 31;

Jan. 7, 2019 Bank Three Ltr. at 10, 15. Further underscoring the dearth of any comparable past

practices, letters from Bank Three's Chinese counsel cite as evidence that the Chinese

government will not hesitate to impose meaningful punishment, instances in which an insolvent

bank was shuttered, banks were fined for violating anti-pollution laws, a bank was fined, and its

chairman prosecuted, for violating anti-competition laws, and banks were fined for unlawful

billing practices. Jan. 7, 2019 Bank Three Ltr. at 19; Feb. 25, 2019 Bank Three Ltr. at 21–22.

The absence of any relevant past practice corroborates that each bank's connection to the

Chinese government is strong reason to doubt that any is "a credible object of *severe* government

sanctions." Gov't's Expert Decl. ¶ 105 (emphasis added). One district court has adopted that

perfectly plausible supposition. *See Nike, Inc. v. Wu* ("*Nike I*"), 349 F. Supp. 310, 340 (S.D.N.Y.

2018) ("The Banks 'are closely tied to the Chinese state and are in many respects quasi-

governmental entities,' and [the government's expert] states that, in his expert opinion, it is

unlikely that the Banks or their employees would face serious repercussions if ordered to comply

with the Subpoenas.").

     By the same token, the government can point to relevant precedent, which differentiates

this case from ones in which the party seeking enforcement has been unable to present "any

instances in which Chinese banks complied with a United States court order compelling

production of documents without negative consequence." *Qi Andrew*, 276 F.R.D. at 159.

Indeed, the trio of *Gucci* cases from the Southern District of New York began with the district

court ordering the Bank of China to comply with a Rule 45 subpoena, despite protestations from

the bank that such an order would subject the bank to "heavy fines" and could subject employees

to "several years in jail." *Gucci I*, 2011 WL 6156936, at * 11. For reasons unrelated to the

district court's order that the bank comply with the subpoena, the Second Circuit remanded the

case and instructed the district court to "consider the question of comity again in light of the

newly available December 4, 2013 Judgment of the Second Intermediate People's Court of

Beijing Municipality, and any subsequent judgments it finds relevant." *Gucci II*, 768 F.3d at

142. That judgment, which was subsequently affirmed by China's Higher People's Court, was

Material Under Seal Deleted

issued in a civil suit brought by Bank of China customers whose accounts had been frozen

pursuant to a separate order issued by the Southern District of New York; the Chinese judgment

required only that Bank of China pay 140 Renminbi in court fees—which converts roughly to

$21.  *Gucci III*, 135 F. Supp. 3d at 101−102.  The miniscule fine, the district court concluded, as

well as the absence of any sanction for the bank's compliance with the order to disclosure

records, substantiated that the bank's claim that enforcing a subpoena for records would lead to

heavy fines and criminal punishment was overblown.  *Id.* at 104.  Thus, even if Chinese law

authorizes administrative penalties, the imposition of significant punishment against banks,

owned in large part by the Chinese government, for producing records in response to a foreign

court's order lacks historical precedent.

As with severe administrative penalties, the lack of historical precedent reduces the

banks' concerns about criminal punishment to pure speculation.  Bank Three has four examples

of criminal cases being brought against bank employees, but in each case the bank employee

stole and sold client information for profit.  Jan. 7, 2019 Bank Three Ltr. at 8.  Bank Two's

examples have the same dissimilarity.  Suppl. Bank Two Expert Decl. ¶¶ 16−19.  Here too the

*Gucci* trio of cases, which did not result in any criminal prosecution, is most probative.

Finally, the banks highlight the MOJ's letters as confirmation that penalties will follow

from an order enforcing compliance with the subpoenas.  *See* Bank One's Opp'n at 15; Bank

Two's Opp'n at 15; Bank Three's Opp'n at 19−20.  Of course, "[i]n the spirit of 'international

comity,' a federal court should carefully consider a foreign state's views about the meaning of its

own laws."  *Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018).

How much weight to afford the foreign government's position, however, is context dependent

and "[r]elevant considerations include the statement's clarity, thoroughness, and support; its

context and purpose; the transparency of the foreign legal system; the role and authority of the entity or official offering the statement; and the statement's consistency with the foreign government's past positions." *Id.* at 1873–74.

Here, the MOJ's letters have some indicia of credibility. The MOJ's counsel was sought prior to the government having initiated proceedings to compel compliance with the subpoenas and the Chinese government has consistently resisted the United States' attempts to enforce subpoena compliance as contrary to Chinese law. *See Gucci II*, 768 F.3d at 128 (describing letter from the Commission and the People's Bank as proclaiming that "China's laws prohibit commercial banks from . . . turning over account records pursuant to foreign court orders"). Nevertheless, as previously noted the, the MOJ letters contribute little to the banks' case. If anything, the MOJ is circumspect about what penalties will result if the banks comply. The MOJ's first letter advises Bank Three that "the banking regulatory authorities will impose administrative penalties and fines on you, and you may bear civil or criminal liabilities depending on your situation." Mar. 22, 2018 MOJ Ltr. From the beginning, the MOJ is non-committal about civil and criminal penalties. In addition, the allusion to civil liability gives the impression that the MOJ is not enmeshed in the details of the case. While the letter promises administrative sanctions, only fines are referenced and nothing about the severity of such fines is mentioned. The second letter gives somewhat more detail, explaining that, under China's Commercial Banking Law, if the banks comply with the subpoenas they "will be subject to administrative penalties such as fines, suspension of banking operation and revocation of license and so on, civil suits from the account holders whose accounts have been illegally interfered with, and even criminal liabilities according to different circumstances." Jan. 6, 2019 MOJ Ltr. at 3. Yet, like the first letter, this letter gives no concrete indication criminal penalties are likely

56

and fails to reference how [REDACTED]'s dissolution affects any civil liability.  Additionally,

although the second letter says sanctions "will" be imposed, that letter's reference to

administrative penalties lists only possible sanctions rather than what penalties the banks will

face.  Moreover, the introduction of suspending the bank's operating licenses is a departure from

the first letter.  Finally, nothing about the second letter, or the first for that matter, suggests the

administrative penalties will amount to more than nominal fines.  The MOJ's letters, then,

provide only thin support to the banks' case that court-ordered compliance with the subpoenas

will trigger substantial punishment from Chinese authorities.

In sum, the banks have established a basis in Chinese law for the imposition of

punishment should any of the banks be compelled to comply with the subpoenas.  Yet, such

penalties, severe or otherwise, would be unprecedented.  While the MOJ has said that the three

banks, if they comply, will face administrative penalties, the MOJ's letters do not suggest that

the Chinese government is inclined to take the counter-intuitive step of imposing heavy penalties

against banks in which the Chinese government has a substantial ownership interest.  At most,

this factor tips ever so slightly toward the banks.

> g)    *Good faith*

Finally, the government agrees that none of the banks has acted in bad faith.  Gov't's

Reply at 31.  Thus, the final factor favors the banks.

*     *     *     *     *

That leaves only how to balance the factors.  To recap, the records' Chinese origins, the

slim chance of the banks suffering some hardship if forced to comply, and the banks' good faith

through this process all militate against enforcement of the subpoenas.  Conversely, the

importance of the subpoenaed records, the specificity of the subpoenas, the lack of alternative

57

Material Under Seal Deleted

channels for obtaining the records, and the risk of undermining a United States national security

interest at the pinnacle of importance, all favor enforcement.

Per the government, "[t]he balance of national interests is arguably the most important

comity factor." Gov't's Mot.—Bank One at 23 (citing *Richmark Corp.*, 959 F.2d at 1476); *see*

*also* Gov't's Reply at 17 (calling the respective interests of the sovereigns the "'first and most

important factor' of the Restatement test" (quoting *In re Grand Jury Proceedings*, 532 F.2d 404,

407 (5th Cir. 1976))). Bank Three, for its part, agrees that the countries' competing interests

carry primary importance, but cites precedent that puts the hardship of compliance on equal

footing. Bank Three's Opp'n at 19 (citing *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116

F.R.D. 517, 522 (S.D.N.Y. 1987)).

On balance, international comity is not a reason to refrain from compelling compliance

with the subpoenas. The most important factor, the interests of the relevant countries, could not

fall more firmly in favor of enforcement. National security is at stake on one side; on the other,

no national interest is compromised. Additionally, the United States government has subpoenaed

only records relevant to its national security investigation and has done so because no effective

alternative method of accessing those critical records exists. The banks' potential hardship is

speculative, and, in any event, any penalty is unlikely to be consequential. While the records

originated in China, and the banks, commendably, have acted in good faith, the importance of

those factors pale in comparison to the remainder of the calculus.

Application of the factors redound strongly in favor of compelling compliance.

Material Under Seal Deleted

IV.    **CONCLUSION**

For the foregoing reasons, each of the government's three motions—to compel compliance with the grand jury subpoenas issued to Bank One and Bank Two and the administrative subpoena issued to Bank Three—is granted.

Bank One and Bank Two are ordered, pursuant to the grand jury subpoenas served by the government, to appear before the grand jury to provide testimony at the earliest date available to the grand jury, or, in the alternative, Bank One and Bank Two shall, if the parties agree, promptly complete production of the subpoenaed records, in lieu of appearing before the grand jury.

Bank Three is ordered to complete production of the subpoenaed records by March 28, 2019.

Additionally, the parties are ordered to submit, by April 17, 2019, a joint report advising the Court whether any portions of this Memorandum Opinion may be unsealed.

An appropriate Order accompanies this Memorandum Opinion.

**Date**: March 18, 2019

_____
BERYL A. HOWELL
Chief Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| *In re* GRAND JURY INVESTIGATION OF POSSIBLE VIOLATIONS OF 18 U.S.C. § 1956 AND 50 U.S.C. § 1705 | Miscellaneous Case Nos. 18-175, 18-176, and 18-177 (BAH)<br><br>Chief Judge Beryl A. Howell |

## MEMORANDUM OPINION AND ORDER

On March 18, 2019, the Court ordered, in response to the government's motions to compel, that three Chinese banks—Bank One, Bank Two, and Bank Three—comply with subpoenas issued in December 2017.  *See* Compulsion Order (Mar. 18, 2019) ("Compulsion Order"), ECF No. 32 (No. 18-175), ECF No. 27 (No. 18-176), and ECF No. 26 (No. 18-177) (granting Gov't's Mot. to Compel Production of Documents Requested via *Bank of Nova Scotia* Subpoena—Bank One, ECF No. 1 (No. 18-175); Gov't's Mot. to Compel Production of Documents Requested via *Bank of Nova Scotia* Subpoena—Bank Two, ECF No. 1 (No. 18-176); and Gov't's Mot. to Compel Production of Documents Requested via Administrative Subpoena—Bank Three, ECF No. 1 (No. 18-177)).[1]  Banks One and Two, each of which received a grand jury subpoena, were directed to either "appear before the grand jury to provide testimony at the earliest date available to the grand jury" or, if the parties agreed, to "promptly complete production of the subpoenaed records, in lieu of appearing before the grand jury."  *Id.*

---

[1]     Bank One is [REDACTED]; Bank Two is [REDACTED]; and Bank Three is [REDACTED].

1

Material Under Seal Deleted

at 1.[2]  Bank One, Bank Two and the government "subsequently negotiated a deadline of March

28, 2019, to produce the witness or records."  Gov't Mot. Contempt, ECF No. 37 (No. 18-175),

ECF No. 32 (No. 18-176), and ECF No. 34 (No. 18-177).[3]  Bank Three, which received a

subpoena under 31 U.S.C. § 5318(k)(3), was directed to complete production of the subpoenaed

records by the same date of March 28, 2019.  Compulsion Order at 1.

      None of the three Chinese banks has complied with the Compulsion Order.

      Instead, on March 22, 2019, Bank Three appealed the Compulsion Order, *see* Notice of

Appeal, ECF No. 30 (No. 18-177), and moved for a stay of that order pending appeal, *see* Bank

Three's Mot. Stay, ECF No. 31 (No. 18-177), which motion is opposed by the government,

Gov't Opp'n Mot. Stay ("Gov't's Opp'n Stay"), ECF No. 33 (No. 18-177).

      Meanwhile, given the lack of compliance with the Compulsion Order, the government

now seeks an order holding each bank in contempt and fining each bank $50,000 per day until

full compliance is achieved.  *See* Gov't Mot. Contempt.  In accordance with the Court's

scheduling order, *see* Min. Order (Mar. 29, 2019), each bank filed its opposition on April 1,

2019, *see* Bank One's Opp'n Gov't Mot. Contempt ("Bank One's Contempt Opp'n"), ECF No.

38 (No. 18-175); Bank Two's Opp'n Gov't Mot. Contempt ("Bank Two's Contempt Opp'n"),

ECF No. 33 (No. 18-176); Bank Three's Opp'n Gov't Mot. Contempt ("Bank Three's

Contempt Opp'n"), ECF No. 35 (No. 18-177).  The government filed an omnibus reply on April

---

[2]      Bank One and Bank Two each received a subpoena under the aegis of Grand Jury 16-2.  *See* Gov't's Omnibus Response to April 5, 2019 Minute Order ("Gov't's Response") at 1, ECF No. 42 (No. 18-175) and ECF No. 36 (No. 18-176); *see also* Bank One's Opp'n Gov't Mot. Compel, Ex. 1, Grand Jury Subpoena, ECF No. 6-1 (No. 18-175).  Since the subpoenas were issued, that grand jury has been discharged and the ongoing criminal investigation has been transferred to Grand Jury 18-2.  *See* Gov't's Response at 1.  Courts may enforce grand jury subpoenas issued by a since-discharged grand jury so long as the shift of grand juries occurred before contempt proceedings.  *In re Sealed Case*, 223 F.3d 775, 778 (D.C. Cir. 2000); *but see In re Grand Jury Proceedings*, 744 F.3d 211, 217–18 (1st Cir. 2014) (ruling that subpoena issued by since-discharged grand jury could not be enforced despite subpoena having been transferred to a successor grand jury).
[3]      The three motions are identical.

Material Under Seal Deleted

3, 2019.  *See* Gov't Contempt Reply, ECF No. 41 (No. 18-175), ECF No. 35 (No. 18-176), and ECF No. 37 (No. 18-177).

Initially, a hearing on the government's motion for contempt was set for April 4, 2019, but at Bank Three's request, and with the consent of the government and the other two banks, that hearing was rescheduled for, and held on, April 10, 2019.  Both the government's motions to hold each bank in contempt and Bank Three's motion for a stay of the Compulsion Order are now ripe.

The cross motions present three issues addressed separately below: (1) Does the Court have jurisdiction to hold Bank Three in contempt despite that bank already having appealed the Compulsion Order? (2) Should any of the banks be held in contempt? (3) Should the Compulsion Order, at least for Bank Three, be stayed pending appeal and, relatedly, if any bank is held in contempt, should the attendant sanctions be stayed pending appeal?  For the following reasons, the government's motions to hold the banks in contempt are granted and stayed pending appeal.  Bank Three's motion to stay the Compulsion Order is denied.

## I.      JURISDICTION

Bank Three already has filed a notice of appeal of the Compulsion Order, s*ee* Notice of Appeal, raising the issue of whether this Court may exercise jurisdiction to hold this bank in contempt.  Ordinarily, "[t]he filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982).  That divestiture lasts until the appellate court issues the mandate.  *See, e.g.*, *Kusay v. United States*, 62 F.3d 192, 195 (7th Cir. 1995); *Zaklama v. Mount Sinai Med. Ctr.*, 906 F.2d 645, 649 (11th Cir. 1990).

3

Material Under Seal Deleted

The government and Bank Three agree that this bank's appeal does not strip this Court of jurisdiction to enter a contempt order. *See* Gov't's Mot. Contempt at 3; Bank Three's Contempt Opp'n at 4. Still, the Court must independently be sure that any exercise of judicial authority is lawful.

The government and bank are correct: This Court has jurisdiction to hold Bank Three in contempt notwithstanding the filing of a notice of appeal. Under *Griggs*, a district court does not have jurisdiction over the appealed aspects of a case until the mandate returns. 459 U.S. at 58. Bank Three's appeal will challenge whether the subpoena it received exceeds the limits of 31 U.S.C. § 5318(k)(3). The pending motion raises a separate question: Has Bank Three complied with the Compulsion Order? If Bank Three prevails on appeal, there will have been no need to comply. That possibility, however, is present in every appeal and not one that affects a District Court's jurisdiction to enforce orders pending appeal. *See, e.g.*, *Horn & Hardart Co. v. Nat'l Rail Passenger Corp.*, 843 F.2d 546, 548 (D.C. Cir. 1988) (ruling that a district court did not lose jurisdiction once declaratory judgment was appealed because 28 U.S.C. § 2202's authorization of "further relief" "carries out the principle that every court, with few exceptions, has inherent power to enforce its decrees and to make such orders as may be necessary to render them effective" (quoting Edwin Borchard, DECLARATORY JUDGMENTS 441 (2d ed. 1941))); *Sergeeva v. Tripleton Int'l Ltd.*, 834 F.3d 1194, 1201–02 (11th Cir. 2016) ("Absent entry of a stay on appeal—which Trident Atlanta failed to obtain here—the District Court retained jurisdiction to enforce its orders."); *In re White-Robinson*, 777 F.3d 792, 796 (5th Cir. 2015) (finding that, unless a bankruptcy court's ruling is stayed pending appeal, that court retains jurisdiction to enforce its own rulings "through any appropriate means, including a civil contempt order"); *Chaganti & Assocs., P.C. v. Nowotny*, 470 F.3d 1215, 1223 (8th Cir. 2006) (upholding order

4

Material Under Seal Deleted

holding corporation in civil contempt and imposing sanctions since "district court retained

jurisdiction to enforce its judgment notwithstanding C&A's appeal on the merits").  The

principle holds when contempt follows from a failure to comply with an order to comply with a

subpoena.  *See, e.g.*, *In re Grand Jury Subpoenas Duces Tecum*, 85 F.3d 372, 375–76 (8th Cir.

1996) (upholding district court's authority to require payment of contempt fines for failing to

comply with subpoenas duces tecum after respondents had noticed their appeal and a stay of the

imposition of contempt sanctions pending appeal had been denied); *Nat'l Labor Relations Bd. v.

Cincinnati Bronze*, *Inc.*, 829 F.2d 585, 588 (6th Cir. 1987) (finding that, despite general rule that

a notice of appeal divests the district court of its jurisdiction, the district court retains jurisdiction

to "enforce its judgment so long as the judgment has not been stayed or superseded," and,

consequently, district court was authorized to issue contempt citation to President of company

that failed to comply with a subpoena to produce certain documents when president's appeal was

pending (citing *Deering Milliken, Inc. v. FTC*, 647 F.2d 1124, 1128–29 (D.C. Cir. 1978))).

Thus, the Court retains jurisdiction to enforce the Compulsion Order by holding Bank

Three in contempt even after the filing of an appeal.  Whether to hold Bank Three and the other

two banks in contempt is the next question.

## II.      HOLDING BANKS IN CONTEMPT

"There can be no question that courts have inherent power to enforce compliance with

their lawful orders through civil contempt."  *Shillitani v. United States*, 384 U.S. 364, 370

(1966).  "[C]ivil contempt will lie only if the putative contemnor has violated an order that is

clear and unambiguous, and the violation must be proved by clear and convincing evidence."

*Broderick v. Donaldson*, 437 F.3d 1226, 1234 (D.C. Cir. 2006).  Some judges in this district

permit a party to "justify its failure to comply with a court order by establishing its inability to

Material Under Seal Deleted

comply or good faith substantial compliance." *Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal & Glass LLC*, 736 F. Supp. 2d 35, 40 (D.D.C. 2010); *see also Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 234 F. Supp. 3d 209, 211 (D.D.C. 2017) (refusing to hold party in contempt because putative contemnor had "by all appearances acted in good faith and in substantial compliance with the Court's order"); *SEC v. Bilzerian*, 112 F. Supp. 2d 12, 17 (D.D.C. 2000) ("A party also may defend on the ground of good faith substantial compliance with the orders.").

The D.C. Circuit, however, has only assumed, but not decided, that good faith substantial compliance is a defense to contempt. *Food Lion, Inc. v. United Food & Commercial Workers Int'l Union*, 103 F.3d 1007, 1017 (D.C. Cir. 1997). If that defense exists, the putative contemnor "must demonstrate that it took all reasonable steps within [its] power to comply with the court's order. Although a party's good faith may be a factor in determining whether substantial compliance occurred, and may be considered in mitigation of damages, good faith alone is not sufficient to excuse contempt." *Id* at 1017–18 (internal citations omitted); *see also* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 442(2) (advising that contempt sanctions ordinarily should not be imposed against a party for failing to comply with a court order to produce records located outside the United States if production is prohibited under the law of the country in which the information is located, "except in cases of deliberate concealment or removal of information or of failure to make a good faith effort" to obtain permission from foreign authorities to make the information available).

None of the banks produced a witness or records responsive to the subpoenas by March 28, 2019, as required under the unambiguous Compulsion Order. *See* Bank One's Contempt Opp'n at 1; Bank Two's Contempt Opp'n at 3; Bank Three's Contempt Opp'n at 2.

6

Material Under Seal Deleted

Nevertheless, each bank asks not to be held in contempt, each touting its good faith since receiving a subpoena. Bank One's Contempt Opp'n at 2–3; Bank Two's Contempt Opp'n at 3–4; Bank Three's Contempt Opp'n at 2–3. Indeed, while granting the government's motions to compel, the Court acknowledged that "[s]ince receiving the subpoena, the banks have acted in good faith and the sincerity of their willingness to comply is not questioned." Mem. Op. (Mar. 18, 2019) at 45, ECF No. 33 (No. 18-175), ECF No. 28 (No. 18-176), and ECF No. 27 (No. 18-177); *see also id.* at 57 ("[T]he government agrees that none of the banks has acted in bad faith."). More specifically, the banks were credited with good faith as to their willingness to comply should the United States government make a request for records through the Agreement Between the Government of the United States of America and the Government of the People's Republic of China on Mutual Legal Assistance in Criminal Matters ("MLAA"), June 29, 2000. For reasons already addressed, the MLAA is not a viable option despite the banks' willingness to cooperate. *See* Mem. Op. (Mar. 18, 2019) at 42–47.[4] Consequently, each bank is now subject to, and flatly disregarding, an unambiguous court order. Although the banks' willingness to comply with an MLAA request may be genuine, that no longer matters.

---

[4] The futility of an MLAA request also explains why the RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 442(2)(b), which Bank One cited, *see* Bank One's Contempt Opp'n at 2–3, and raised again at the April 10, 2019 hearing, is not helpful here. That Restatement section provides, in pertinent part, that contempt sanctions "should not ordinarily" be imposed unless the putative contemnor has failed to make a good-faith effort to obtain permission from authorities in the country where the records are located to make the requested information available. Bank One ignores the very next Restatement paragraph, however, advising that "a court or agency may, in appropriate cases, make findings of fact adverse to a party that has failed to comply with the order for production, even if that party has made a good faith effort to secure permission from the foreign authorities to make the information available and that effort has been unsuccessful." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 442(2)(c). Here, after examining thorough declarations submitted by the parties and several letters from China's Ministry of Justice, the Court determined that Bank One's best efforts to secure permission from foreign authorities will go nowhere. *See* Mem. Op. (Mar. 18, 2019) at 42–47. Thus, the Court issued the Compulsion Order, which Bank One, even by its own account, is openly violating. Bank One's Contempt Opp'n at 1.

7

More relevant to contempt, each bank purports to be disobeying the Compulsion Order in good faith because Chinese law does not permit compliance. Bank One's Contempt Opp'n at 3; Bank Two's Contempt Opp'n at 3; Bank Three's Contempt Opp'n at 2. Here, too, the Court has explained why the banks' representations about the risk that compliance poses under Chinese law is overstated. Mem. Op. (Mar. 18, 2019) at 51–57. Thus, the banks' defiance is not in good faith. Rather, the banks simply disagree with the Court's resolution of the banks' comity arguments.

In any event, good faith disobedience of a Court order is not a defense to contempt. *Food Lion*, 103 F.3d at 1017–18 ("Although a party's good faith may be a factor in determining whether substantial compliance occurred, and may be considered in mitigation of damages, good faith alone is not sufficient to excuse contempt."). The defense the banks aim to invoke is good faith substantial compliance. *Id.* Bank Three alone contends that it has substantially complied, underscoring that it has "conduct[ed] document searches to ensure it has collected and preserved documents responsive to the subpoena and [sought] permission from Chinese authorities to permit it to produce the documents." Bank Three's Contempt Opp'n at 2. Yet, Bank Three's stashing documents somewhere in its facilities is not responsive to the subpoena. To the extent Bank Three argues that compliance is demonstrated by avoiding spoliation of the subpoenaed documents, that sets far too low a bar to constitute substantial compliance. Preserving the subpoenaed documents is expected. Accordingly, even assuming good faith substantial compliance is a defense to contempt, no bank meets that standard. Civil contempt is necessary to enforce the Compulsion Order.

As for the corresponding sanction, a civil contempt sanction should be "designed to compel future compliance with a court order." *Int'l Union, United Mine Workers of Am. v.*

8

JA 1851

Material Under Seal Deleted

*Bagwell*, 512 U.S. 821, 827 (1994).  Thus, the contempt sanctions must be sufficiently hefty such

that the contemnors are induced to comply and the Court "must then consider the character and

magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any

suggested sanction in bringing about the result desired." *United States v. United Mine Workers

of Am.*, 330 U.S. 258, 304 (1947).  Here, the government suggests that "[c]ontempt should

include imposition of a coercive daily-fine of $50,000."  Gov't's Mot. Contempt at 3.  Bank

Three raises no objection to that specific amount, but Bank One and Bank Two do.  Bank One

suggests that only a nominal fine is appropriate, doubling down on its good faith and regarding

contempt merely as a procedural vehicle for appellate review.  Bank One's Contempt Opp'n at

4–5.  Bank Two, citing its own good faith, also asks that any contempt sanction be less than a

$50,000 daily fine.  Bank Two's Contempt Opp'n at 4–5.  In addition, Bank Two contends that a

$50,000 daily fine is inappropriate given that the bank has only a "small number" of responsive

documents.  *Id.* at 5.

Without rehashing the prior discussion, the banks have not demonstrated good faith in a

way relevant to contempt.  Next, contrary to Bank Two's assertion, the volume of responsive

records being withheld is unimportant.   More important, the requested records are essential to an

investigation into a matter of national security.  Mem. Op. at 39–41.  Therefore, "continued

contumacy" threatens tremendous harm.  Finally, while Bank One may view contempt merely as

a means of obtaining appellate review, civil contempt "is essential to . . . the enforcement of

judgments, orders, and writs of the courts."  *Broderick*, 427 F.3d at 1234.

Daily imposition of a $50,000 fine is fitting for those purposes.  The contemnors here are

multi-billion-dollar banks disregarding an order to produce records or a witness essential to an

investigation into a state-sponsor of terrorism's proliferation of nuclear weapons.  Minor fines

9

would hardly be felt, let alone produce the coercive effect intended, and compliance is vital.

Courts previously have approved the amount of $50,000 per day as an appropriate sanction for

other well-resourced corporations and international banks. *See In re Grand Jury Subpoena*, 912

F.3d 623, 626 (D.C. Cir. 2019) (affirming contempt sanction of $50,000 per day against a

corporation owned by a foreign country that refused to comply with a grand jury subpoena);

*Gucci Am., Inc. v. Li*, No. 10-cv-4974, 2015 WL 7758872, at *1 (S.D.N.Y. Nov. 30, 2015)

(imposing daily $50,000 fine on Bank of China for failing to produce documents as required by a

subpoena issued in civil litigation); *In re Grand Jury Proceedings Bank of Nova Scotia*, 740 F.2d

817, 819–20 (11th Cir. 1984) (imposing, thirty years ago, a fine of $25,000 per day on Bank of

Nova Scotia for bank's refusal to comply with a grand jury subpoena).  For now, contempt

sanctions will be set at $50,000 per day.  If that does not induce compliance, sanctions may be

increased.

**III.    STAY**

What remains, then, is whether to stay accrual of the contempt sanctions.  In principle,

the government and each bank agree: Contempt sanctions should not accrue during the pendency

of the banks' appeal to D.C. Circuit.  Bank One and Bank Three, however, raise peripheral issues

about the contours of the stay.

Bank One asks that the stay last not just during the pendency of an appeal to the D.C.

Circuit, but until Bank One "has exhausted its appellate rights."  Bank One's Contempt Opp'n at

5.  In the next breath, Bank One asks that contempt not extend past the grand jury's term.  *Id.*[5]

---

[5]    In isolation, Bank One's position that sanctions should not run beyond the life of the grand jury term is unremarkable.  Indeed, civil contempt must end no later than when the grand jury performing the investigation is discharged. *See* 28 U.S.C. § 1826(a)(2); *see also Shillitani v. United States*, 384 U.S. 364, 371 (1966) ("Where the grand jury has been finally discharged, a contumacious witness can no longer be confined since he then has no further opportunity to purge himself of contempt."); *United States v. Harris*, 582 F.3d 512, 516 (3d Cir. 2009)

10

Those two requests, side-by-side, impress that Bank One's request to stay sanctions until all appellate rights have been exhausted is intended to give Bank One enough time to wait out the life of the grand jury without ever being subject to any sanctions. Such a stay would make the contempt order self-defeating. In any event, staying sanctions during an expedited appeal is enough to allow each bank to press its arguments to a court of review without introducing the possibility that the banks' appeal disrupts for too long the grand jury investigation.

Bank Three asks that, instead of holding the bank in contempt and staying accrual of contempt fines, the Court stay the Compulsion Order itself. *See generally* Bank Three's Mot. Stay; *see also* Bank Three's Contempt Opp'n at 3–4.[6] The bank's arguments, however, while

---

(describing proposition that civil contempt must end when grand jury's term expires as "universally acknowledged"); *In re Sealed Case*, 223 F.3d 775, 778 (D.C. Cir. 2000) (distinguishing, for purposes of compelling subpoena compliance when the issuing grand jury has since expired, instances in which "the shift in grand juries occurred during the contempt enforcement process" from cases in which the shift "occurred before [contempt] even started").

[6]      The government and Bank Three dispute the D.C. Circuit's jurisdiction over Bank Three's appeal prior to Bank Three being held in contempt. Gov't's Contempt Mot. at 3 n.2; Gov't's Opp'n Stay at 2–5; Gov't's Contempt Reply at 3–7; Bank Three's Mot. Stay at 10–11; Bank Three's Contempt Opp'n at 4–7; Bank Three's Stay Reply at 1–7, ECF No. 38 (No. 18-177). Appellate jurisdiction is for the D.C. Circuit to decide but clarifying one point here is beneficial. All along, these parties have referred to Bank Three's subpoena as an "administrative" subpoena. *See generally* Gov't Motion to Compel Production of Documents Requested via Administrative Subpoena; Bank Three's Opp'n Gov't's Mot. Compel, ECF No. 4 (No. 18-177). Most commonly, an administrative subpoena refers to a subpoena issued in connection with internal agency proceedings. *See, e.g.*, *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 501–02 (1943) (treating a subpoena issued as part of the Secretary of Labor's investigation under the Walsh-Health Public Contracts Act as an administrative subpoena); *Resolution Tr. Corp. v. Thornton*, 41 F.3d 1539, 1541 (D.C. Cir. 1994) (treating "two subpoenas . . . issued . . . pursuant to the agency's investigation of two failed savings associations" as administrative subpoenas); *FTC v. Texaco*, 555 F.2d 862, 868 (D.C. Cir 1977) (treating subpoenas issued in conjunction with FTC's investigation into whether corporations were underreporting natural gas reserves as administrative subpoenas). Here, the Court adopted the parties' nomenclature and proceeded to consider whether the subpoena issued to Bank Three was consistent with the authorizing statute, a predicate for enforcement of a statutorily authorized subpoena, including typical administrative subpoenas. Mem. Op. (Mar. 18, 2019) at 9–10, 27–31. Concluding that the subpoena issued to Bank Three comported with 31 U.S.C. § 5318(k)(3), the Court issued the Compulsion Order. As for the immediate appealability of that decision, Bank Three notes that "[a] proceeding to enforce an administrative subpoena is 'self-contained, so far as the judiciary is concerned—as much so as an independent suit in equity in which appeal will lie from an injunction without the necessity of waiting for disobedience.'" Bank Three's Mot. Stay at 10 (quoting *Cobbledick v. United States*, 309 U.S. 323, 330 (1940)); *see also Texaco, Inc.*, 555 F.2d at 873 n.21 ("[I]it is settled that an order of a district court granting or denying an agency's petition for enforcement of a subpoena is final and appealable."). The government disagrees, arguing that Bank Three's pre-contempt appeal is premature, since only orders enforcing subpoenas issued as part of an administrative proceeding are appealable prior to a contempt determination, and Bank Three's subpoena relates to an ongoing grand jury criminal investigation. Gov't's Opp'n Stay at 4–5 (citing *United States v. Const. Prods.*

11

Material Under Seal Deleted

explaining its interest in delaying accrual of contempt fines during any appeal to the D.C.

Circuit, fail to answer why staying the Compulsion Order is preferable to holding Bank Three in

contempt and staying that contempt order. For example, Bank Three contends that the

Compulsion Order should be stayed because the appeal raises at least a serious legal question.

Bank Three's Stay Mot. at 2. Even if the appeal raises a serious legal question that might be

resolved in Bank Three's favor, staying any contempt order would allow Bank Three to pursue

that appeal without accruing fines.[7]

Next, Bank Three argues that the Compulsion Order should be stayed because

compliance with that order would force Bank Three to violate Chinese law, thus visiting

irreparable harm upon the bank and its employees. Bank Three's Stay Mot. at 6–8. At the same

time, absent coercive sanctions, Bank Three will not comply with the Compulsion Order. Bank

Three's Contempt Opp'n at 2. So, whether the Compulsion Order is stayed or Bank Three is

held in contempt and fines are stayed, Bank Three is in the same position vis-à-vis Chinese law

---

*Research, Inc.*, 73 F.3d 464, 468–69 (2d Cir. 1996)). Whether Bank Three's pre-contempt appeal is proper depends on whether a subpoena under 31 U.S.C. § 5318(k)(3), no matter the label, more resembles a subpoena issued as part of an administrative proceeding or a grand jury subpoena. The Congressional Findings for Title III of the USA Patriot Act suggest that the purpose of the then newly-authorized subpoena was to aid criminal investigations into money laundering, *see* Mem. Op. (Mar. 18, 2019) at 30 n.12 (citing the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act) Act of 2001, Pub. L. 107-56, § 302(a)(6), (a)(8), (b)(4), 115 Stat. 272, 296–97), suggesting that the anti-money laundering ("AML") subpoena authorized under 31 U.S.C. § 5318(k)(3) hews more closely to a grand jury subpoena than administrative subpoena. Either way, Bank Three is being held in contempt today so appellate jurisdiction is secure. Additionally, referring to the AML subpoena as an administrative subpoena did not alter the Compulsion Order as, labels notwithstanding, an AML subpoena, like an administrative subpoena, is enforceable only if consistent with the authorizing statute. *See* Mem. Op. (Mar. 18, 2019) at 9–10, 27–31.

[7]        Additionally, Bank Three's motion for a stay is unconvincing as to the strength of its appellate arguments. The motion to stay suggests that Bank Three will argue that the subpoena requesting all [REDACTED] records from Bank Three is broader than 31 U.S.C. § 5318(k)(3) allows because that subpoena is not confined to records attached to [REDACTED] use of a United States correspondent bank account. Bank Three's Stay Mot. 2–6. In asserting this argument, Bank Three uses just two sentences to breeze past the rationale for the Court's ruling: [REDACTED] is a front for North Korea's [REDACTED] and [REDACTED] sole purpose was laundering money through United States correspondent accounts. Mem. Op. (Mar. 18, 2019) at 29–30. On the facts of this case, no space separates [REDACTED] records from [REDACTED] records related to a United States correspondent account. If [REDACTED] were a front company serving some other purpose, Bank Three might have a point. Bank Three's motion for a stay, however, overlooks the nature of [REDACTED] illicit services.

12

Material Under Seal Deleted

and any irreparable harm. Likewise, Bank Three's arguments that the government will not suffer any harm if the Compulsion Order is stayed, Bank Three's Stay Mot. at 8–9, and that staying the Compulsion Order serves the public's interest in international comity, *id.* at 10–11, are as true of staying any contempt order.

Bank Three makes two arguments specific to staying the Compulsion Order rather than any contempt order. Neither is persuasive. First, according to Bank Three, "even if contempt sanctions are stayed . . . the mere fact of being held in contempt would cause irreparable harm to the Bank. 'Injury to reputation or goodwill'—such as the Bank would suffer from being held in contempt—'is not easily measurable in monetary terms.'" Bank Three's Stay Reply at 10, ECF No. 38 (No. 18-177) (quoting 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2948.1 (3d ed. 2014)). These proceedings, however, are under seal. Knowledge of Bank Three's contempt and the resulting reputational injury are consequently non-existent. In the same vein, Bank Three raised, at the April 10, 2019 hearing, the possibility that any contempt finding might need to be reported to regulators in a third country, in which Bank Three operates. Yet, even by Bank Three's counsel's representations, this possibility was entirely speculative.

Second, Bank Three argues that staying the Compulsion Order would serve the public's interest by conserving judicial resources. Bank's Stay Mot. at 10–11. Not so: Conservation of judicial resources counsels for holding Bank Three in contempt now and staying that contempt order. Bank Three's contempt is fully briefed. A hearing has been held. Delaying resolution of Bank Three's contempt while the bank appeals makes little sense as a matter of judicial resources, since, if that appeal results in affirmance of the Compulsion Order, the Court would then have to entertain repetitive briefs and possibly hold another hearing, when an alternative that realizes the bank's interests is available now. Moreover, enforcing the Compulsion Order by

13

Material Under Seal Deleted

holding Bank Three in contempt and staying that order rather than the Compulsion Order

eliminates the possibility that Bank Three's pre-contempt appeal is dismissed for want to

appellate jurisdiction, which would needlessly delay a final resolution and require that contempt

proceedings, as to Bank Three, begin anew.

Accordingly, as with Bank One and Bank Two, Bank Three will be held in contempt

until that bank complies with the Order. Contempt sanctions will not accrue, however, until

Bank Three's appeal to the D.C. Circuit has been resolved.

## IV.    CONTEMPT ORDER

For the foregoing reasons, it is hereby

**ORDERED** that Bank Three's Motion for Stay Pending Appeal, ECF No. 31 (No. 18-

177) is DENIED; and it is further

**ORDERED** that the Government's Motions to Hold the Witnesses in Civil Contempt for

Failure to Comply with the Court's March 18, 2019 Order, ECF No. 37 (No. 18-175), No. 32

(No. 18-176), and No. 34 (No. 18-177), are GRANTED; and it is further

**ORDERED** that Bank One, Bank Two, and Bank Three are found in civil contempt of

the Court's March 18, 2019 Order; and it is further

**ORDERED** that Bank One, Bank Two, and Bank Three are assessed a fine of $50,000

per day, payable to the United States, until such time as those banks are willing to complete

production of the subpoenaed records or produce a witness to testify before the grand jury,

provided that such daily fines shall not exceed the life of the term of the Grand Jury 18-2,

including extensions; and it is further

**ORDERED** that the civil contempt sanctions against the banks shall be STAYED

pending appeal, shall not accrue during the pendency of the appeal, and shall only begin accruing

14

Material Under Seal Deleted

seven business days after the Court of Appeals affirms this Court's order, provided the

following:

1.  That Bank One and Bank Two file a notice of appeal by April 12, 2019;

2.  That Bank One, Bank Two, and Bank Three agree to file a joint motion in the Court of

    Appeals for an expedited briefing schedule, as agreed to and described at the April 10,

    2019 hearing; and

3.  That Bank One, Bank Two, and Bank Three preserve all information called for by the

    subpoena in this matter during the pendency of any appeal.

It is further **ORDERED** that the parties shall submit, by May 10, 2019, a joint report

advising whether any portions of this Memorandum Opinion and Order may be unsealed and, if so,

proposing any redactions.

**SO ORDERED.**

DATE: April 10, 2018

_____
Beryl A. Howell
Chief Judge

15

JA 1858