<u>PUBLIC COPY – SEALED INFORMATION DELETED</u>

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued July 12, 2019          Decided July 30, 2019
                                    Reissued August 6, 2019

No. 19-5068

IN RE: SEALED CASE

———

Consolidated with 19-5100, 19-5102, 19-5103

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:18-mc-00175)
(No. 1:18-mc-00176)
(No. 1:18-mc-00177)

———

Before: TATEL, MILLETT, and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*:[*] The three appellant banks, headquartered in China, hold records that the United States government thinks may clarify how North Korea finances its nuclear weapons program. The government therefore procured subpoenas for those records, obtaining two from a grand jury (for the two banks with U.S. branches) and one from the

———

[*] **NOTE:** Portions of this opinion contain **sealed** information, which has been redacted.

**PUBLIC COPY – SEALED INFORMATION DELETED**

Attorney General under the Patriot Act (for the bank that has no U.S. branch). The banks resisted on multiple fronts, claiming that the district court lacked personal jurisdiction, that the Patriot Act subpoena exceeded the government's statutory authority, and that compelling production would run afoul of comity principles because turning over the records—even in response to a U.S. court order—would trigger penalties under Chinese law. In a thorough and thoughtful pair of opinions, the district court overruled those objections and, when the first opinion failed to elicit the records, held the banks in civil contempt. For the reasons set forth below, we affirm.

## I.

For decades, the Democratic People's Republic of Korea (better known as North Korea) has aspired to a battle-ready nuclear weapons program. Seeking to defuse the threat, the U.S. government has imposed stiff financial sanctions on the North Korean regime and its instrumentalities, exercising authority located in the International Emergency Economic Powers Act. *See* 50 U.S.C. §§ 1701–02 (granting the President the power to "prohibit" various "transactions" after declaring a "national emergency" posed by "any unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States"). Relevant to this case, those sanctions are intended to cut off North Korea's access to American markets and currency. *See* Executive Order No. 13,382, § 1, 70 Fed. Reg. 38,567, 38,567 (June 28, 2005) (authorizing various cabinet officers to "block[]" entities that further nuclear proliferation by preventing any "property or interests in property" from being "transferred, paid, exported, withdrawn, or otherwise dealt in"). According to government investigators, however, North Korea manages to evade the sanctions by using

**PUBLIC COPY – SEALED INFORMATION DELETED**

Chinese front companies that cloak the true ownership of the funds involved.

The facts uncovered by this investigation so far are a case in point. The U.S. government has collected substantial evidence that a now-defunct Chinese company called ███████████ ("the Company") acted as a front for ████████, a North Korea-owned entity ("the NKE"), by facilitating transactions that violated the sanctions orders. In fact, to date the government's "investigation [has] not yield[ed] *any* evidence that" the Company "was *ever* used as a legitimate business." Declaration of ████ ████ ████ ("FBI Declaration") ¶ 10, Joint Appendix ("J.A.") 864. Unsurprisingly, then, in addition to the NKE itself, the government has sanctioned the Company and two of its alleged founders. Actions Taken Pursuant to Executive Order 13382, ████████████ (designating the NKE); Notice of [Office of Foreign Asset Control (OFAC)] Sanctions Actions, ████████ (designating the Company); Notice of OFAC Sanctions Actions, ██ ██ ██ ██ ██ (designating alleged co-founder ████); Notice of OFAC Sanctions Actions, ████████████ (designating alleged co-founder ██████).

According to the government, the scheme operated like this: Hobbled by the worthlessness of North Korea's currency, the NKE would use the Company to make or receive payments in U.S. dollars. These transactions helped North Korea access resources that would otherwise have been beyond its reach. For example, the Company's assistance allegedly enabled North Korea to export hundreds of millions of dollars of coal and other minerals, generating revenue in U.S. currency that North

PUBLIC COPY – SEALED INFORMATION DELETED

Korea could then use to requisition other commodities vital to its weapons program.

In these transactions, the Company routinely took advantage of U.S. correspondent bank accounts—that is, accounts held by banks outside the United States at banks located inside the United States. *See* 31 U.S.C. § 5318A(e)(1)(B) (defining "correspondent account" to mean "an account established to receive deposits from, make payments on behalf of a foreign financial institution, or handle other financial transactions related to such institution"). Such accounts allow foreign "banks to conduct business and provide services for their customers in" the United States even if "the banks have no physical presence" here. Minority Staff of the Senate Permanent Subcommittee on Investigations, *Correspondent Banking: A Gateway for Money Laundering*, S. Hrg. 107-84, 107th Cong., app. 287 (2001). This, in turn, enables a foreign bank's customers to "receive many or all of the services offered by [a] U.S. bank" without forming a direct-client relationship with an American institution. *Id.* Correspondent banking arrangements are fairly ubiquitous: "[d]ue to U.S. prominence in international trade and the high demand for U.S. dollars due to their overall stability, most foreign banks that wish to provide international services to their customers have accounts in the United States capable of transacting business in U.S. dollars." *Id.* In short, then, correspondent bank accounts allow foreign banks to offer their clients services—including obtaining and transacting in U.S. currency—without opening a U.S. branch.

These accounts are how the appellant banks (collectively, the "Banks") enter the story. All three are China-based—indeed, the Chinese government owns a substantial minority of each—and hold correspondent accounts in the United States.

PUBLIC COPY – SEALED INFORMATION DELETED

Banks One and Two also operate branches in the United States, but according to the government the Company relied on the three Banks' U.S. correspondent accounts to execute its scheme.

To better grasp the full scope of the Company's operations, the government seeks certain records from the Banks. The United States and China have a bilateral agreement for obtaining just these kinds of records. Known as the Mutual Legal Assistance Agreement (MLAA), it obligates the two countries to assist each other "in proceedings related to criminal matters," including by "providing . . . records or articles of evidence" and "executing requests for inquiry," and specifies the "[f]orm and [c]ontents" of any requests. Agreement Between the Government of the United States of America and the Government of the People's Republic of China on Mutual Legal Assistance in Criminal Matters, arts. 1, 4, June 19, 2000, T.I.A.S. No. 13,102. Absent an MLAA request, Chinese law prohibits banks from disclosing records to international investigators.

In this case, however, the United States chose not to go through the MLAA. Stymied by what it perceives as sluggish and typically fruitless cooperation from Chinese authorities in the past, the government unilaterally issued subpoenas to all three Banks in December 2017. The two banks with branches in the United States— ("Bank One" and "Bank Two," respectively)—received grand jury subpoenas. *See* Federal Rule of Criminal Procedure 17(e)(1). The third— ("Bank Three")—has no branch in the United States and received a subpoena from the Attorney General pursuant to the Patriot Act, which gives the Attorney General and the Treasury Secretary special investigatory tools

**PUBLIC COPY – SEALED INFORMATION DELETED**

when it comes to U.S. correspondent bank accounts. *See* 31 U.S.C. § 5318(k)(3)(A)(i). The subpoenas seek all records dated 2012 to 2017 concerning all correspondent banking transactions associated with certain accounts linked to the Company, defining records to include signature cards, ledger cards, account statements, and documentation of deposits, withdrawals, and transfers. Through this investigation, the government hopes to learn whether the Company or any other entities have committed various federal crimes, including engaging in unlicensed financial transactions (violating 50 U.S.C. § 1705), money laundering (violating 18 U.S.C. § 1956), or failing to exercise due diligence in correspondent banking as required by the Bank Secrecy Act (violating 31 U.S.C. §§ 5318 and 5322). The government does not currently suspect the subpoenaed Banks of any wrongdoing.

In correspondence with the U.S. government, the Banks and the Chinese government protested that complying with the subpoenas would violate multiple Chinese laws, including the law designating the MLAA process as the exclusive mechanism for disclosures. They claimed that failure to use the MLAA channel would expose the Banks to administrative and criminal penalties. In response, the U.S. government took the position that such a request would be futile, given China's slow and spotty history of providing records requested through that process.

There matters stood for about a year. Despite traveling twice to China for what proved to be unproductive negotiations with the Chinese government, there were no major breakthroughs: the United States refused to submit an MLAA request, and the Banks continued to withhold the records. At last, in November 2018, things kicked back into gear when the government moved the district court to compel enforcement.

**PUBLIC COPY – SEALED INFORMATION DELETED**

Still resisting, the Banks disputed the district court's personal jurisdiction and contended that enforcing the subpoenas would violate deeply ingrained principles of international comity. Bank Three also protested that the scope of its subpoena exceeded the Attorney General's Patriot Act authority.

The district court granted the government's motion to compel. *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 and 50 U.S.C. § 1705*, Nos. 1:18-mc-175, -176, -177, slip op. at 3 (D.D.C. Mar. 18, 2019) ("March Op."). The court found that Banks One and Two had consented to personal jurisdiction when they signed an agreement with the Federal Reserve permitting them to open branches in the United States. *Id.* at 11–13. As for Bank Three, which has no branch in the United States, the court determined that (along with Banks One and Two) it had sufficient contact with the United States as a whole and the subpoenas sufficiently related to that contact so as to support the court's personal jurisdiction. *Id.* at 13–27; *see also International Shoe Co. v. State of Washington, Office of Unemployment Compensation and Placement*, 326 U.S. 310, 316 (1945) (personal jurisdiction requires "minimum contacts" with the forum such that jurisdiction is consistent with "traditional notions of fair play and substantial justice" (internal quotation marks omitted)). The district court also perceived no problems with the scope of the Patriot Act subpoena. March Op. 27–31. Finally, although the government conceded that compliance with the subpoenas would entail violating at least some Chinese laws, the district court concluded that comity principles did not require the subpoenas to be quashed. *Id.* at 32–58. The court found that, based on past practice, China's preferred MLAA procedure would likely be futile and determined that the U.S. government's strong national security interests outweighed China's stake in enforcing the identified laws. *Id.* at 42–51. The

**PUBLIC COPY – SEALED INFORMATION DELETED**

court was unmoved by a series of letters from the Chinese Ministry of Justice promising to "promptly review and process" any MLAA request in this case. *Id.* at 45 (quoting Letter from Du Yaling, Director General of International Cooperation Department of the Ministry of Justice, to Chief Judge Beryl A. Howell (Feb. 26, 2019), J.A. 966).

About a month later, after the Banks made clear they would not comply with the compulsion order, the district court held them in contempt. *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 and 50 U.S.C. § 1705*, Nos. 1:18-mc-175, -176, -177, slip op. at 1–3 (D.D.C. Apr. 10, 2018) ("April Op."). It imposed a $50,000 per day fine against each bank but stayed that penalty contingent on the parties seeking an expedited appeal. *Id.* at 14–15. They obliged, and we agreed to accelerate our consideration of the case. Per Curiam Order, *In re: Sealed Case*, No. 19-5068 (D.C. Cir. Apr. 25, 2019). We now turn to the Banks' arguments, beginning with personal jurisdiction before examining the merits.

## II.

The Constitution forbids federal courts from exercising personal jurisdiction absent sufficient "minimum contacts" to satisfy "'traditional notions of fair play and substantial justice.'" *International Shoe*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). That protection extends to private foreign entities—such as the Banks—just as to American citizens. *See Livnat v. Palestinian Authority*, 851 F.3d 45, 48 (D.C. Cir. 2017) (delineating the "general rule" that restrictions on personal jurisdiction "protect[] all litigants in our courts"). Unlike subject-matter jurisdiction, however, personal jurisdiction "can . . . be waived," meaning a party may "consent" to a court's personal jurisdiction. *Insurance*

USCA Case #19-5068    Document #1800815    Filed: 08/06/2019    Page 8 of 44

Filed: 08/06/2019

Document #1800815

9

*Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982). Because neither the government nor the Banks suggests that these principles operate differently in grand jury investigations than in ordinary civil litigation, we shall treat these two contexts as identical for purposes of this case. *But see Boyd v. Meachum*, 77 F.3d 60, 66 (2d Cir. 1996) ("While the federal constitutional requirements of personal jurisdiction in a civil setting are reasonably well-defined, . . . this is not so in a criminal case.").

All three Banks contest personal jurisdiction. "Reviewing the district court's assertion of personal jurisdiction *de novo*," *United States ex rel. Miller v. Bill Harbert International Construction, Inc.*, 608 F.3d 871, 886 (D.C. Cir. 2010), we conclude that the Banks' challenges are meritless. Banks One and Two consented to jurisdiction when they opened branches in the United States. And although Bank Three has no U.S. branch and executed no such agreement, its choice to maintain correspondent accounts in the United States establishes an adequate connection to the forum and the enforcement action to sustain jurisdiction.

## A.

Congress requires any "foreign bank" to acquire "prior approval of the" Federal Reserve before it "may establish a branch or an agency" in the United States. 12 U.S.C. § 3105(d)(1). The Federal Reserve, in turn, has authority to "impose such conditions on its approval" of a foreign bank's application "as it deems necessary," *id.* § 3105(d)(5), to, among other things, assure itself that the bank will be "in compliance with applicable United States law" and mitigate any "risk to the stability of the United States financial system," *id.* § 3501(d)(3)(D)–(E). *See also* 12 C.F.R. § 211.24(c)(2)(vii)

**PUBLIC COPY – SEALED INFORMATION DELETED**

(Federal Reserve scrutinizes "[w]hether the foreign bank . . . has established adequate controls and procedures . . . to ensure continuing compliance with U.S. law, including controls directed to detection of money laundering").

When Banks One and Two applied to open their U.S. branches, both executed agreements with the Federal Reserve to assure compliance with relevant provisions of American law. As part of that deal, they "consent[ed] to the jurisdiction of the federal courts of the United States . . . for purposes of any and all . . . proceedings initiated by . . . the United States . . . in any matter arising under U.S. Banking Law." Letter from ███████, Vice Chairman & President, ████████████████████ to Board of Governors of the Federal Reserve System 1 ██████████, J.A. 1659 ("Bank One Consent"); Assurances Commitment and Consent to Jurisdiction Commitment ████████████████ ████ 1, J.A. 1663 ("Bank Two Consent"). The agreements define "U.S. Banking Law" expansively to include "all federal criminal laws of which violation(s) arise(s): . . . under . . . the Bank Secrecy Act." Bank One Consent 3 n.2, J.A. 1661; Bank Two Consent 1 n.2, J.A. 1663.

The plain language of those agreements covers this case. This investigation is unquestionably a "proceeding[]" initiated by . . . the United States" and, as the government explains, "the grand jury is investigating whether those financial institutions that provided services in the United States"—for example, the American institutions hosting the foreign Banks' correspondent accounts—"exercised due diligence." Appellee's Br. 18 (citing 31 U.S.C. §§ 5318, 5318A, 5322). The Bank Secrecy Act makes willful dereliction of that obligation a federal criminal violation. 31 U.S.C. § 5322. In short, then, the government has assembled the necessary

PUBLIC COPY – SEALED INFORMATION DELETED

ingredients for jurisdiction: a criminal investigation initiated by the United States (the grand jury investigation) arising under U.S. Banking Law (the Bank Secrecy Act).

The banks' contrary arguments amount to nothing more than an unsuccessful effort to move the goalposts. They insist that there must be a reasonable showing that someone actually violated the Bank Secrecy Act. Bank Two Br. 8. Not so. All our precedent requires is a "'reasonable probability that . . . the facts necessary for the exercise of jurisdiction'" exist. *In re Sealed Case*, 832 F.2d 1268, 1274 (D.C. Cir. 1987) (quoting *In re Marc Rich & Co.*, 707 F.2d 663, 670 (2d Cir. 1983)). Here, nothing in the consent agreements requires the government to establish liability; they require only that the proceedings "*aris[e] under* U.S. Banking Law." Bank One Consent 1, J.A. 1659 (emphasis added); Bank Two Consent 1, J.A. 1663 (emphasis added). Whether a proceeding "arises under" a particular law is a question about its subject matter at the outset, not a question about its outcome. To look at the same phrase in a more typical context, when we ask whether a lawsuit "aris[es] under" federal law for purposes of subject-matter jurisdiction, U.S. Const. art. III, § 2, we look to whether the plaintiffs "*assert* a claim" based on "federal law," not whether they will ultimately prevail, *National Farmers Union Insurance Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 850 (1985) (emphasis added); *see also American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916) ("A suit arises under the law that creates the cause of action."). Given this "legal lineage," *Hall v. Hall*, 138 S. Ct. 1118, 1125 (2018), a grand jury investigation plainly "arises under" a particular statute when it probes whether that statute has been violated.

Read properly, the consent agreements demand only that "U.S. Banking Law" form the basis of the investigation. The

**PUBLIC COPY – SEALED INFORMATION DELETED**

government has cleared that threshold here. Even if, as the banks suggest, this investigation's potential to yield successful prosecutions is uncertain, the banks have offered no basis for doubting that "U.S. Banking Law" constitutes this investigation's subject matter.

The banks also suggest that there is a problem with personal jurisdiction because the subpoenaed records are located outside the United States. But that fact has no bearing on personal jurisdiction given that the banks' consent agreements supply the basis for jurisdiction. The argument is better conceived as a challenge to the scope of the subpoenas— an understanding not evident from the banks' briefs. Even were we to entertain the argument, however, it would go nowhere. Federal courts have long required the production of documents held abroad. *See, e.g.*, *In re Marc Rich*, 707 F.2d at 667 (A witness may not "resist the production of documents on the ground that the documents are located abroad."); *United States v. First National City Bank*, 396 F.2d 897, 900–01 (2d Cir. 1968) ("[A] federal court has the power to require the production of documents located in foreign countries if the court has in personam jurisdiction of the person in possession or control of the material."). That practice makes sense: grand juries often investigate violations of criminal laws that obviously cover extraterritorial conduct. "It would be strange, indeed, if the United States could punish a foreign corporation for violating its criminal laws . . . , but a federal grand jury could not investigate to ascertain the probability that a crime had taken place." *In re Marc Rich*, 707 F.2d at 666.

## B.

Bank Three, by contrast, has neither opened a U.S. branch nor consented to personal jurisdiction. We therefore must

USCA Case #19-5068      Document #1800815      Filed: 08/06/2019      Page 12 of 44

PUBLIC COPY – SEALED INFORMATION DELETED

determine whether it "has purposefully directed" its relevant "activities" at "the forum." *Burger King Corp v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal quotation marks omitted).

That, of course, requires us to correctly identify "the forum," a task ordinarily linked to where Congress has authorized service of process. *See BNSF Railway Co. v. Tyrrell*, 137 S. Ct. 1549, 1555–56 (2017) ("Congress' typical mode of providing for the exercise of personal jurisdiction has been to authorize service of process" because "a basis for service of a summons on the defendant is prerequisite to the exercise of personal jurisdiction"). In many situations, Congress limits the territorial reach of federal district courts to that of the state in which they sit. *See* Wright & Miller, 4 Federal Practice & Procedure § 1068.1 (4th ed.); *see, e.g.*, Federal Rule of Civil Procedure 4(k)(1)(A). For example, unless a federal statute otherwise provides, by virtue of Rule 4(k)(1)(A) the jurisdictional reach of a federal court in a civil action is keyed to that of a court of general jurisdiction in the state in which it sits. So in reviewing the constitutionality of their assertions of jurisdiction, federal courts often perform state-specific contacts analyses. Although the constitutional restraint in those situations necessarily flows from the Fifth Amendment, the scope of the minimum-contacts inquiry is the same as it would be under the Fourteenth Amendment for a claim in state court: confined to contacts with the forum state.

According to Bank Three, a state-specific contacts analysis is appropriate for the Patriot Act subpoenas at issue here. And, the Bank argues, since its agent was served in New York and the Bank lacks any meaningful contact with the District of Columbia, the district court here lacked jurisdiction. For its part, the government maintains that the Patriot Act authorizes *nationwide* service of process. Under those

PUBLIC COPY – SEALED INFORMATION DELETED

circumstances, the Fifth Amendment requires only "minimum contacts with the United States" as a whole—rather than with the forum state. *SEC v. Bilzerian*, 378 F.3d 1100, 1106 n.8 (D.C. Cir. 2004); *accord Livnat*, 851 F.3d at 55 ("Under the Fifth Amendment, which defines the reach of federal courts, contacts with the United States as a whole are relevant."). Therefore, the government argues, the district court properly considered Bank Three's contacts with the United States as a whole, including its maintenance and use of correspondent accounts in New York.

We begin by observing that the usual process of looking to where federal law authorizes service of process as a proxy for whether Congress sought to trigger a federal court's nationwide territorial reach is, perhaps, not a perfect fit for this provision of the Patriot Act. Because the statute confers authority to issue a subpoena directly on the Attorney General and the Treasury Secretary, rather than on a federal district court, Congress may have given little consideration to the territorial reach of a district court considering a motion to compel enforcement of such a subpoena. But given that Bank Three assumes that authorizing nationwide service in this context would trigger a nationwide contacts analysis, we shall too. *See Sickle v. Torres Advanced Enterprise Solutions, LLC*, 884 F.3d 338, 344 (D.C. Cir. 2018) (accepting a party's decision "not to brief or argue the question of personal jurisdiction" because that "defense . . . can be waived or forfeited").

Here, that service-of-process provision, codified in 31 U.S.C. § 5318(k), authorizes the kind of subpoena served on Bank Three to "be served on the foreign bank in the United States if the foreign bank has a representative in the United States." 31 U.S.C. § 5318(k)(3)(A)(ii). We know of no other service-of-process provision in the U.S. Code phrased exactly

PUBLIC COPY – SEALED INFORMATION DELETED

this way. Still, we are not entirely without guideposts as we evaluate this question.

We know, for instance, that Congress has many different ways of authorizing nationwide service of process. Sometimes it makes its intention abundantly clear by authorizing service "anywhere in the United States." *See, e.g.*, 7 U.S.C. § 499g(b) (service for enforcing in federal district courts certain orders of the Secretary of Agriculture); 28 U.S.C. § 2321(c) (same for enforcing orders of the Surface Transportation Board); 33 U.S.C. § 921(c) (service for review proceedings in the courts of appeals of decisions of the Benefits Review Board for longshore and harbor workers). On other occasions, Congress employs some riff on the phrase "wherever the defendant may be found," language generally understood to refer to nationwide service. *See, e.g.*, 7 U.S.C. § 25(c) (service in private lawsuits under the Commodity Exchange Act); *see also Omni Capital International, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 105–06 (1987) (recognizing that such language "explicitly authorize[s] nationwide service of process"); Appellee's Br. 25 n.20 (collecting additional examples). We also know that Congress can very clearly limit service to a particular judicial district when it wants to. *See, e.g.*, 45 U.S.C. § 362(b) (authorizing process issued by most courts in Railroad Retirement Board proceedings to be served "in the judicial district of the district court issuing such . . . process").

At first glance, the language in section 5318(k) looks more like the provisions that authorize nationwide service. So long as a foreign bank has designated a representative, the statute allows for service "in the United States," without specifying any state or judicial district. True, the provision lacks the unmistakable clarity of the statutes that expressly authorize service "*anywhere*" in the country; nonetheless, the text

PUBLIC COPY – SEALED INFORMATION DELETED

contains no limitation other than the territorial boundaries of the entire United States. Bank Three, however, seizes on the requirement to designate a representative to argue that, in fact, Congress only meant to authorize service in the judicial district where that representative is located.

Bank Three's position makes some intuitive sense. After all, as a matter of physics, the designated representative will have a single location. On further reflection, however, this logic fails to resolve things in the Bank's favor. After all, both Bank Three and the government agree that language authorizing service "wherever a defendant may be found" authorizes nationwide service, *see* Bank Three Br. 51, Appellee's Br. 25 n.20, even though in many instances that defendant, too, will only be located in one place at a time.

Even more instructive, in other service-of-process regimes involving designated representatives, when Congress wants to specify a particular location or district for service, it says so directly. For example, in certain trademark actions, Congress has instructed foreign mark holders to designate a U.S. agent and authorized service of process "by leaving with that person or mailing to that person a copy [of the process] *at the address specified in the last designation so filed.*" 15 U.S.C. § 1141k(f) (emphasis added). Congress has even provided a backup option, explaining that "[i]f the person so designated cannot be found at the last designated address" then "process may be served on the Director" of the United States Patent and Trademark Office. *Id.*; *see also* 7 U.S.C. § 2569 (containing a similar backup provision for when a designee "cannot be found at the address given"). The provision at issue in this case is noticeably devoid of any similar language, leading to the inference that Congress sought to impose no similar geographical limitation here.

PUBLIC COPY – SEALED INFORMATION DELETED

Reading section 5318(k) to authorize nationwide service also aligns with the Patriot Act's structure and purpose. *Cf. United States International Trade Commission v. ASAT, Inc.*, 411 F.3d 245, 251 (D.C. Cir. 2005) (examining, when considering whether a statute authorizes nationwide service, whether "Congress would have desired nationwide service of process to effectuate the underlying statute's purpose"). Rather than requiring the Attorney General or Treasury Secretary to go to court to obtain a subpoena, Congress authorized those officers to issue process themselves. Unlike federal district courts, which customarily serve a particular geographical area, Cabinet officers serve the entire country. Structurally speaking, then, Congress's choice to give two such officers the subpoena power evokes an intent to rely on their nationwide reach. As for purpose, having found that correspondent accounts were a source of special concern for money laundering, Congress sought "to provide a clear national mandate for subjecting to special scrutiny those . . . financial institutions operating outside of the United States . . . that pose particular, identifiable opportunities for criminal abuse." USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 302(a)(6), (b)(4), 115 Stat. 272, 296–97. It would be odd if, in establishing this "clear national mandate," Congress had geographically subdivided the government's investigative powers.

Apparently recognizing that its preferred interpretation of section 5318(k) may not represent "the most natural reading of the provision," Bank Three Br. 48, Bank Three falls back on the presumption against extraterritoriality, which teaches that without a "clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2100 (2016). According to the Bank, reading the

PUBLIC COPY – SEALED INFORMATION DELETED

Patriot Act to authorize nationwide service "would vastly expand the extraterritorial scope of federal regulatory power." Bank Three Br. 49. But that does not follow. This service-of-process provision has no impact on the substantive extraterritorial reach of federal law; it merely helps sort out *which* federal court has authority to enforce the subpoena. After all, even under Bank Three's preferred interpretation, at least one federal court could assert jurisdiction over Bank Three (the one in the district where the Bank's agent resides). The presumption against extraterritoriality therefore offers no basis to upset the most straightforward reading of the text: that once a foreign bank has designated a representative in the United States, service may be accomplished throughout "the United States."

Having defined the forum as the entire United States, we would usually go on to assess whether the Bank's contacts with that forum are sufficient. In this case, however, Bank Three placed all its eggs in the forum-identification basket; it claims only that it lacks the necessary contacts with the District of Columbia, offering no argument that its contacts with the United States as a whole are insufficient. *See* Bank Three Br. 46–47 ("The only way the government can prevail is by showing that the relevant forum is the United States as a whole."). We therefore have no occasion to question the district court's conclusion that Bank Three's maintenance of correspondent accounts in the United States supplies the necessary nexus. March Op. 21–24. With no further jurisdictional hurdles in our path, we proceed to the merits.

## III.

Bank Three, the only bank to receive a Patriot Act subpoena, argues that its subpoena exceeds the Attorney

PUBLIC COPY – SEALED INFORMATION DELETED

General's statutory authority. Although "[w]e generally review district court decisions enforcing document subpoenas only for arbitrariness or abuse of discretion," we afford no deference to a decision that applies "the wrong legal standard." *In re Sealed Case*, 146 F.3d 881, 883 (D.C. Cir. 1998). We therefore review "de novo" the district court's "legal conclusions," including its statutory interpretation, even as we review "its factual findings for clear error." *United States v. Ahn*, 231 F.3d 26, 38 (D.C. Cir. 2000).

Congress enacted section 5318(k)(3) "to increase the strength of United States measures to prevent, detect, and prosecute international money laundering and the financing of terrorism." Pub. L. No. 107-56, § 302(b)(1), 115 Stat. at 297. In particular, Congress found that correspondent accounts held by foreign banks were "one of the banking mechanisms susceptible in some circumstances to manipulation by foreign banks to permit the laundering of funds." § 302(a)(6), 115 Stat. at 296. Thus, it authorized both the Attorney General and the Treasury Secretary to issue a "subpoena to any foreign bank that maintains a correspondent account in the United States and request records related to such correspondent account, including records maintained outside of the United States relating to the deposit of funds into the foreign bank." 31 U.S.C. § 5318(k)(3)(A)(i).

Bank Three claims the subpoena it received strays outside the statutory lines because it is "not expressly confine[d]" to documents related to the Bank's correspondent accounts *in the United States*. Bank Three Br. 23. To be sure, the subpoena is comprehensive: it seeks "[a]ll documents relating to [the Company's] correspondent banking transactions"—including, it would seem, documents related to transactions using correspondent accounts in countries other than the United

**PUBLIC COPY – SEALED INFORMATION DELETED**

States. Bank Three Subpoena, J.A. 771; *see also id.* (requesting "signature cards," "account ledger cards," "periodic account statements," and "records . . . of all items deposited, withdrawn, or transferred"). And we know Bank Three does, in fact, have correspondent accounts outside the United States. If we knew nothing else about the Company, Bank Three's argument might therefore have some force: where, as here, a bank maintains correspondent accounts in multiple countries, it is by no means a given that all of an account holder's correspondent banking transactions "relate to" the bank's *U.S.* correspondent accounts, as the statute requires.

With respect to this particular case, however, the government has a compelling response. It argues, as it did before the district court, that evidence already collected during the investigation shows that the Company's "exclusive raison d'etre" was to serve as "a progenitor of U.S. dollars for" the NKE. Appellee's Br. 62; *see also id.* at 64 (describing the Company as "a front company created for the sole purpose of executing U.S.-dollar transactions"); March 5, 2019 Hearing Tr. 95:17–25, J.A. 1650–51 ("[The Company] existed only for one reason . . . [T]he [NKE] has to set up entities like this, because [it] want[s] access to the U.S. financial system."). In the government's view, such a showing means that *all* of the Company's records are "related to" the Bank's U.S. correspondent accounts because those accounts were part of the Company's means of obtaining U.S. dollars.

The parties' dispute turns on the meaning of the term "related to" as used in section 5318(k)(3). Arguing for a narrow interpretation, Bank Three reads the statute to authorize collecting only those records of transactions that themselves passed through Bank Three's U.S. correspondent accounts. For its part, the government advocates a more expansive reading—

PUBLIC COPY – SEALED INFORMATION DELETED

one that would cover all records that have a "connection with" the Company's use of Bank Three's U.S. correspondent accounts, even if some individual transactions made no use of a U.S. correspondent account. Appellee's Br. 60 (internal quotation marks omitted).

To assess how broadly the phrase "related to" sweeps, we look to the "traditional tools of statutory interpretation—text, structure, purpose, and legislative history." *Tax Analysts v. IRS*, 350 F.3d 100, 103 (D.C. Cir. 2003) (internal quotation marks omitted). The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning"; "[o]ur inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (internal quotation marks omitted).

"[W]hen asked to interpret statutory language including the phrase 'relating to,' . . . th[e] [Supreme] Court has typically read the relevant text expansively." *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1760 (2018). We see no reason to deviate from that approach here. The ordinary meaning of that phrase encompasses the broad relationships described by the government. *See, e.g.*, Merriam-Webster's Collegiate Dictionary 987 (10th ed. 1997) (defining "relate" as "to have [a] relationship or connection"); Black's Law Dictionary 1288 (6th ed. 1990) (defining "relate" as "[t]o stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with"); *see also BP America Production Co. v. Burton*, 549 U.S. 84, 91 (2006) ("Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.").

**PUBLIC COPY – SEALED INFORMATION DELETED**

The government's interpretation finds further support in the one example that Congress offered of a record "related to" a U.S. correspondent account: "records maintained outside of the United States relating to the deposit of funds into the foreign bank." 31 U.S.C. § 5318(k)(3)(A)(i). The final phrase is important. Merely depositing funds "into the foreign bank" would not necessarily entail passing those funds through the foreign bank's U.S. correspondent account; rather, it may be a preparatory step for using the correspondent account. For instance, an aspiring money launderer might deposit illicitly-obtained foreign currency into the foreign bank before using the U.S. correspondent account to facilitate a payment in U.S. dollars, helping the guilty party conceal the origin of the funds. By specifying that its view of records "related to" a U.S. correspondent account includes such a predicate transaction, Congress embraced an expansive view of the term in line with the government's. And, of course, that view accords with Congress's stated purpose in enacting the provision: "to increase the strength of United States measures to prevent, detect, and prosecute international money laundering and the financing of terrorism." Pub. L. No. 107-56, § 302(b)(1), 115 Stat. at 297.

Resisting this expansive text, Bank Three offers two reasons to prefer a more circumscribed understanding of the statute. First, it again looks to the presumption against extraterritoriality. But here, the statute contains no ambiguity requiring us to resort to that presumption. *See Validus Reinsurance, Ltd. v. United States*, 786 F.3d 1039, 1046 (D.C. Cir. 2015) (explaining that "*ambiguity* is resolved by [applying] the presumption against extraterritoriality" (emphasis added)). To be sure, the statutory text is capacious, but as the Supreme Court has observed, "[b]road . . . language is not necessarily ambiguous when congressional objectives

PUBLIC COPY – SEALED INFORMATION DELETED

require broad terms." *Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980).

Second, Bank Three points to the Justice Department's attempt to persuade Congress to amend the statute to allow the government to obtain not just "records relating to" a foreign bank's U.S. correspondent account, but also "any records" pertaining to "*any related account* at the foreign bank, including records maintained outside of the United States, that are the subject of *any investigation* of a criminal violation of United States law." Department of Justice, Title III, Anti-Corruption Legislative Proposals, 114th Cong., at 4 (May 5, 2016), https://www.justice.gov/opa/file/849986/download (emphases added). The Bank would have us infer from Congress's failure to adopt the amendment that section 5318(k)(3) as currently written can never reach "[a]ll documents" relating to "all" of a company's "correspondent banking transactions," as this subpoena does. Bank Three Subpoena, J.A. 771. But the Supreme Court has long cautioned against reading too much into congressional inaction given that "[l]ogically, several equally tenable inferences could be drawn from the failure of the Congress to adopt an amendment . . . , including the inference that the existing legislation already incorporated the offered change." *United States v. Wise*, 370 U.S. 405, 411 (1962). In any event, the unenacted amendment Bank Three cites does not expand the definition of what records count as "related to" a U.S. correspondent account; rather, it would allow the government to reach *other* accounts, regardless of their relationship to a U.S. correspondent account. Such a proposal tells us little about what Congress currently considers to be "related to" a correspondent account.

We therefore conclude that records "related to" a U.S. correspondent account include records of transactions that do

24

PUBLIC COPY – SEALED INFORMATION DELETED

not themselves pass through a correspondent account when those transactions are in service of an enterprise entirely dedicated to obtaining access to U.S. currency and markets using a U.S. correspondent account. All that remains is to determine whether the government has adequately shown that the Company was such an enterprise.

The district court found that the government had made the necessary showing. Specifically, it found that "[n]o part" of the Company could "be separated from the ploy to put money through the United States financial market." March Op. 29. On the record before us, that finding was not clearly erroneous. *See Boca Investerings Partnership v. United States*, 314 F.3d 625, 629–30 (D.C. Cir. 2003), *as amended* (Mar. 26, 2003) (a conclusion is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed") (internal quotation marks omitted). The investigation has turned up considerable evidence supporting the court's conclusion. The Company engaged in an enormous volume of U.S. dollar transactions: "[B]etween October 2012 and November 2015 alone, [the Company] made over $100 million U.S.-dollar payments." FBI Declaration ¶ 13, J.A. 866. And the Company "was a counterparty to over 680 U.S.-dollar international transfers (which transited through the United States financial system via correspondent U.S. banks)." *Id.*, J.A. 867. The government has uncovered no "evidence that" any of these transactions were part of "a legitimate business"; rather, all were part of the NKE's scheme to launder money. *Id.* ¶ 10, J.A. 864–65.

Nor does any record evidence suggest that the NKE used the Company to launder money through currencies other than U.S. dollars. Indeed, the NKE had a special need for dollars because "commodity companies, such as those operating in

**PUBLIC COPY – SEALED INFORMATION DELETED**

China, Thailand, and Singapore, frequently prefer to take payments in U.S. dollars because of the dollar's global demand and stability." *Id.* ¶ 26, J.A. 871; *see also Correspondent Banking: A Gateway for Money Laundering*, S. Hrg. 107-84 app. 287 n.12 ("U.S. dollars are one of a handful of major currencies accepted throughout the world. They are also viewed as a stable currency, less likely to lose value over time and, thus, a preferred vehicle for savings, trade and investment."). Further, the government explains, and Bank Three nowhere contests, that before 2017—and consequently during the vast majority of the period covered by this subpoena—the NKE "could legally conduct transactions in other currencies" besides the U.S. dollar (such as the euro), Appellee's Br. 61, signaling that the NKE would have had no need of a front company to conduct transactions in those currencies.

Taken together, these facts support the district court's finding that "[n]o part" of the Company—and thus, none of its banking records—"can be separated from the ploy" to launder money through U.S. financial markets, March Op. 29, because the Company's sole purpose was to give the NKE access to U.S. dollars through U.S. correspondent accounts. We therefore conclude that on the facts of this case, the records requested by the Patriot Act subpoena all "relate to" Bank Three's U.S correspondent account. To be clear, nothing in this opinion authorizes, as the Bank fears, the government "for any reason, [to] obtain *essentially any document or record* from any foreign bank with a U.S. correspondent account," Bank Three Br. 22, regardless of whether those records are "related to" that U.S. correspondent account. The government's power to subpoena the records in this case derives from the evidence that *this* particular company operated exclusively as a U.S. dollar clearinghouse for the NKE. Under such circumstances, all

**PUBLIC COPY – SEALED INFORMATION DELETED**

records pertaining to the Company's Bank Three account and its correspondent banking transactions, no matter where they occurred, are "related to" the Bank's U.S. correspondent accounts.

## IV.

"Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." *Société Nationale Industrielle Aérospatiale v. U.S. District Court for the Southern District of Iowa* ("*Société Nationale*"), 482 U.S. 522, 543 n.27 (1987). Invoking this "spirit of cooperation," *id.*, all three Banks argue that "ordering a foreign-sovereign-owned bank to violate foreign law on foreign soil violates basic 'comity' principles" and, as such, demands reversal, Bank One Br. 11; *see also* Bank Two Br. 25 (making this argument); Bank Three Br. 32–33 (same). We begin by providing some additional background before explaining why the Banks' argument fails.

### A.

A comity analysis typically starts by determining whether a "true conflict" exists between the implicated legal systems. *Hartford Fire Insurance Co. v. California*, 509 U.S. 764, 798 (1993) (internal quotation marks omitted). Absent a clash of foreign and domestic law, American courts may press forward free from worry that their rulings will threaten the "international legal ties that advance the rule of law within and among nations." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984), *as amended* (Mar. 6 and 9, 1984). As the district court recognized, however, in this case that determination "is the easy part," given that "[t]he [U.S.] government concedes that complying with the

**PUBLIC COPY – SEALED INFORMATION DELETED**

respective subpoenas exposes each bank to legal penalties in China." March Op. 32.

After this initial inquiry, the question is whether "the factual circumstances" of the case at hand counsel against applying American law. *Laker Airways*, 731 F.2d at 937. A collection of factors helps us to delineate the "inherently uncertain" borders set by the principles of comity in the context of subpoena enforcement. *Id.* Factors include "the importance to the litigation of the documents . . . requested," "the degree of specificity of the request," "whether the information originated in the United States," "the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located," and whether "alternative means of securing the information" exist. *Société Nationale*, 482 U.S. at 544 n.28 (alteration omitted) (quoting Restatement of Foreign Relations Law of the United States (Revised) § 437(1)(c)). Courts also look to whether compliance would impose hardship on the party targeted by the subpoena and whether that party has acted in good faith. *See In re Sealed Case* ("*Sealed Case I*"), 825 F.2d 494, 498–99 (D.C. Cir. 1987) (distinguishing cases based on "good faith" considerations); *Linde v. Arab Bank, PLC*, 706 F.3d 92, 110 (2d Cir. 2013) ("[A] district court should also examine the hardship of the party facing conflicting legal obligations . . . .").

The district court diligently applied this "constellation of factors" to the facts at issue here. March Op. 33. In so doing, it observed that two factors indisputably weigh against enforcing the subpoenas: the documents originated outside the United States, *see id.* at 42, and the Banks have acted in good faith throughout this litigation, *see id.* at 57 ("[T]he government

USCA Case #19-5068      Document #1800815      Filed: 08/06/2019      Page 27 of 44

**PUBLIC COPY – SEALED INFORMATION DELETED**

agrees that none of the banks has acted in bad faith."). According to the district court, another pair of factors just as clearly weighs in favor of enforcement: the documents contain unique information vital to the investigation—indeed, "the government avows the subpoenaed documents are the foundation of the United States' investigation," *id.* at 39 (alteration and internal quotation marks omitted), and the subpoenas target an appropriately specific collection of records—that is, "the subpoenas are tailored to specific financial records, for a defined date range, at banks [the Company] is known to have used to launder funds," *id.* at 41.

Parsing the more complex remaining factors, the district court emphasized the government's goal of learning how North Korea has thwarted American sanctions in pursuing weapons of mass destruction. "[N]on-enforcement" of the subpoenas, the district court stressed, "would undermine a critical national interest." *Id.* at 48. Although acknowledging that China has a "legitimate" "interest in the development of a sound banking system," the district court concluded that the United States' national security interest easily outweighs China's interest in safeguarding its banking secrecy laws. *Id.* at 50; *see also id.* (observing that because "even Chinese authorities recognize that bank secrecy can co-exist with limited disclosure to government agencies," "China's interest would not be undermined by enforcement of the subpoenas").

The district court recognized that the U.S. government had declined to take advantage of an alternative channel through which the United States might obtain the documents at issue: the Mutual Legal Assistance Agreement, which creates a process to exchange "documents" and "records" relevant to criminal investigations. MLAA art. 1(2)(c); *see* March Op. 42–47 (discussing the MLAA). But based on the U.S.

**PUBLIC COPY – SEALED INFORMATION DELETED**

government's declarations that China has failed to satisfactorily engage in the MLAA process in many other cases over the past decade, the district court accepted the Executive Branch's representation that requiring the government to first exhaust the MLAA process would just "[a]llow[] China to gum up [the] United States' investigations" and, therefore, that "[t]he Department of Justice no longer needs to take overtures of China's willingness to assist the United States[] with investigations into North Korea seriously." March Op. 47.

Finally, with respect to the hardship facing the Banks, the district court acknowledged that compliance with the subpoenas would violate Chinese law. Though the government doubts the Banks' claim that any criminal laws would be broken, it concedes that compliance would at least violate those laws prohibiting Chinese companies from handing over records that have not been approved for release through the MLAA process. *See* Law of the People's Republic of China on International Criminal Judicial Assistance (promulgated by the Standing Committee of the Thirteenth National People's Congress, Oct. 26, 2018, effective Oct. 26, 2018), ch. I, art. 4, J.A. 355 (forbidding any "institution [or] organization . . . within the territory of [China]" from "provid[ing] evidentiary materials and assistance prescribed by this Law to foreign countries"); *id.* ch. II, § 2, art. 13, J.A. 358 (requiring a "foreign country" to request "criminal judicial assistance" "in accordance with the provisions of the criminal judicial assistance treaty"). The district court also recognized that the Ministry of Justice has advised that these violations would have consequences in the form of administrative penalties against the Banks and civil or criminal penalties against individual officers. *See* March Op. 51–53. The district court, however, found the hardships accompanying compliance both speculative and minimal. *See id.* at 53–57. It based this

USCA Case #19-5068          Document #1800815          Filed: 08/06/2019          Page 29 of 44

**PUBLIC COPY – SEALED INFORMATION DELETED**

conclusion in part on historical Chinese enforcement trends: penalties are rare and relatively modest when they do occur. The court found, for example, no instances of "a state-owned Chinese enterprise . . . fac[ing] severe repercussions for responding to the order of a foreign court," *id.* at 53, and that bank officers had apparently faced penalties only for stealing and selling "client information for profit," *id.* at 55. The district court also relied on the logical supposition that the Chinese government is unlikely to severely sanction banks that it largely owns, *id.*, and concluded that the Ministry's warnings failed to "suggest[] the administrative penalties will amount to more than nominal fines" or provide any "concrete indication criminal penalties are likely," *id.* at 56–57.

Affording the most weight to the United States' unassailable interest in successfully investigating and, with any luck, frustrating North Korea's arms programs, *see id.* at 58 (calling "the interests of the relevant countries" the "most important factor"), the district court concluded that "[o]n balance, international comity is not a reason to refrain from compelling compliance with the subpoenas," *id.* On appeal, the Banks argue that the district court applied the incorrect legal standard, that enforcing the subpoenas runs afoul of our case law, that "[c]omity dictates that the Chinese government at least be given an opportunity to comply with an MLAA request before forcing a Chinese bank to violate Chinese law on Chinese soil," Bank Two Br. 19, and, finally, that the district court incorrectly balanced the relevant factors.

**B.**

Before considering these arguments, we must first ascertain the appropriate standard of review. Although we "ordinarily review[] a district court's grant of a motion to

Filed: 08/06/2019    Page 31 of 44

Document #1800815

USCA Case #19-5068

compel . . . for abuse of discretion," *Recording Industry Ass'n of America, Inc. v. Verizon Internet Services, Inc*., 351 F.3d 1229, 1233 (D.C. Cir. 2003), we have yet to expressly determine the standard of review applied to a comity analysis in this context, *cf. Sealed Case I*, 825 F.2d at 497–99 (not identifying the standard of review); *de Csepel v. Republic of Hungary*, 714 F.3d 591, 606 (D.C. Cir. 2013) ("This court has never expressly addressed the standard by which we review a district court's decision to grant comity to a foreign judgment."). The Supreme Court, however, has observed that "[t]he exact line between reasonableness and unreasonableness" when weighing comity principles "must be drawn by the trial court, based on its knowledge of the case," *Société Nationale*, 482 U.S. at 546, and we generally review for abuse of discretion when the district court finds itself responsible for making such a fact-bound reasonableness call, *see, e.g.*, *Ideal Electronic Security Co. v. International Fidelity Insurance Co.*, 129 F.3d 143, 150 (D.C. Cir. 1997) ("[T]he reasonableness of an attorney's fees award is within the sound discretion of the trial court and is reviewed only for abuse of discretion."); *United States v. Law*, 806 F.3d 1103, 1105 (D.C. Cir. 2015) ("We . . . consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." (internal quotation marks omitted)). This approach comports with our sister circuits, which review similar questions for abuse of discretion. *See, e.g.*, *Allstate Life Insurance Co. v. Linter Group Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993) ("[S]ince the extension or denial of comity is within the court's discretion, we will reverse the court's decision only when we find an abuse of discretion."); *Reinsurance Co. of America v. Administratia Asigurarilor de Stat*, 902 F.2d 1275, 1283 (7th Cir. 1990) ("The denial of [the company's] motion to compel responses was . . . not an abuse of discretion."). The Banks offer no argument for departing from that approach here. *See*

**PUBLIC COPY – SEALED INFORMATION DELETED**

Bank Two Br. 5 (suggesting "an abuse of discretion standard"); Oral Arg. Rec. 13:33–13:40 (Bank One counsel agreeing that if "the district court did apply the correct legal standard, then it's an abuse of discretion standard"). Accordingly, we shall review the district court's comity analysis for abuse of discretion.

Employing that standard, we ask whether the district court "based its ruling on an error of law, a clearly erroneous assessment of the evidence, or an improper weighing of the factors limiting its discretion." *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356 (D.C. Cir. 2018) (citation and internal quotation marks omitted). We of course review any embedded "legal conclusions *de novo*." *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019).

Bank One first argues that "the District Court used the wrong *legal standard* to review the Government's request to enforce the Subpoenas"—that is, the court should not have adopted "the multifactorial approach of . . . Restatement (Third) of Foreign Relations." Bank One Reply Br. 1. This argument gets the Banks nowhere. In *Société Nationale*, the Supreme Court explained that the Restatement's "factors are relevant to any comity analysis." 482 U.S. 522, 544 n.28; *see Overby v. National Ass'n of Letter Carriers*, 595 F.3d 1290, 1295 (D.C. Cir. 2010) ("[C]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." (internal quotation marks omitted)). The Bank points out that our decision in *Sealed Case I*, issued a few months after *Société Nationale*, never expressly references the Restatement's factors. In that case we reversed an order holding a bank owned by (unidentified) Country X in contempt for failure to comply with a subpoena that would

**PUBLIC COPY – SEALED INFORMATION DELETED**

have required the bank to produce documents in contravention of the banking privacy laws of Country Y, where the branch at issue was located. *Sealed Case I*, 825 F.2d at 497–98. But *Sealed Case I* neither refutes *Société Nationale*'s ratification of the Restatement factors nor offers a different test to apply— nor, of course, could it. *See We the People Foundation, Inc. v. United States*, 485 F.3d 140, 144 (D.C. Cir. 2007) (circuit courts must follow Supreme Court precedent). As the district court recognized, *Sealed Case I* "comports with the Supreme Court's treatment of international comity as a principle that depends on 'prior scrutiny in each case of the particular facts, sovereign interests, and likelihood that resort to [alternative] procedures will prove effective.'" March Op. 34 (alteration in original) (quoting *Société Nationale*, 482 U.S. at 544).

This brings us to the Banks' related assertion that "[t]he present case is controlled by" *Sealed Case I*. Bank One Br. 14. But that case by its own terms constricts its holding to its facts: "If any of the facts we rest on here were different," we cautioned, "our holding could well be different." *Sealed Case I*, 825 F.2d at 499. We therefore agree with the district court that this case merits its own factual inquiry; *Sealed Case I* does not, as a legal matter, control the outcome here.

The Banks' more powerful argument is that, due to the factual parallels between *Sealed Case I* and this case, "it was an abuse of discretion to enforce the Subpoena[s]." Bank Two Br. 25. The *Sealed Case I* court identified several facts central to its decision not to enforce the contempt order at issue, and they might sound familiar. First, and "[m]ost important," the "sanctions represent[ed] an attempt by an American court to compel a foreign person to violate the laws of a different foreign sovereign on that sovereign's own territory." 825 F.2d at 498; *see also id.* (observing that the bank had no way to

**PUBLIC COPY – SEALED INFORMATION DELETED**

"comply with the contempt order without violating the laws of Country Y on Country Y's soil"). We also recognized that the bank "had acted in good faith," was "a third party . . . not . . . accused of any wrongdoing," and constituted "not merely a private foreign entity," but also "an entity owned by the government of Country X." *Id.* Finally, because the bank's manager would "be available and able to testify as to many of the facts that the grand jury may [have] wish[ed] to ascertain," the government was not "left empty-handed" by the decision not to enforce the subpoena. *Id.* at 499. *But see id.* (acknowledging "that the grand jury's investigation may nonetheless be hampered, perhaps significantly" by the decision not to enforce).

As the Banks point out, each of those facts maps neatly onto this case, in which the government asks us to compel Chinese banks owned in significant part by the Chinese government to violate Chinese law on Chinese territory. The Banks have acted in good faith, they are currently third parties to the criminal investigation, and the MLAA, at least on its face, provides an alternative path that would allow the government to obtain the records at issue.

What's more, to the extent there are differences, there is some reason to believe that this case is an even better candidate for comity than *Sealed Case I.* For one thing, where the subpoena recipient in *Sealed Case I* was being asked to violate the laws of a "different foreign sovereign," *id.* at 498, here the government demands that the Banks violate their home country's laws. Although the Country X-based bank in *Sealed Case I* might have closed its branch in Country Y to avoid sanctions, the Banks here have no such workaround. As the district court recognized, "[a] Country X bank can shutter the Country Y portion of its business; a Chinese bank cannot leave

PUBLIC COPY – SEALED INFORMATION DELETED

China." March Op. 36 n.13; *see also id.* ("[C]ompelling a bank to violate its own nation's law is *more* prejudicial to international comity." (internal quotation marks omitted)). Moreover, the Chinese government in this case "has warned the Bank[s] that [they] *will* be sanctioned if [they] ignore[]" its "express instructions not to produce these documents outside the MLAA process," and "[t]here is no indication that the foreign government in *Sealed Case I* did anything similar." Bank Three Br. 39.

The district court ignored none of these considerations. Quite to the contrary, it grappled with each and instead found persuasive two other "critical" differences between the cases. March Op. 34.

The district court first pointed out that *Sealed Case I* concerned a "domestic law enforcement matter," which "hardly compares to the national security interests and associated potential harm caused by non-compliance with a subpoena related to an investigation into funding a state-sponsor of terrorism's nuclear weapons program." *Id.* at 35. This is an important distinction. The government justifiably believes that the subpoenas will unearth information concerning North Korea's use of third-party front companies to evade economic sanctions, and nothing in *Sealed Case I* suggests any "sovereign interest[]," *Société Nationale*, 482 U.S. at 544, remotely comparable to impeding North Korea's stockpiling of nuclear weapons.

We acknowledge, as the Banks point out, that the government here has failed to proceed as though North Korea were about to push the nuclear launch button. Indeed, the government took nearly a year to enforce the subpoenas in court and never sought to expedite this case until the district

USCA Case #19-5068      Document #1800815      Filed: 08/06/2019      Page 35 of 44

36

PUBLIC COPY – SEALED INFORMATION DELETED

court instructed it to do so. It did not, however, sit on its hands during that time, as the Banks repeatedly assert, but "engaged in intra- and inter-agency deliberations" and "twice sent a delegation to China" during that period. March Op. 40. More to the point, we are reluctant to second-guess the Executive Branch's assessments of national security interests and how to best serve them. *See Frugone v. Central Intelligence Agency*, 169 F.3d 772, 775 (D.C. Cir. 1999) (cautioning "that courts have little expertise in either international diplomacy or counterintelligence operations"). We of course agree with Bank One that "the judiciary has an independent obligation to evaluate" the diplomatic ripple effects of its decisions. Bank One Br. 25; *see also Sealed Case I*, 825 F.2d at 499 ("[W]e see good reason for courts not to act on their own, *even at the urging of the executive branch*, when their actions 'may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere.'" (emphasis added) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964))). But we are confident that the district court respected that obligation and that it acted within its discretion by recognizing that the heightened national interest here, as articulated by the Executive Branch, distinguishes this case from *Sealed Case I*.

The Banks next observe that "if the Government receives the documents via the MLAA, its national security interests will be fully vindicated." Bank Two Br. 26. The district court, however, concluded that the futility of the MLAA process sets this case apart from *Sealed Case I*, in which testimony from the bank's manager appeared to offer a sure-fire way of securing at least some of the desired information. "[I]n this investigation," by contrast, the district court observed, "the government insists that without compelling compliance, the requested information is out of reach." March Op. 35.

PUBLIC COPY – SEALED INFORMATION DELETED

Forcefully disagreeing with this conclusion, the Banks insist that the MLAA process provides a channel specifically designed to allow the U.S. government to obtain exactly the types of records it seeks. Allowing it to eschew that process without so much as making an initial MLAA request, they argue, neglects comity's "spirit of cooperation." *Société Nationale*, 482 U.S. at 543 n.27. For its part, the government argues in support of the district court that "the historical record demonstrates . . . an MLAA request of China for such bank records is not a viable alternative." Appellee's Br. 37 (internal quotation marks omitted).

Recall that the MLAA establishes a procedure for the U.S. and Chinese governments to obtain documents from each other in criminal investigations. Specifically, the process provides that "insofar as national law permits," if, say, the United States makes a request, China's "Central Authority" must search for and then send the requested records. MLAA arts. 2(1), 14(1), (3). Nothing in the MLAA, however, designates it as the exclusive means of obtaining evidence in a criminal investigation.

In this case, China's Central Authority, the Ministry of Justice, *id.* art. 2(2), expressed a "willingness to cooperate with a DOJ MLAA request" as early as March 2018, Letter from Hank B. Walther & Samidh Guha to Zia Faruqui & Ari Redboard 3 (Mar. 23, 2018), J.A. 830. Bank Three communicated China's overture to the U.S. Department of Justice, observing that the MLAA process "would allow DOJ to obtain the documents it seeks, while avoiding the time, cost, and risk of litigating the Patriot Act subpoena." *Id.* As we now know, the United States declined that invitation—even as it filed at least ten other MLAA requests in 2017 and 2018—and instead sought to enforce the subpoenas in court.

PUBLIC COPY – SEALED INFORMATION DELETED

The Ministry then directly communicated with the district court multiple times, assuring that court that the Ministry "would timely review and handle the requests for assistance sought by the DOJ in accordance with the [MLAA] and applicable domestic laws." Letter from Du Yaling, Director General of International Cooperation Department of the Ministry of Justice to Chief Judge Beryl A. Howell 4 (Jan. 6, 2019), J.A. 76. If the government submits a "request in line with the [MLAA]," the Ministry pledged, "China will provide the assistance to the United States accordingly." *Id.* Confident that the MLAA "mechanism works effectively," the Ministry reminded the district court that China has "provided effective assistance to the US in many cases" and that "[t]he avenue of the [MLAA] is the only legal means to obtain criminal evidence in China by foreign judicial agencies under Chinese laws." Letter from Du Yaling, Director General of International Cooperation Department of the Ministry of Justice to Chief Judge Beryl A. Howell 2–4 (Feb. 26, 2019), J.A. 965–67. The district judge observed that this marked "the first time" she had seen "correspondence directly from a foreign government related to an ongoing matter." March 5, 2019 Hearing Tr. 18:2–4, J.A. 1573. The government points to no other case where the Ministry has made such a representation and reneged on it and admits that in some cases, "China has produced bank records to the general satisfaction of the U.S. prosecutors and agents." Declaration of Associate Director of the Office of International Affairs Jeffrey M. Olson ("OIA Declaration") ¶ 14(e), J.A. 951.

The district court considered all these facts but ultimately concluded that pursuing the MLAA process would result in an inadequate production of documents. According to the Associate Director of the Office of International Affairs—

**PUBLIC COPY – SEALED INFORMATION DELETED**

which serves as the United States' Central Authority under the MLAA—the United States has submitted fifty MLAA requests for bank records over the past decade and has received no responsive records to thirty-five; the government found most of China's responses in the remaining fifteen cases inadequate or untimely. And of the ten requests submitted within the last two years, the United States has received at most one response. *Cf.* OIA Declaration ¶ 13(b), J.A. 950 (describing that, for example, China failed to produce documents in one of those cases even though the United States informed the Ministry that the request was time-sensitive due to an upcoming trial).

Moreover, the district court recognized that the government is especially pessimistic about the chances of success in this case given that the investigation involves a perfect storm of disagreements between the United States and China: "Chinese authorities have a demonstrated failure in supporting foreign and U.S. sanctions and U.S. law enforcement actions involving North Korea," and "the Chinese government has specifically objected to the imposition of sanctions on [the Company] and other Chinese front companies." FBI Declaration ¶ 80, J.A. 888. Drawing the district court's attention to a case "nearly identical" to this one, *id.* at 37, J.A. 884, an FBI special agent submitted a declaration pointing out that although in that case, China had "nominally agreed to work jointly with the U.S. authorities" on MLAA requests for bank records involving North Korea, *id.* ¶ 72, J.A. 885, nothing ever came of that initial agreement; offering various excuses, China never handed over any records. "Based on these facts," the agent "concluded that the MLAA process is not an effective way to obtain bank records from Chinese authorities with respect to investigations involving North Korea." *Id.* ¶ 75, J.A. 886; *see id.* ("[O]ne reason that Chinese authorities do not want to assist with North Korean

USCA Case #19-5068      Document #1800815      Filed: 08/06/2019      Page 39 of 44

**PUBLIC COPY – SEALED INFORMATION DELETED**

investigations is that producing such records could reflect badly on the Chinese government and the Chinese financial industry.").

Given this record, we see no abuse of discretion in the district court's decision to enforce the subpoenas despite the fact that the United States chose not to pursue the MLAA process. The Supreme Court has made clear that evidence-sharing arrangements set up by international agreements, although often valuable, can also prove "unduly time consuming and expensive, as well as less certain" than court-enforced subpoenas "to produce needed evidence." *Société Nationale*, 482 U.S. at 542. As such, whether comity "requires resort" to an agreement's procedures calls for an inquiry into the "likelihood that resort to those procedures will prove effective." *Id.* at 544. The district court addressed just that question: it reviewed declarations from U.S. and Chinese officials, identified facts that undermined the Chinese government's assurances about the MLAA system, and concluded that the U.S. government had no obligation to submit a voluntary MLAA request because it would likely prove ineffective.

We need not tarry over the Banks' remaining arguments that the district court abused its considerable discretion in balancing the comity factors. *Cf. Morley v. Central Intelligence Agency*, 894 F.3d 389, 391 (D.C. Cir. 2018) (recognizing that when "factors point in different directions," "it will be the rare case when we can reverse a district court's balancing of the . . . factors"). Specifically, Bank Three reiterates its claim that "the Patriot Act subpoena is facially overbroad," Bank Three Reply Br. 20, and, as such, the "degree of specificity of the request," *Société Nationale*, 482 U.S. at 544 n.28 (internal quotation marks omitted), also weighs in favor of the Bank. But we agree

PUBLIC COPY – SEALED INFORMATION DELETED

with the district court that given that the Company "solely existed as a front company," "all [the Company's] records relate to the conduct under investigation," March Op. 41 (internal quotation marks omitted). With respect to the hardship factor, Bank One takes issue with the district court's conclusion that the Banks would likely face minimal penalties for complying with the subpoenas. In a civil law country such as China, the Bank contends, "[t]he District Court cannot know how the Chinese government will exercise its prosecutorial discretion." Bank One Br. 28. But the district court never presumed to declare itself a soothsayer; it assessed a cluster of datapoints presented and substantiated by the Executive Branch and ultimately determined that the risk of harsh punishment was slim. In any event, it recognized that "this factor tips ever so slightly toward the banks." March Op. 57. The district court exercised its "judgment" in drawing these conclusions and was "guided by sound legal principles." *United States v. Taylor*, 487 U.S. 326, 336 (1988) (internal quotation marks omitted). Our analysis ends there.

We proceed with extreme caution when enforcing subpoenas that would require recipients to violate a foreign sovereign's domestic laws. As we said in *Sealed Case I*, "[w]e have little doubt . . . that our government and our people would be affronted if a foreign court tried to compel someone to violate our laws within our borders," 825 F.2d at 498–99, all the more so if our government assured that court that it was ready and willing to engage in a mutually agreed-upon bilateral process to provide the precise information requested. But we take heart that at every stage of this process decisionmakers have recognized that whether to enforce a subpoena "in cases like this one raises grave difficulties for courts." *Id.* at 498. The government decided to pursue the records at issue through the courts rather than the MLAA process only after twice sending

**PUBLIC COPY – SEALED INFORMATION DELETED**

delegates to China and engaging in extensive "internal discussions with subject matter experts . . . within the FBI, as well as consultations involving senior FBI management and Department of Justice and Department of Treasury officials." FBI Declaration ¶ 80, J.A. 888. That decision was then put to "the wise discretion of our judicial colleague[] on the District Court," *Fraenkel*, 892 F.3d at 362, and that court consented to the government's course of action only after undertaking a thorough, considered analysis that frankly acknowledged the Banks' comity concerns. Whether to enforce the subpoenas was a hard call, the district court made that call, and we have no reason to reverse its fact-bound conclusion.

## V.

Finally, Banks One and Three challenge the district court's April 2019 contempt order, arguing that it was unjustified given the government's concession that the Banks acted in good faith to obtain the Chinese government's permission to produce the records covered by the subpoenas. "[W]e review . . . the contempt finding . . . for abuse of discretion." *In re Fannie Mae Securities Litigation*, 552 F.3d 814, 818 (D.C. Cir. 2009).

A civil contempt citation is appropriate "only if the putative contemnor has violated an order that is clear and unambiguous, and the violation must be proved by clear and convincing evidence." *Broderick v. Donaldson*, 437 F.3d 1226, 1234 (D.C. Cir. 2006) (internal quotation marks omitted). Banks One and Three nowhere dispute that by refusing to produce the documents covered by the subpoenas, they have violated a clear and unambiguous order. Instead, they rest their challenge to the contempt order on the Restatement (Third) of Foreign Relations Law, which suggests that a court "*should not*

**PUBLIC COPY – SEALED INFORMATION DELETED**

*ordinarily* impose sanctions of contempt, dismissal, or default on a party that has failed to comply with [an] order for production" that would violate another state's laws or regulations, "except in cases of deliberate concealment or removal of information or of failure to make a good faith effort" "to secure permission from the foreign authorities to make the information available." Restatement (Third) of Foreign Relations Law § 442(2)(a)–(b) (1987) (emphasis added).

The banks insist that the district court should not have held them in contempt because they acted in good faith (albeit unsuccessfully) to secure the Chinese government's permission to produce the records at issue. This is a rather thin reed to begin with, rendered more slender still by the fact that the more recent Restatement (Fourth) of Foreign Relations Law significantly diminishes the importance of a putative contemnor's "good faith": the Restatement (Fourth) simply states that courts "have *discretion* to excuse violations of law, or moderate the sanctions imposed for such violations, on the ground that the violations are compelled by another state's law" if "the person in question appears likely to suffer severe sanctions for failing to comply with foreign law" and "has acted in good faith to avoid the conflict." Restatement (Fourth) of Foreign Relations Law § 442 (2018) (emphasis added)). In any event, this court has long held that "[t]he intent of the recalcitrant party is irrelevant in a civil contempt proceeding because, unlike a criminal contempt proceeding, a civil contempt action is a remedial sanction used to obtain compliance with a court order or to compensate for damage sustained as a result of noncompliance." *Food Lion, Inc. v. United Food & Commercial Workers International Union, AFL-CIO-CLC*, 103 F.3d 1007, 1016 (D.C. Cir. 1997) (internal quotation marks omitted).

PUBLIC COPY – SEALED INFORMATION DELETED

Confronted with clear non-compliance in the face of a perfectly pellucid order, the district court reasonably found that "the banks have not demonstrated good faith in a way relevant to contempt" and that, because "the requested records are essential to an investigation into a matter of national security[,] . . . continued contumacy threatens tremendous harm." April Op. 9 (internal quotation marks omitted). Under these circumstances, the banks have given us no basis for concluding that the district court abused its discretion.

## VI.

For the foregoing reasons, we affirm the district court's contempt orders against all three Banks.

*So ordered.*