**PUBLIC COPY – SEALED MATERIAL DELETED**

**ORAL ARGUMENT SCHEDULED FOR JULY 12, 2019**

**Nos. 19-5068, -5100, -5102, -5103**

# In the United States Court of Appeals for the District of Columbia Circuit

_____

**IN RE:  SEALED CASE**

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**NOS. 18-MC-00175-BAH, 18-MC-00176-BAH, 18-MC-00177-BAH**

_____

**BRIEF FOR THE UNITED STATES**

_____

JESSIE K. LIU
   United States Attorney
ELIZABETH H. DANELLO
ZIA M. FARUQUI
*DAVID B. GOODHAND
   Assistant United States Attorneys
   United States Attorney's Office for the
      District of Columbia
   555 4th Street, NW
   Washington, DC 20530
   (202) 252-6601

*Counsel for oral argument

MATERIAL UNDER SEAL DELETED

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. R. 28(a)(1), undersigned counsel certifies as follows:

**A.    Parties**

The parties before the district court and this Court are the United States and

████████████████████████████████████████████████████, and ████████████

████████████████ (the "Banks").

**B.    Rulings Under Review**

The Banks are appealing the district court's March 18, 2019, opinion and order

granting the United States' motions to compel (JA1733-93), as well as the court's April

10, 2019, order holding the Banks in civil contempt for disobeying the court's directive

to comply with the subpoenas (JA1844-58). A redacted version of the court's March

2019 memorandum opinion is available at 2019 WL 2170776. The court's April 2019

memorandum opinion is available at 2019 WL 2182436.

**C.    Related Cases**

On April 15, 2019, this Court consolidated the Banks' three appeals from the

above district court orders (Nos. 19-5100, -5102, -5103) with ████████████████

████████████████ prior appeal (No. 19-5068) from the district court's March 18

opinion and order granting the United States' motions to compel.

## TABLE OF CONTENTS

GLOSSARY OF ABBREVIATIONS.................................................................XIII

JURISDICTIONAL STATEMENT ...................................................................1

STATUTES, REGULATIONS, AND RULES....................................................1

STATEMENT OF THE CASE ..........................................................................1

  I.  BACKGROUND...........................................................................................2

  II.  THE PRESENT CONTROVERSY .............................................................9

    A.  The Subpoenas ......................................................................................9

      1.  *The Anti-Money Laundering Subpoena to* ████ ...............................9

      2.  *The Grand Jury Subpoenas to* ████ *and* ████ ..........................10

    B.  The Motions To Compel....................................................................11

    C.  The Civil Contempt Order.................................................................13

SUMMARY OF ARGUMENT........................................................................13

STANDARDS OF REVIEW ...........................................................................15

ARGUMENT ..................................................................................................15

  I.  THE DISTRICT COURT HAD SPECIFIC PERSONAL JURISDICTION
     OVER THE BANKS.................................................................................15

    A.  ████ *and* ████ Previously Consented to Personal Jurisdiction.............16

    B.  The District Court Had Personal Jurisdiction Over All Three Banks
       Because of Their Contacts with the United States .........................................18

  II.  THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION
     WHEN IT DETERMINED THAT A FOREIGN-LAW CONFLICT DID
     NOT RENDER SUBPOENA COMPLIANCE UNREASONABLE.............28

    A.  The District Court Properly Weighed the Relevant Comity Factors...........29

      1.  *The United States' National-Security Interest Would Be Damaged by
        Noncompliance, but China's Bank-Secrecy Interest Would Not Be Undermined
        by Compliance*...........................................................................................31

        a.  The United States has a substantial interest in exposing the
          illegal means by which North Korea evades U.S. sanctions and
          finances its weapons programs...............................................................31

        b.  China has never claimed a strong national interest in
          bank secrecy ...........................................................................................34

      2.  *The MLAA Is Not a Viable Alternative Method To Secure the Banks'
        ████ Transactional Records* ........................................................................37

MATERIAL UNDER SEAL DELETED

    3.   *The Banks' Claimed Hardships Are Speculative* ........................................ 45

    4.   *The Banks* ▮▮▮▮▮ *Transactional Records Are a Critical Piece of the Grand Jury's Investigation* ............................................................ 51

    5.   *The Subpoenas Are Narrowly Focused and Highly Specific* ..................... 54

    6.   *The Banks Demonstrated Good Faith* .................................................. 54

    7.   *The Documents Did Not Originate in the United States* .......................... 55

  B.   *Sealed Case I* Is Not Controlling Authority ......................................... 56

  C.   The Bank's Remaining Challenges To The Contempt Order Lack Merit ... 58

III.  THE ANTI-MONEY LAUNDERING SUBPOENA DID NOT EXCEED THE USA PATRIOT ACT'S SCOPE .................................................... 59

CONCLUSION ............................................................................................ 66

CERTIFICATE OF COMPLIANCE ............................................................ 2

# TABLE OF AUTHORITIES[*]

Page

*Animal Sci. Prods., Inc. v. Herbei Welcome Pharm. Co., Ltd.*, 138 S. Ct. 1865 (2018).... 50, 55

*Armstrong v. Exec. Office of the President*, 1 F.3d 1274 (D.C. Cir. 1993)...............15

*Bally Gaming, Inc. v. Kappos*, 789 F. Supp. 2d 41 (D.D.C. 2011)........................27

*Braswell v. United States*, 487 U.S. 99 (1988) ........................15

* *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985).........................17, 19, 22, 24

*CAB v. Deutsche Lufthansa Aktiengesellschaft*, 591 F.2d 951 (D.C. Cir. 1979)...................65

*Coventry Health Care of Missouri, Inc. v. Nevils*, 137 S. Ct. 1190 (2017) ...............61

*D.C. Human Relations Comm'n v. Nat'l Geographic Soc.*, 475 F.2d 366 (D.C. Cir. 1973)........................65

*Damler AG v. Bauman*, 571 U.S. 117 (2014) ........................20

*Dellums v. Powell*, 561 F.2d 242 (D.C. Cir. 1977)........................65

*F.T.C. v. Anderson*, 631 F.2d 741 (D.C. Cir. 1979)........................65

*F.T.C. v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2001) ........................65

*F.T.C. v. Texaco, Inc.*, 555 F.2d 862 (D.C. Cir. 1977) ........................64

*First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759 (1972)...............32

*Fitzsimmons v. Barton*, 589 F.2d 330 (7th Cir. 1979) ........................27

*Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348 (D.C. Cir. 2018)....................15

[*]  Authorities upon which we chiefly rely are marked with asterisks.

*Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958 (D.C. 2016) ..........................15

*Greenbaum v. Handlesbanken*, 26 F. Supp. 2d 649 (S.D.N.Y. 1998) ...................................28

*GTE New Media Svcs. v. Bellsouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000) ........................25

*Gucci America, Inc. v. Weixing Li*, 135 F. Supp. 3d 87 (S.D.N.Y. 2015)... 21-22, 46, 49, 51

*Gucci America, Inc. v. Weixing Li*, 768 F.3d 122 (2d Cir. 2014).........................................21

*Hilton v. Guyot*, 159 U.S. 113 (1895).................................................................................29

*In re Grand Jury 81-2*, 550 F. Supp. 2d 24 (W.D. Mich. 1982).........................................37

*In re Grand Jury Subpoena Dated Aug. 9, 2000*, 218 F. Supp. 2d 544 (S.D.N.Y. 2002),
     *aff'd*, 318 F.3d 379 (2d Cir. 2003).............................................................................36-37

*In re Grand Jury Subpoena*, 646 F.3d 159 (4th Cir. 2011) ................................................42

*In re Grand Jury Subpoena*, 912 F.3d 623 (D.C. Cir. 2019)..................................13, 16, 29

*In re Papst Licensing GBMH & Co. KG Litig.*, 590 F. Supp. 2d 94 (D.D.C. 2008).........27

*In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412 (D.C. Cir. 1994) ................................65

*In re Sealed Case*, 825 F.2d 494 (D.C. Cir. 1987) ("*Sealed Case I*").............................. 56, 57

* *In re Sealed Case*, 832 F.2d 1268 (D.C. Cir. 1987)
     ("*Sealed Case II*").................................................................15-16, 19-21, 28-29, 57

*In re Various Grand Jury Subpoenas*, 924 F. Supp. 2d 549 (S.D.N.Y. 2013) ......................18

*In the Matter of Application to Enforce Administrative Subpoenas Duces Tecum of the SEC*,
     87 F.3d 413 (10th Cir. 1996)....................................................................................20-22

*In the Matter of Arbitration Between Johns and Taramita, Inc.*, 132 F. Supp. 2d 1021
     (S.D. Fla. 2001) ........................................................................................................26

*Insurance Corp. of Ireland Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982)....16

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) ................................................... 21

*Laker Airways v. Sabena*, 731 F.2d 909 (D.C. Cir. 1984) ................................................. 55-56

*Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752 (2018) .................................... 61

*Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 841 F. Supp. 2d 769
     (S.D.N.Y. 2012) ........................................................................................................... 41

*Lee v. Dep't of Justice*, 413 F.3d 53 (D.C. Cir. 2005) ....................................................... 15

*Levine v. United States*, 362 U.S. 610, 617 (1960) ............................................................ 9

*Licci v. Lebanese Canadian Bank Ltd*, 732 F.3d 161 (2d Cir. 2013) ................................. 21-23

*Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50 (2d Cir. 2012) ................................ 25

*Livnat v. Palestinian Authority*, 851 F.3d 45 (D.C. Cir. 2017) .......................................... 20

*Maggio v. Zeitz*, 333 U.S. 56 (1948) ................................................................................ 59

*Marc Rich & Co.. A.G. v. United States*, 707 F.2d 663 (2d Cir. 1983) .............................. 16, 28

*Marshall v. Stevens People & Friends for Freedom*, 669 F.2d 171 (4th Cir. 1981) ........... 65

*McGee v. International Life Ins. Co.*, 355 U.S. 220 (1957) ................................................ 20

*Medical Mut. of Ohio v. DeSoto*, 245 F.3d 561 (6th Cir. 2001) ........................................ 25

*Milliken & Co. v. Bank of China*, 758 F. Supp. 2d 238 (S.D.N.Y. 2010) .......................... 43, 46

*Montship Lines, Ltd. v. Fed. Mar. Bd.*, 295 F.2d 147 (D.C. Cir. 1961) ............................. 54

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ............................................. 60, 62

*Motorola Credit Corp. v. Uzan*, 73 F. Supp. 3d 397 (D.D.C. 2014) .................................. 50

*Nike, Inc. v. Wu*, 349 F. Supp. 3d 310 (S.D.N.Y.),
     *aff'd*, 349 F. Supp. 3d 346 (S.D.N.Y. 2018) ......................................... 21-22, 43, 46, 49

*NRDC, Inc. v. Train*, 510 F.2d 692 (D.C. Cir. 1974) ....................................................... 59

*Official Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 5
    49 B.R. 56 (S.D.N.Y. 2016) ...................................................................21

*Ofisi v. Al Shamal Islamic Bank*, 2019 WL 1255096 (D.D.C. March 19, 2019) ...............22

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97 (1987) ............... 25, 27-28

*Overby v. Nat'l Ass'n of Letter Carriers*, 595 F.3d 1290 (D.C. Cir. 2010) ..........................30

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992) ....................................22

*Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935
    (11th Cir. 1997) .........................................................................................26

*Resolution Trust Corp. v. Thornton*, 41 F.3d 1539 (D.C. Cir 1994) ........................................65

*Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468 (9th Cir. 1992) ...................42

*RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016) ........................................26

*SEC v. Banca Della Svizzera Italiana*, 92 F.R.D. 111 (S.D.N.Y. 1981) ..............................37

*SEC v. Banner Fund Int'l*, 211 F.3d 602 (D.C. Cir. 2000) ........................................56

*SEC v. Bilzerian*, 378 F.3d 100 (D.C. Cir. 2004) ..................................................20

*SEC v. Carrillo*, 115 F.3d 1540 (11th Cir. 1997) .................................................22

*Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*,
    357 U.S. 197 (1958) ........................................................................................29

\* *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court*,
    482 U.S. 522 (1987) .................................................... 29-30, 35, 37, 56

*Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3 (E.D.N.Y. 2016) ........................ 21, 24

*Sunshine Distribution, Inc. v. Sports Auth. Michigan, Inc.*, 157 F. Supp. 2d 779
    (E.D. Mich. 2001) ........................................................................................27

*Thompson Hine, LLP v. Taieb*, 734 F.3d 1187 (D.C. Cir. 2013) ...........................................19

MATERIAL UNDER SEAL DELETED

*Tiffany (NJ) LLC v. Forbse*, 2012 WL 1918866, (S.D.N.Y. May 23, 2012),
     *aff'd in part vacated in part sub nom. Tiffany & Co. v. China Merchants Bank*,
     589 F. App'x 550 (2d Cir. 2014) ............................................................. 46, 49

████████████████████████████████████
████████████ ................................................................................. 7

*United States v. Anaconda Co.*, 445 F. Supp. 486 (D.D.C. 1977)........................63

*United States v. Bank of Nova Scotia*, 740 F.2d 817 (11th Cir. 1984)
     ("*Bank of Nova Scotia I*")................................................................... 36, 42

*United States v. Bank of Nova Scotia*, 740 F.2d 817 (11th Cir. 1984)
     ("*Bank of Nova Scotia II*") ...........................................................36, 51, 57

*United States v. BCCI Holdings (Luxembourg), S.A.*, 48 F.3d 551 (D.C. Cir. 1995) ...........28

*United States v. Bowen*, 689 F. Supp. 2d 675 (S.D.N.Y. 2010) .............................63

*United States v. Chase Manhattan Bank, N.A.*, 584 F. Supp. 1080 (S.D.N.Y. 1984).........37

*United States v. Davis*, 767 F.2d 1025 (2d Cir. 1985)....................................... 32, 36

*United States v. Delgado-Garcia*, 374 F.3d 1337 (D.C. Cir. 2004) ..........................32

*United States v. Field*, 532 F.2d 404 (5th Cir. 1976)................................... 29, 36-37

*United States v. First Nat'l City Bank of Chi.*, 699 F.2d 341 (7th Cir. 1983) .....................37

*United States v. First Nat'l City Bank*, 396 F.2d 897 (2d Cir. 1968)............................. 32, 37

*United States v. Ginyard*, 215 F.3d 83 (D.C. Cir. 2000) ....................................30

*United States v. Ingram*, 490 F. App'x 363 (2d Cir. 2012) ...................................63

*United States v. Oloyede*, 982 F.2d 133 (4th Cir. 1992)......................................63

*United States v. Rubin*, 836 F.2d 1096 (8th Cir. 1988)......................................36

*United States v. Rylander*, 460 U.S. 752 (1983) .........................................59

*United States v. Sedaghaty*, 2010 WL 11643384 (D. Or. Feb. 26, 2010)..............................63

\* *United States v. Vetco, Inc.*, 691 F.2d 1281 (9th Cir. 1981) ................................32, 42, 50, 53

*Validus Reinsurance Ltd. v. United States*, 786 F.3d 1039 (D.C. Cir. 2015)..................63-64

*Weiss v. National Westminster Bank*, 176 F. Supp. 3d 264 (E.D.N.Y. 2016).....................21

*World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286 (1980)........................................19

*Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548 (S.D.N.Y. 2012)..............43, 46, 48, 51

# STATUTES AND REGULATIONS

18 U.S.C. § 1956 ............................................................................................18

18 U.S.C. § 1956(a)(2)(A) ............................................................................10

18 U.S.C. § 1956(c)(7)(D) ............................................................................10

18 U.S.C. § 1956(h) ......................................................................................10

31 U.S.C. § 5318 .....................................................................................10, 18

31 U.S.C. § 5318(c)(1) ..................................................................................25

31 U.S.C. § 5318(k)(3) ..............................................................................9, 26

31 U.S.C. § 5318(k)(3)(A) .........................................................................9, 20

31 U.S.C. § 5318(k)(3)(A)(i) ............................... 24, 26, 59-60, 62- 64

31 U.S.C. § 5318(k)(3)(A)(ii) ....................................................... 15, 24-26

31 U.S.C. § 5318(k)(3)(B)(i) .........................................................................25

31 U.S.C. § 5318A ...................................................................................10, 18

31 U.S.C. § 5318A(e)(1)(B) ..........................................................................60

31 U.S.C. § 5322 .....................................................................................10, 18

35 U.S.C. § 293...............................................................................................27

50 U.S.C. § 1701 .....................................................................................3, 10

50 U.S.C. § 1702 .............................................................................................3

50 U.S.C. § 1705 .............................................................................................3

31 C.F.R. § 544.405 ........................................................................................3

31 C.F.R. § 1010.100(e)................................................................................18

MATERIAL UNDER SEAL DELETED

31 C.F.R. § 1010.605.................................................................60

31 C.F.R. § 1010.605(c)............................................................4

## RULES

Fed. R. App. P. 28(i)..............................................................23

Fed. R. Crim. P. 17................................................................27

Fed. R. Crim. P. 17(c)(1)........................................................27

Fed. R. Crim. P. 17(e)............................................................20

Fed. R. Crim. P. 17(e)(1)........................................................27

## LEGISLATIVE MATERIALS

Pub. L. No. 107-56, 115 Stat. 272...................................9, 26, 60

*Serial No. 115-91: Sanctions, Diplomacy, and Information: Pressuring North Korea,*
    *Hearing Before the Committee on Foreign Affairs, House of Representatives, 115th Cong.,*
    *1st Session, House Foreign Affairs Committee* (Testimony of Treasury Department's
    Assistant Secretary for Terrorist Financing, Marshall Billingslea and
    State Department's Assistant Acting Secretary, Susan Thornton), (Sept. 12, 2017).
    Available at:
    https://www.hsdl.org/?abstract&did= 810576. ............................ 2-6, 8, 31, 43, 57

..............................................5, 7

## OTHER AUTHORITIES

Note, *The Aerospatiale Dilemma: Why U.S. Courts Ignore Blocking Statutes and*
    *What Foreign States Can Do About It*, 106 Cal. L. Rev. 231 (2018)..............................37

"Notice of Finding that the Democratic People's Republic of Korea Is a Jurisdiction of
    Primary Money Laundering Concern," 81 Fed. Reg. 35441 (June 2, 2016)...........2, 4

Restatement (Third) of the Foreign Relations Law of the United States
  (1987) ............................................................................................... 13, 30, 35, 58

Restatement (Fourth) of the Foreign Relations Law of the United States
  (1987) ............................................................................................... 30, 45, 50, 58

Treasury Department Press Release, "Treasury Sanctions Bank and Official Linked to
  North Korea Weapons of Mass Destruction Programs," (Mar. 11, 2013)
  Available at:
  https://www.treasury.gov/press-center/press-releases/Pages/jl1876.aspx ............. 3

MATERIAL UNDER SEAL DELETED

# GLOSSARY OF ABBREVIATIONS

| ███████ | ████████████████████████ |
|---------|--------------------------|
| BSA | Bank Secrecy Act |
| ████ | ████████████████ |
| DHID | Dandong Hongxiang Industrial Development Co. Ltd |
| FINCEN | Financial Crimes Enforcement Network |
| ████ | ████████████████ |
| JA | Joint Appendix |
| IEEPA | International Emergency Economic Powers Act |
| MOJ | China's Ministry of Justice |
| MLAA | China-U.S. Agreement on Mutual Legal Assistance in Criminal Matters |
| OIA | Justice Department's Office of International Affairs |
| OFAC | Treasury Department's Office of Foreign Assets Control |
| ████ | ██████████████████████ |
| WMD | Weapons of Mass Destruction |

MATERIAL UNDER SEAL DELETED

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231. *In re Grand Jury*, 286 F.3d 153, 157 (3d Cir. 2002); *In re Grand Jury Subpoena 92-1(SJ)*, 31 F.3d 826, 828-29 (9th Cir. 1994); *see also* Fed. R. Crim. P. 17(c)(2), (g). The contempt orders were entered on April 10, 2019, JA1844-58, and the Banks filed timely notices of appeal, JA1859-64. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.   Whether the district court had personal jurisdiction over the Banks.

II.  Whether the district court abused its discretion in concluding that international comity did not preclude enforcement of the subpoenas.

III. Whether the Attorney General's anti-money laundering subpoena to ███████████████████ exceeded the scope of the USA Patriot Act.

## STATUTES, REGULATIONS, AND RULES

Pursuant to D.C. Circuit Rule 28(a)(5), appellee states that all pertinent statutes and regulations other than those attached hereto are attached in the Addendums to appellants' briefs.

## STATEMENT OF THE CASE

This case involves subpoenas served on the Banks seeking records of commercial banking activity. The Banks refused to comply, arguing that the district court lacked personal jurisdiction over them and that the subpoenas were unduly oppressive because

MATERIAL UNDER SEAL DELETED

compliance would violate Chinese law. The district court rejected the Banks' challenges to the subpoenas, ordered compliance, and held the Banks in civil contempt when they refused to comply.

## I. BACKGROUND

North Korea's weapons programs pose "a grave and growing threat" to the security of the United States and—indeed—the world.[1] "Since 2005, North Korea has been sanctioned repeatedly" for its proliferation of weapons of mass destruction (WMD) and "the development of nuclear and ballistic missile programs."[2] North Korea "uses state-owned entities and banks" to conduct financial transactions "in support" of its weapons programs, which are "very expensive" to maintain. 81 Fed. Reg. 35441, 35443; Hearing 22 (Royce).

"To impede" North Korea's weapons programs, in early 2013 the Treasury Department sanctioned North Korea's ███████████████████████ — ██

---

[1] *Serial No. 115-91: Sanctions, Diplomacy, and Information: Pressuring North Korea, Hearing Before the Committee on Foreign Affairs, House of Representatives, 115th Cong., 1st Session, House Foreign Affairs Committee* (Testimony of Treasury Department's Assistant Secretary for Terrorist Financing, Marshall Billingslea and State Department's Assistant Acting Secretary, Susan Thornton), at 15 (Sept. 12, 2017) (hereafter "Hearing"). Available at: https://www.hsdl.org/?abstract&did= 810576.

[2] "Notice of Finding that the Democratic People's Republic of Korea Is a Jurisdiction of Primary Money Laundering Concern," 81 Fed. Reg. 35441 (June 2, 2016).

MATERIAL UNDER SEAL DELETED

██████ (████).[3] This sanction prohibits any entity from providing financial services to ██ in the United States except as authorized by the Treasury Department's Office of Foreign Assets Control (OFAC) and, additionally, prohibits any person from causing a U.S. entity to provide financial services for ████ benefit. *See* 50 U.S.C. § 1705; 31 C.F.R. § 544.405.[4]   In sanctioning ████, the Treasury Department targeted "a key financial node in North Korea's WMD apparatus" and cut it off from "the U.S. financial system." 2013 Sanctions, at 1.

Because North Korea's money essentially has "no value," however, the country needs access to foreign currency—including U.S. dollars—to pay for its weapons programs "on a month to month basis." Hearing 22 (Royce). To finance its nuclear and ballistic-missile programs, North Korea evades the restrictions imposed on its state banks (like ████) by, among other things, deploying bank representatives abroad to establish front companies with the aid of foreign-national conspirators. 81 Fed. Reg.

---

[3] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████ .

[4] The Treasury Department acted pursuant to the International Emergency Economic Powers Act (IEEPA), which grants the President the authority to regulate "any unusual and extraordinary threat"—originating in whole or in part outside of the United States—to the national security of the United States. 50 U.S.C. § 1701. This authority includes the power to prohibit payments "between, by, through, or to any banking institution" to the extent such payments involve the interest of any foreign country or national, and to prohibit transactions involving any property in which a foreign country or national has an interest. *Id.* § 1702.

35441, 35442; *see also* Hearing 19 (Billingslea). A front company unlawfully hides the affiliation of the sanctioned entity, which permits it to conduct U.S.-dollar transactions through the United States without the required OFAC license. *See* JA864-65.

In this case, the government's investigation thus far has revealed that an ██ representative (████████) and a Chinese national (██████) operated ████████ ████████ as a China-based front company to conduct prohibited U.S.-dollar transactions through New York bank accounts. JA864-65. ██ used " ██ ████████ " to send and receive " ████████████████ " between ██, ████████████, and third-party service providers. JA864. Pursuant to these coded instructions, from late-2012 to early-2015, ████████ ████████ made over $105 million in illicit U.S.-dollar payments for the benefit of the North Korean government using three Chinese banks: ████████ ████████ (████), ████████████████ (██████), and ████ ████████ (████). JA36-37, 45-46. All of these wire transfers transited through the United States financial system via correspondent U.S. banks in New York City,[5]

---

[5] A correspondent bank account is an account established by a foreign bank to receive deposits from, or make payments on behalf of, the foreign bank. 31 C.F.R. § 1010.605(c).

MATERIAL UNDER SEAL DELETED

which cleared the transactions before they reached the intended beneficiaries. JA866-67.[6]

The evidence that the government has gathered shows that ███ and ██ never operated ████████████████ as "a legitimate business." JA864-65. ████████████████, for example, did not have a website.[7]  Further, despite the significant financial transactions described above, ████████████ ██████ stated no business purpose in the corporate documents it filed in Hong Kong. ████████. Consistent with North Korea's practice of "using the interconnected global financial system to its advantage and employing deceptive financial practices to cover its tracks," Hearing 16 (Billingslea),[8] ████ and ████ "created" ████████

---

[6] ████ laundered $57,931,904.75 (via 388 separate transactions) through a U.S. correspondent account of ████s, which has no U.S. branch but maintains seven correspondent accounts here. JA1738, 1756. ████ also laundered $45,779,669.50 (via 323 separate transactions) through a U.S. correspondent account of ████'s, which has branches in ████████████████████. JA1659-56, 1737, 1755-56. Finally, ████ laundered $1,627,909.34 (via 15 transactions) through a U.S. correspondent account of ████s, which has a ████████████████. JA1737-38, 1756. All three banks are closely tied to the Chinese state: the Chinese government, or its affiliated enterprises, owns between 40% and 50% of ████████, 41.96% of ████, and at least 39.75% of ████. JA1737-38.

[7] ████████████████████████████████████████████████████████████████████████████████

[8] For example, acting on behalf of a separate North Korean state bank (Korea Kwangson Banking Corp.) that OFAC had sanctioned, Dandong Hongxiang Industrial Development Co. (also a China-based company) used an illicit network of front

MATERIAL UNDER SEAL DELETED

████████████ ████████████████████████████████████████

█████████████ JA865.

████████████████████████████ helped North Korea unlawfully raise revenue by, for example, executing millions of dollars in transactions between 2013 and 2015 with Chinese coal importers, coal being North Korea's primary source of money. JA868-71; *see* Hearing 12-13 (Billingslea). For example, publicly available shipping records show that, in July and August 2015, Dandong Hongxiang Industrial Development Co. (DHID) received almost $3 million worth of coal from North Korea. Because sanctioned North Korean banks (like ████) could not legally receive U.S. dollars as payment for such exports, a DHID front company laundered the payment by wiring funds to several ████ front companies, including roughly $1.5 million to ██████████████████████. In turn, █████████ paid other companies—*e.g.*, a Chinese petroleum company and a Malaysian exporter—for oil and other commodities that were then shipped to North Korea. *See* JA867-72. This ████████ is how North Korean state banks, with the aid of China-based front companies like █████████, evade the sanctions that prohibit them from using the U.S.

---

companies and third-party financial facilitators to conduct over $1 billion U.S.-dollar transactions between 2009 and 2016. JA867. Of that $1 billion, approximately $280 million were sent from accounts held by ██████, $270 million from accounts held by ████, and $125 million from accounts held by ██████. JA868.

financial system. JA868. Specifically, the ████████████████████████████

████████████████████████████████ JA868.[9]

It is unsurprising that ████████████████████ (a) was located in a

Chinese city near the North Korea border (Shenyang); (b) used Chinese banks to

conduct its prohibited U.S.-dollar transactions (████████████████); and (c)

operated with the assistance of a Chinese national (██████). Because China exercises

████████████████ of North Korean bank representatives, the U.N. Panel of

Experts found that sanctioned North Korean banks and trading companies often

████████████████████ JA855-56, 858-59. Further, the U.N. panel found,

Chinese nationals help North Korea ████████████ by registering such front

companies in, for example, Hong Kong, and by ████████████████████

████████ via Chinese banks. JA854-55, 858-59. "[M]any North Korean front or

shell companies" use "Chinese banks to facilitate the movement of illicit funds."

████████; *see also* JA882.

To address the "gravely serious" threat posed by North Korea's weapons

programs, in September 2017, Assistant Secretaries from the State and Treasury

---

[9] ████ and ████ dissolved ████████████████████ soon after the U.S.
correspondent banks blocked (*i.e.*, froze) 20 of ████████ transactions in the Fall of
2015. JA37-38, 46-47. Ultimately, the United States forfeited these frozen assets.
████████████████████████. In mid-2017, OFAC sanctioned ████████
████████████████ JA865.

Departments outlined a "maximum pressure" strategy to Congress. Hearing 8 (Thornton); *see alo id.* at 15 (Billingslea). As part of this strategy, the United States continues to "call for all countries to cut trade ties" with North Korea and "choke off revenue sources" that "finance the regime's weapons programs." *Id.* at 9 (Thornton). China's support for this campaign, however, has been "'uneven.'" *Id.* The United States has not seen "sufficient evidence of China's willingness to truly shut down North Korean revenue flows, expunge the North Korean illicit actors from its banking system, and expel the North Korean middlemen and brokers who are establishing webs of front companies." *Id.* at 21 (Billingslea). While the United States "will continue to engage in a dialogue" with China "on how to further pressure" North Korea, the United States intends to use all its "tools" to disrupt "North Korea's illicit activities," including acting "unilaterally" when necessary. *Id.* at 9 (Thornton). The Treasury Department, for example, is "closely coordinating" with the Justice Department to identify North Korean front-company networks "transferring money through the U.S. financial system" because it is a United States "priority" to "target and expose those individuals who are the financial facilitators for the North Korean regime who set up these elaborate front and shell company structures, which are then used to get the bank accounts to launder the money." *Id.* at 20 (Billingslea), 25 (Thornton).

MATERIAL UNDER SEAL DELETED

## II.    THE PRESENT CONTROVERSY

### A. The Subpoenas

   1.  *The Anti-Money Laundering Subpoena to* ██████

On December 24, 2017, after obtaining the requisite Justice Department approvals, JA953, the government served on ██████'s registered agent an anti-money laundering subpoena pursuant to the USA Patriot Act,[10] which authorizes the Attorney General to issue a subpoena "to any foreign bank that maintains a correspondent account in the United States and request records related to such correspondent account, including records maintained outside of the United States relating to the deposit of funds into the foreign bank." 31 U.S.C. § 5318(k)(3)(A); *see* JA767-74. The subpoena commanded ██████ to produce specified records relating to correspondent-banking transactions for ██████████████████████, and explained that those records were ██████ for the Justice Department ████████████████████████████ ██ JA769.[11]

---

[10] Because the findings accompanying the USA Patriot Act suggest that Congress granted this subpoena power "to aid criminal investigations into money laundering," the district court correctly opined that such a subpoena "hews more closely to a grand jury subpoena than administrative subpoena." JA1854; *see* 31 U.S.C. § 5318(k)(3); Pub. L. No. 107-56, § 302(b)(1), 115 Stat. 272, 296. An administrative subpoena refers to a subpoena issued "in connection with internal agency proceedings," JA1854, whereas a "grand jury is an arm of the court," *Levine v. United States*, 362 U.S. 610, 617 (1960).

[11] The U.S.-dollar transactions that ████████████████████ and its co-conspirators processed via correspondent bank accounts in the United States potentially violated several laws. First, IEEPA's provisions required ██████████ to have a license

MATERIAL UNDER SEAL

To allow ▮▮▮ an opportunity to consult with Chinese regulators, the United States repeatedly extended the subpoena's original return date. JA828. On March 22, 2018, the Chinese Ministry of Justice (MOJ)—which is China's designated "▮▮▮▮ ▮▮▮▮" for the China-U.S. Agreement on Mutual Legal Assistance in Criminal Matters (MLAA) (JA74)—told ▮▮▮ that the Chinese government is "▮▮▮▮ ▮▮▮▮▮▮▮▮" and declared that the MLAA is a "▮▮▮▮▮▮▮" for legal assistance. JA826. Further, the MOJ decreed, if ▮▮▮ provided any client information "▮▮▮▮" to the United States, Chinese "▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮" JA826. ▮▮▮, in turn, told U.S. law-enforcement officials that it would not comply with the anti-money laundering subpoena and that the United States would have "▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮" JA830.

2. *The Grand Jury Subpoenas to* ▮▮▮ *and* ▮▮▮

Also on December 24, 2017, after again obtaining the requisite approvals, the government served on ▮▮▮ and ▮▮▮ at their ▮▮▮▮▮▮ subpoenas "▮▮▮

---

to process those payments through the United States in which ▮▮▮ had an interest, yet no one ever sought or obtained such an OFAC license. *See* 50 U.S.C. §§ 1701 *et seq.* Second, it is a money-laundering crime to transfer funds to the United States from a place outside the United States with the intent to promote a specified unlawful activity, such as violating IEEPA. *See* 18 U.S.C. §§ 1956(a)(2)(A), 1956(h), 1956(c)(7)(D). Finally, the Bank Secrecy Act prohibits persons from, among other things, causing U.S. banks to engage in any financial transaction with an entity, such as ▮▮▮ within a jurisdiction deemed an area of money-laundering concern. *See* 31 U.S.C. §§ 5318, 5318A, 5322.



" each of which commanded a witness "███████"

in the United States district court and bring all records held at the banks relating to

█████████████, covering the period from January 1, 2012, through

the subpoena's date. JA404-12. ████████████████████

████████████████████████████████████

████████████████████████" JA404. Like █████,

and █████ declined to comply with the subpoenas and instructed the United States to

submit MLAA requests. JA55-56, 60-61.

## B. The Motions To Compel

Following the Banks' refusals to comply, in April and August 2018 senior Justice

Department officials traveled to China and explained to their Chinese counterparts that

China's past failures to respond to U.S. MLAA requests for bank records had

"████████" the grand-jury and anti-money laundering subpoenas in this case. JA952.

The Justice Department officials also explained that the United States intended to

enforce the subpoenas if there was no compliance. JA952. The Chinese officials

declined to permit the Banks' compliance, and directed the Justice Department to

submit MLAA requests. JA1629.

Thereafter, in Fall 2018 the United States drafted its motions to compel, which

were reviewed by numerous government components, including the Justice

Department's Office of International Affairs (OIA) and the Treasury Department's

Office of Terrorism and Financial Intelligence. *See* JA953, 1774. On November 29,

MATERIAL UNDER SEAL DELETED

2018, the government filed its motions, which the Banks opposed, arguing that the district court lacked personal jurisdiction over them and, in any event, international-comity obligations precluded enforcement because the government was asking the Banks to violate Chinese law.

Following briefing and oral argument, on March 18, 2019, the district court granted the government's motions. JA1733-93. The court concluded that, as to ████████ and ████, "personal jurisdiction is straightforward:  each has consented to personal jurisdiction." JA1745. As part of their applications to the Federal Reserve Board to establish their U.S. branches, *see* note 6 *supra*, ████████ and ████ each "████████████████████████████████████████████" for purposes of proceedings initiated by the United States "██████████████████████████████████ ████" JA1659-64.[12]  Even if ████████ and ████ had not consented to jurisdiction, the court found that all three banks had sufficient minimum contacts with the United States for the exercise of specific personal jurisdiction. JA1747-61.

The court also concluded that international comity was not a reason to refrain from compelling compliance with the subpoenas. JA1766-92. Though acknowledging a conflict between Chinese and domestic law, the court applied the factors that federal courts regularly take into account when deciding whether to issue an order directing production of information located abroad despite a claim that foreign law bars

---

[12] ████ has no U.S. branch and has never executed such a consent.

MATERIAL UNDER SEAL DELETED

disclosure. JA1768, 1771 (citing Restatement (Third) of the Foreign Relations Law of the United States § 442 (1987)). Here, the court held, the grand jury's strong need for the materials sought and inability to obtain them through alternative channels outweighed the asserted competing legal obligations. JA1771-92. The court thus ordered ███ to produce the subpoenaed records by March 28, and ███ and ███ to appear before the grand jury at the earliest date to provide testimony or complete production of the subpoenaed records in lieu of testimony. JA1793.[13]

## C. The Civil Contempt Order

When none of the Banks complied with the court's order, the government moved for civil contempt orders. After a hearing, the court found "each bank is now subject to, and flatly disregarding, an unambiguous court order." JA1850. The court imposed monetary civil contempt sanctions but stayed its order conditioned on the Banks filing prompt notices of appeal and moving to expedite their appeals. JA1851-59.

## SUMMARY OF ARGUMENT

The district court correctly concluded that it could exercise personal jurisdiction over the Banks. When ███ and ███ applied to the Federal Reserve for

---

[13] ███ immediately appealed the district court's compulsion order and moved the district court to stay that order pending its appeal, No. 19-5068, which the district court denied, JA1853-58. Because the district court has now held ███ in contempt, *see* discussion *infra*, this Court should "dismiss as moot" this aspect of ███ appeal. *In re Grand Jury Subpoena*, 912 F.3d 623, 634 (D.C. Cir. 2019).

MATERIAL UNDER SEAL DELETED

permission to establish branches in the United States, they consented to federal-court jurisdiction for purposes of proceedings initiated by the United States in any matter arising under U.S. Banking Law, which includes the government's motions to compel. In any event, there are sufficient minimum contacts to satisfy the Due Process Clause because all three Banks purposefully availed themselves of the United States' financial market by conducting millions of dollars' worth of transactions for ▮▮▮▮▮ ▮▮▮▮▮▮▮▮ through their New York correspondent accounts.

Additionally, the district court did not abuse its discretion in compelling production pursuant to the subpoenas even assuming a conflicting Chinese-law obligation. The government's national-security interest is significant, while the Banks' claimed hardships are minimal: China's bank-secrecy laws are not absolute and the risk of a severe penalty is minimal because the Chinese government owns significant percentages of each of the Banks. Moreover, the MLAA is not a viable alternative to subpoenas because, in recent years, it has not been an effective channel for the United States to receive timely, adequate bank-record responses from China. Balancing these and other relevant factors, the district court acted well within its discretion in concluding that comity did not preclude enforcement of the subpoenas.

The Attorney General's anti-money laundering subpoena does not exceed the scope of its authorizing statute, the USA Patriot Act, which broadly authorizes requests for records related to those correspondent accounts kept in the United States by foreign banks. Critically, such records include those maintained outside the United States

"relating to the deposit of funds into the foreign bank," 31 U.S.C. § 5318(k)(3)(A)(ii), which, in this case, means all of ████████ records because that front company existed for the sole purpose of illegally accessing U.S. dollars for ██ .

## STANDARDS OF REVIEW

This Court reviews for abuse of discretion a civil contempt order, *Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993), and the related ruling on a motion to compel, *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 968 (D.C. 2016). Further, this Court defers to the district court's "sound discretion" in "the balancing of the relevant factors." *Lee v. Dep't of Justice*, 413 F.3d 53, 59 (D.C. Cir. 2005). *See generally Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356 (D.C. Cir. 2018) ("A district court would necessarily abuse its discretion if it based its ruling on an error of law, a clearly erroneous assessment of the evidence, or an improper weighing of the factors limiting its discretion." (citation and internal quotation marks omitted)).

## ARGUMENT

## I. THE DISTRICT COURT HAD SPECIFIC PERSONAL JURISDICTION OVER THE BANKS

In this grand jury proceeding, the United States had to "demonstrate that the District Court ha[d] personal jurisdiction over each of the [Banks] in order to secure a valid order directing the production" of their records. *In re Sealed Case*, 832 F.2d 1268, 1272 (D.C. Cir. 1987) ("*Sealed Case II*"), *abrogated on other grounds by Braswell v. United States*, 487 U.S. 99 (1988); *see also In re Grand Jury Subpoena*, 912 F.3d 623, 635-37 (D.C. Cir.

MATERIAL UNDER SEAL DELETED

2019) (Williams, J., concurring). That is not a significant burden at this investigatory stage; the United States needed only to demonstrate that there is "'a reasonable probability that ultimately it will succeed in establishing facts necessary for the exercise of jurisdiction.'" *Sealed Case II*, 832 F.2d at 1274 (quoting *Marc Rich & Co., A.G. v. United States*, 707 F.2d 663, 670 (2d Cir. 1983)). The government met this burden by demonstrating that ████ and ████ consented to jurisdiction in their U.S.-branch applications or, alternatively, that all three Banks had sufficient minimum contacts with the United States to satisfy the Due Process Clause.

## A. ████ and ████ Previously Consented to Personal Jurisdiction

"The validity of an order of a federal court depends upon that court's having jurisdiction over both the subject matter and the parties." *Insurance Corp. of Ireland Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982). Unlike subject-matter jurisdiction, however, the requirement of personal jurisdiction is "an individual right" that can be waived. *Id.* at 703. ████ and ████ executed such waivers by giving "express" consent "to the personal jurisdiction of the court," *id.*, when they sought the Federal Reserve's permission to establish branches in the United States.

In their branch applications, ████ and ████ each executed a "████████ ████████████████" and agreed that that Commitment was a "████████" imposed "████████████████████████████" on their applications. JA1659-60, 1663-64. In return for the benefits of having U.S. branches, ████ and ████ agreed to appear in the "████████████████████" for "████████" of

16



any "███████████" the United States on a "███████████ ███████" JA1659-60, 1663-64. ███████ and ███ s consents defined "███████████" to include violations of "███████████" arising under, *inter alia*, "███████████" (BSA) and any "███████████ ███████████████████████████████████████ ███████████" JA1661, 1663-64.

The pending actions fit comfortably within the terms of ███████ s and ███ s jurisdictional consents, which ███████ and ███ have never suggested were not "obtained through 'freely negotiated' agreements." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) (citation omitted). The government's motions are proceedings initiated by the United States. Further, these motions concern "matter[s] arising under U.S. Banking Law" because the grand jury is investigating possible criminal-law violations of the BSA and federal money-laundering statutes. *See* note 11 *supra*. The district court thus properly concluded that ███████ and ███ "expressly consented to the exercise of personal jurisdiction in this proceeding." JA1747.

███████ contends (at 6-8) its consent is inapplicable because this proceeding does not arise under "U.S. Banking Law" since the BSA only "places obligations on 'financial institutions,' which are entities that provide financial services within the United States, which none of the entities under investigation provide." The grand jury's investigation is broader than ███████ describes, however, and reaches beyond North Korea to financial institutions here and abroad that processed ███████ and ███████ laundered

transactions. This subpoena-enforcement action thus "arise(s)" under "U.S. Banking Law" because the grand jury is investigating whether those financial institutions that provided services in the United States—such as correspondent bank accounts—exercised due diligence pursuant to the BSA. *See* 31 U.S.C. §§ 5318, 5318A, 5322; *see also In re Various Grand Jury Subpoenas*, 924 F. Supp. 2d 549, 555 (S.D.N.Y. 2013) (financial institution improperly refused to comply with subpoena since grand jury need "not prove" that BSA necessarily applied before issuing subpoena).

Additionally, ███ consent also applies if the United States initiates a proceeding in "████████████" under "████████████████ ████" to the "████████████████████" JA1663-64. The grand jury is investigating whether ███ (a "foreign bank") laundered money through ████████████████ and also whether the Banks themselves knowingly participated in ███s money-laundering activities. *See* 18 U.S.C. § 1956; *see also* JA884; note 11 *supra*.[14] Those potential Title 18 criminal-law violations also trigger ███s jurisdictional consent.

## B. The District Court Had Personal Jurisdiction Over All Three Banks Because of Their Contacts with the United States

In the alternative, the district court correctly held, each of the three Banks has

---

[14] Indeed, contrary to ███s claim (at 8), this money-laundering provision is also part of the BSA, which, in turn, ███s consent expressly declares is part of "████████ ███" *See* 31 C.F.R. § 1010.100(e) (defining "Bank Secrecy Act" to include "18 U.S.C. § 1956").

sufficient minimum contacts with the United States for the exercise of specific personal jurisdiction because "each bank has purposefully availed itself of the United States financial market through correspondent banking activity, including transactions on behalf of ███████" JA1747-61.

"[A] federal court has personal jurisdiction over a corporation or other business concern with respect to its activities * * * within the United States only if that corporation has certain 'minimum contacts' with the United States," *Sealed Case II*, 832 F.3d at 1273, such that that business "should reasonably anticipate being haled into court there," *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980). More particularly, where a forum seeks to assert *specific* jurisdiction over such a corporation,[15] this "'fair warning' requirement is satisfied if [1] the defendant has 'purposefully directed' his activities at residents of the forum, and [2] the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King*, 471 U.S. at 472 (citations omitted); *see also Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1189 (D.C. Cir. 2013).

"Even a single purposeful contact may be sufficient to meet the minimum contacts standard when the underlying proceeding is directly related to that contact." *In the Matter of Application to Enforce Administrative Subpoenas Duces Tecum of the SEC*, 87

---

[15] Specific jurisdiction is different from general jurisdiction, which depends on systematic and continuous contacts unrelated to the particular litigation. *See Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984).

F.3d 413, 419 (10th Cir. 1996) (citing *McGee v. International Life Ins. Co.*, 355 U.S. 220, 223 (1957)) ("*SEC Application*"); *see also Damler AG v. Bauman*, 571 U.S. 117, 127 (2014). And, where, as here—*see* 31 U.S.C. § 5318(k)(3)(A); Fed. R. Crim. P. 17(e)—a court "exercises personal jurisdiction by virtue of a federal statute authorizing nationwide service of process," the requirement of minimum contacts with a forum *state* is inapplicable. *SEC v. Bilzerian*, 378 F.3d 100, 1106 n.8 (D.C. Cir. 2004). Rather, "minimum contacts with the *United States* suffice." *Id.* (emphasis added); *see also Livnat v. Palestinian Authority*, 851 F.3d 45, 55 (D.C. Cir. 2017); *Sealed Case II*, 832 F.2d at 1273-74.

The district court rightly determined that it had specific personal jurisdiction over the Banks because their "correspondent banking activity qualifies as purposeful availment of the United States" and the subpoenas are "directly related" to those contacts. JA1756, 1758. Over two-and-one-half years, the Banks conducted millions of dollars' worth of banking activity in the United States on ███████████ ██████ behalf. Specifically, through its U.S. correspondent account, ████████ conducted over 300 U.S.-dollar transactions—worth approximately $45 million—for ████████. JA37. For its part, ██████ transacted $1.6 million in ████████ business (via 15 transactions) through its U.S. correspondent account. JA37. And, finally, ██████ executed close to 400 U.S.-dollar transactions (totaling approximately $58 million) for ████████ through its U.S. correspondent account. JA46. The Banks' repeated uses of their U.S. correspondent accounts to accomplish their voluminous dollar-denominated

wire transfers for ▮▮▮▮▮▮ show that the Banks' contacts with the United States were not "'random, isolated, or fortuitous.'" *Licci v. Lebanese Canadian Bank Ltd*, 732 F.3d 161, 171 (2d Cir. 2013) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)). To the contrary, this "deliberate and recurring activity" reflects the Banks' purposeful availment of the United States' "dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States.'" *Id.* (citation omitted); *see also Sealed Case II*, 832 F.3d at 1273 n.3 (suggesting that Canadian bank which did "considerable business in the United States" "plainly" had "'minimum contacts' with this country to establish jurisdiction").[16]

Further, the grand jury's "investigation and this subpoena enforcement action arise out of [the Banks'] contacts with the United States and thus support the exercise of specific jurisdiction in order to secure enforcement." *SEC Application*, 87 F.3d at 418; *see also Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 141-42 (2d Cir. 2014). The grand jury is investigating ▮▮▮ illegal efforts to evade those statutory prohibitions that bar it from directly conducting U.S.-dollar transactions. The Banks' correspondent-account

---

[16] *See also Nike, Inc. v. Wu*, 349 F. Supp. 3d 310, 330-32 (S.D.N.Y.) (magistrate op.), *aff'd*, 349 F. Supp. 3d 346 (S.D.N.Y. 2018); *Weiss v. National Westminster Bank*, 176 F. Supp. 3d 264, 285-86 (E.D.N.Y. 2016); *Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 28-29 (E.D.N.Y. 2016); *Gucci America, Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 97-99 (S.D.N.Y. 2015); *Official Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 69-70 (S.D.N.Y. 2016).

transactions on behalf of ███████████████ — ███ front company—

relate to this investigation because "the correspondent account[s] at issue [are] alleged

to have been used as * * * instrument[s] to achieve the very wrong alleged." *Licci*, 732

F.3d at 171. Put another way, the Banks' contacts involve activities that are the "very

source," *SEC Application*, 87 F.3d at 418, of the grand jury's interest in, among others,

███.[17]

By means of millions of dollars' worth of U.S.-correspondent-account

transactions for ██████ front company, the Banks have thus purposely availed

themselves of the United States' banking system. And, because those U.S. contacts are

directly related to the grand jury's investigation, "it is presumptively not unreasonable

to require" the Banks to submit to the burdens of litigation here. *Burger King*, 471 U.S.

at 476; *see also Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 619-20 (1992) ("[W]e

---

[17] *See also SEC v. Carrillo*, 115 F.3d 1540, 1545 (11th Cir. 1997) ("It is not the *existence* of the bank accounts that is alleged to have given rise to the causes of action but rather the *use* of the bank accounts to carry out the sale of unregistered securities to United States investors."); *Nike, Inc.*, 349 F. Supp. 3d at 332 ("In this case, it is evident that the Judgment Debtors would not have been able to enjoy the profits made through their exploitation of Plaintiff's trademarks, 'but for' the Banks' use of New York correspondent and settlement accounts."); *Gucci America*, 135 F. Supp. 3d at 99 ("Court has little difficulty concluding that [Bank of China's] New York contacts are a 'but for' cause of Gucci's document requests" because Gucci's subpoenas "are premised on the fact that Defendants' proceeds from the sale of counterfeit goods were transferred through BOC's correspondent accounts in New York"); *cf. Ofisi v. Al Shamal Islamic Bank*, 2019 WL 1255096, at *5 (D.D.C. March 19, 2019) (insufficient contacts to establish specific personal jurisdiction where no "factual allegations that Al Shamal transacted with banks in the United States").

MATERIAL UNDER SEAL DELETED

find that Argentina possessed 'minimum contacts' that would satisfy the constitutional test. By issuing negotiable debt instruments denominated in United States dollars and payable in New York and by appointing a financial agent in that city, Argentina 'purposefully avail[ed] itself of the privilege of conducting activities within the [United States].'" (citation omitted)).

████ alone challenges the district court's minimum-contacts analysis, arguing (at 11-12) that it executed "only" 15 transactions for ██████████████████████ via its U.S.-correspondent accounts.[18] Contrary to ██████ suggestion, this is a sufficient number of transactions and volume of transferred U.S. dollars ($1.6 million) because it plainly demonstrates that ██████ contacts were "deliberate and recurring," *Licci*, 732 F.3d at 171, and not isolated or accidental events. At any rate, ██████ ignores that its relevant United States conduct was much more substantial and sustained than just these 15 ██████████ transactions. ██████ maintained an ██████████ branch in the United States and was "██████████████████████████████████████████" JA60-61. These contacts show that ██████ purposefully directed its conduct at the United States and that

---

[18] Purporting to adopt ██████ argument, ██████████ claims (at 11) that it is "identically situated" as ██████ "with respect to the personal jurisdiction issue." But ██████ fact-specific argument—"only 15" transactions went "through ██████ correspondent accounts" and those transactions totaled "only $1.6 million" (██ 11-12)—shows that ██████████████ and ██████ are *not* "identically situated." ██████ is thus precluded from adopting ██████ argument pursuant to Fed. R. App. P. 28(i). As described, ██████ claims lack merit in any event.

MATERIAL UNDER SEAL DELETED

that conduct relates to the grand jury's investigation. *See*, *e.g.*, *Strauss*, 175 F. Supp. 3d at 19, 28-29 (bank's five U.S.-dollar transfers—totaling $205,000—through its New York branch, which was "staffed with employees and licensed to operate under New York banking laws," constituted "deliberat[e]" use of "New York's banking system" for minimum-contacts analysis).[19]

███ does not assert that it lacks the requisite minimum contacts with the United States but claims (at 47-53) that the Patriot Act "does not authorize nationwide service of process." The Act's plain language belies this claim, declaring that the Attorney General may issue a subpoena "to any foreign bank that maintains a correspondent account in the United States"—as ███ does—and that that subpoena, in turn, "may be served on the foreign bank *in the United States* if the foreign bank has a representative in the United States." 31 U.S.C. § 5318(k)(3)(A)(i), (ii) (emphasis added). "The language of the statute is plain, and its meaning seems clear"—"invocation of the nationwide service clause rests on satisfying the [U.S.- representative] provision." *GTE*

---

[19] Even assuming sufficient minimum contacts, ███ maintains (at 12) that it would violate "traditional notions of fair play and substantial justice" to subject it to the "burdens of U.S. legal process" on the basis of its correspondent-account activity "alone." But, as explained, ███ contacts with the United States were more extensive than simply a correspondent account. Regardless, the district court correctly concluded that ███ failed to present a "'compelling case'" that the presence of other considerations—such as "onerous logistical burdens"—rendered the exercise of jurisdiction unfair. JA1758-61 (quoting *Burger King*, 471 U.S. at 477). ███ is a "well-resourced," "sophisticated international financial institution" that could certainly have foreseen the possibility of U.S. litigation. JA1759-61.

*New Media Svcs. v. Bellsouth Corp.*, 199 F.3d 1343, 1350 (D.C. Cir. 2000). Because ███ had a "representative in the United States," 31 U.S.C. § 5318(k)(3)(A)(ii), the subpoena could be served "in the United States," *i.e.,* nationwide.

Despite § 5318(k)(3)(A)(ii)'s plain language, ███ maintains (at 47-48) that that provision is not a "blanket declaration authorizing nationwide service of process" because § 5318(k)(3)(B)(i) "clarifies that Congress intended to allow for service in the judicial district where that agent resides, not anywhere in the country." But, critically, § 5318(k)(3)(B)(i) contains no geographic limitation on where a foreign bank's agent may reside. Rather, it requires only that the agent "reside[] in the United States." Thus, the district court properly concluded, "the statute requires that all foreign banks with a correspondent account in the United States must have a representative in the United States, and service may be accomplished *wherever* that representative is stationed," JA1753-54 (emphasis added), which is the very definition of nationwide service of process.[20] *Cf.* 31 U.S.C. § 5318(c)(1) (restricting scope of financial-records summons

---

[20] *See Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 105-06 (1987) (suggesting § 6d(4) of Commodity Exchange Act authorizes nationwide service because it provides process may be served in any district in which the defendant is an inhabitant or "wherever the defendant may be found"); *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 n.8 (2d Cir. 2012) (suggesting Anti-Terrorism Act authorizes nationwide service because it provides a defendant "may be served in any district where the defendant resides, is found, or has an agent"); *Medical Mut. of Ohio v. DeSoto*, 245 F.3d 561, 566 (6th Cir. 2001) (suggesting ERISA authorizes nationwide service because it provides an action "may be brought in the district court where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found"); *Republic*

MATERIAL UNDER SEAL DELETED

from Treasury Secretary to "not more than 500 miles distant from any place where the financial institution * * * operates or conducts business in the United States").

██████ also claims (at 48-50) that, "[e]ven" if its textual argument is not the "most natural" reading of § 5318(k)(3)(A)(ii), it is a "reasonable" one, which should be "adopt[ed] in light of the presumption against extraterritoriality." That presumption is easily rebutted here because of the statute's "clear indication of extraterritorial effect," *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2102 (2016), and § 5318(k)(3) need not be narrowly construed. Section 5318(k)(3) is titled "Foreign Bank Records," and it provides for a method—a subpoena served on a foreign bank's United States agent—by which the Attorney General can secure records maintained "outside the United States." 31 U.S.C. § 5318(k)(3)(A)(i), (ii). Further, one of the statute's "purpose[s]" is to "increase the strength of United States measures to prevent, detect, and prosecute international money laundering." Pub. L. 107-56, § 302(b)(1), 115 Stat. 272, 296. Consistent with this purpose, § 5318(k)(3)'s foreign-records measure strengthens the United States' "international" enforcement efforts by requiring foreign banks with U.S. correspondent accounts to designate agents for the service of

---

*of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 941 (11th Cir. 1997) (suggesting RICO authorizes nationwide service because it provides process "may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs"); *see generally In the Matter of Arbitration Between Johns and Taramita, Inc.*, 132 F. Supp. 2d 1021, 1025-27 (S.D. Fla. 2001).

MATERIAL UNDER SEAL DELETED

subpoenas seeking out-of-country documents related to those accounts.[21]

██████ similarly suggests (at 9-11) that Fed. R. Crim. P. 17 has "limited extraterritorial application" and asserts it thus could not be used "to compel production of documents located outside of the United States in the possession of a non-U.S. citizen or resident." This is incorrect. Rule 17 was the statutory "authorization for service" on ████. *Omni Capital Int'l,* 484 U.S. at 104. Consistent with that Rule, the grand jury served its subpoena on ████ "at any place within the United States," Rule 17(e)(1), namely New York. Also consistent with that Rule, the subpoena required the testifying witness to "████" documents. JA407; *see* Rule 17(c)(1). In this manner, the grand jury properly "satisfied" the "procedural requirement" of service pursuant to Rule 17, which was the "prerequisite[]" to the district court's exercise of personal jurisdiction

---

[21] Citing the Patent and Lanham Acts, ████ mistakenly claims (at 49-50) that courts have construed "similar statutory schemes as *not* authorizing nationwide service." The Patent Act does not expressly provide for service of process "in the United States," as the Patriot Act does, but declares that a patentee not residing in the United States may designate a "person residing within the United States" for service. *In re Papst Licensing GBMH & Co. KG Litig.*, 590 F. Supp. 2d 94, 100 (D.D.C. 2008) (quoting 35 U.S.C. § 293). This language, the Seventh Circuit concluded, in fact "establishes nationwide service" with respect "to 'designated agents' of foreign patentees." *Fitzsimmons v. Barton*, 589 F.2d 330, 333 n.2 (7th Cir. 1979); *see also Bally Gaming, Inc. v. Kappos*, 789 F. Supp. 2d 41, 43 (D.D.C. 2011) (finding similar provision of Patent Act created "nationwide-service-of-process" and "in certain specified circumstances, vests jurisdiction" in the District of Columbia district court). The Lanham Act does not create nationwide service only because its service provision deals solely with administrative proceedings before the patent court, which have no bearing on "civil actions or the jurisdiction of the federal courts." *Sunshine Distribution, Inc. v. Sports Auth. Michigan, Inc.*, 157 F. Supp. 2d 779, 787 (E.D. Mich. 2001).

over ▮▮▮. *Omni Capital Int'l*, 484 U.S. at 104. And, contrary to ▮▮▮ claim, "[s]o long as the court which must enforce the grand jury process can obtain personal jurisdiction of the summoned witness," that witness "may not resist the summons on the sole ground that he is a non-resident alien." *Marc Rich & Co., A.G. v. United States*, 707 F.2d 663, 667 (2d Cir. 1983). Nor may the witness "resist the production of documents on the ground that the documents are located abroad." *Id.*; *see also Sealed Case II*, 832 F.2d at 1273 ("The Independent Counsel must therefore demonstrate that the District Court has personal jurisdiction over each of the [eight foreign] companies in order to secure a valid order directing the production of the companies' records."). [22]

## II. THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION WHEN IT DETERMINED THAT A FOREIGN-LAW CONFLICT DID NOT RENDER SUBPOENA COMPLIANCE UNREASONABLE

The Banks also argue that compliance with the subpoenas would be unreasonable or oppressive because it would force them to violate Chinese law. Even if compliance with the subpoenas would expose the Banks to penalties, the district court

---

[22] Though ▮▮▮ additionally asserts (at 10) that its New York branch should be treated as a separate entity when "assessing jurisdiction," a foreign-bank domestic branch "must be viewed as a part of the parent bank rather than as an independent entity," *United States v. BCCI Holdings (Luxembourg), S.A.*, 48 F.3d 551, 553 (D.C. Cir. 1995); *see also Greenbaum v. Handlesbanken*, 26 F. Supp. 2d 649, 653 (S.D.N.Y. 1998) (then-judge Sotomayor) (same). The separate-entity authority cited by ▮▮▮ (at 10 n.4) "is inapposite" because it "merely treat[s] branches like independent banks in [a] discrete, narrow context[] unrelated to the branches' juridical status." *BCCI Holdings*, 48 F.3d at 555 n.6; *see also Greenbaum*, 26 F. Supp. 2d at 654.

acted well within its discretion in compelling compliance given the weighty national security interest here and the speculative and minimal harm from compliance.

## A.  The District Court Properly Weighed the Relevant Comity Factors

The government agrees that the Banks have met their burden and shown that complying with the subpoenas could "run afoul" of China's administrative law, *In re Grand Jury*, 912 F.3d at 633. But a criminal investigation need not be "thwarted whenever there is conflict with the interest of other states." *United States v. Field*, 532 F.2d 404, 410 (5th Cir. 1976). "[A]lthough courts recognize comity as an important objective, there is little doubt that '[a] United States Court has the power to order any party within its jurisdiction to testify or produce documents regardless of a foreign sovereign's views to the contrary.'" *Sealed Case II*, 832 F.2d at 1283 (citation omitted); *see also Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court*, 482 U.S. 522, 544 n.29 (1987); *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 204-06 (1958); *Hilton v. Guyot*, 159 U.S. 113, 165 (1895).

When a party claims that comity precludes compliance with a subpoena, as the Banks have here, the "exact line between reasonableness and unreasonableness in each case must be drawn by the trial court, based on its knowledge of the case and of the claims and interests of the parties and the governments whose statutes and policies they invoke." *Societe Nationale*, 482 U.S. at 546. The district court conducted this "particularized analysis," *id.* at 543, by considering seven factors: (a) the "extent to which noncompliance with the request would undermine important interests of the

United States, or compliance with the request would undermine important interests of" China, where the information is located; (b) the availability of "alternative means of securing the information"; (c) the importance to the grand jury's investigation of the documents; (d) the specificity of the request; (e) whether the information originated in the United States; (f) the hardship that compliance would cause the Banks; and (g) whether the Banks have demonstrated good faith in addressing their discovery obligations. JA1771 (quoting Restatement (Third) of Foreign Relations Law § 442(1)(c)).[23]  This Court should affirm the district court's discretionary decision that these factors "redound strongly in favor of compelling compliance" with the subpoenas notwithstanding the asserted Chinese-law conflict. JA1792.

---

[23] *Societe Nationale* deemed the first five factors—which came from the Restatement (Third) and are repeated in Restatement (Fourth) § 426, comment a; *see also id.* § 442— "relevant to any comity analysis." 482 U.S. at 544 n.28. "[D]rawing from Second Circuit case law," the Banks encouraged the district court also to consider the sixth and seventh factors, which the court agreed to do. JA1771-72. Though ████ embraced the Restatement (Third) factors below, ████ and ████████ now contend (at 44 n.6, 20-23, respectively) the district court erred in applying that—purportedly—"directionless" standard. By "invit[ing]" any error below, however, ████ at least is "barred from complaining about it on appeal." *United States v. Ginyard*, 215 F.3d 83, 88 (D.C. Cir. 2000). Moreover, because the Supreme Court broadly announced that the Restatement (Third) factors are relevant to "any" comity analysis, the district court correctly applied them. *See Overby v. Nat'l Ass'n of Letter Carriers*, 595 F.3d 1290, 1295 (D.C. Cir. 2010) ("carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative").

1. *The United States' National-Security Interest Would Be Damaged by Noncompliance, but China's Bank-Secrecy Interest Would Not Be Undermined by Compliance*

   a. The United States has a substantial interest in exposing the illegal means by which North Korea evades U.S. sanctions and finances its weapons programs

Non-enforcement of the subpoenas, the district court rightly determined, would undermine a "critical" national interest. JA1782. Because front companies such as ██████████████████████ facilitate the funding of North Korea's weapons programs, the United States is "target[ing]" them. Hearing 25 (Billingslea). North Korea "needs revenue" to maintain and expand its weapons programs. *Id.* at 16 (Billingslea). To exploit this "key" financial vulnerability, *id.*, the United States long ago forbade North Korea's ███████████████████████████████████—from engaging in U.S.-dollar transactions that transit through the United States. That sanctioned entity, however, continues to access the U.S. financial system illegally by using front companies, which obscure the bank's identity from the international financial markets. Acting pursuant to coded instructions from ████, for example, ██████████████████████ unlawfully negotiated over $100 million worth of transactions on North Korea's behalf by using █████, █████, and ████████ correspondent accounts. Denying the grand jury the Banks' ████████ transactional records would thus undermine a United States "priority"—exposing the "financial facilitators for the North Korean regime," *id.* at 25 (Billingslea), including ████████

██ and ████, who set up and operated ████████████████ in China as an ██ front company.

Although ████ suggests (at 24-25) this enforcement action will, in fact, undermine U.S. interests by threatening "long-term cooperation" between the countries "in promoting denuclearization," the district court properly accorded "some deference" to the United States' contrary conclusion. JA1783. It is the Executive Branch that has "primacy" in the "conduct of foreign relations," *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 767 (1972), while the Judiciary lacks such "foreign policy expertise," *United States v. Delgado-Garcia*, 374 F.3d 1337, 1351 (D.C. Cir. 2004). Accordingly, when the Executive Branch brings an action such as this, the courts presume it has "weigh[ed] the foreign relations impact," *United States v. Vetco, Inc.*, 691 F.2d 1281, 1289 n.9 (9th Cir. 1981) (citation and internal quotations omitted), and determined that the "adverse diplomatic consequences of the discovery request would be outweighed by the benefits of disclosure," *United States v. Davis*, 767 F.2d 1025, 1035 (2d Cir. 1985); *see also United States v. First Nat'l City Bank*, 396 F.2d 897, 904 (2d Cir. 1968) (same).

For its part, ████ does not dispute that the United States has a substantial interest in thwarting North Korea's sanctions-evasion techniques but claims (at 40-42, 44-45) that the "government's actions since it issued this subpoena"—*e.g.*, waiting "nearly a year" before filing its motions to compel and "never" requesting the documents "through the MLAA"—"undercut its asserted urgent need for the

MATERIAL UNDER SEAL DELETED

subpoenaed records." Far from demonstrating a *laissez faire* attitude about the Banks' records, the post-subpoena timeline demonstrates the government's commendable effort to accommodate both the grand jury's needs (on the one hand) and China's sovereignty concerns (on the other hand).

After years of "████████████" from China, the MLAA is not presently "███" to receive "████████████████████████████████" JA948, 952; *see* Part II.A.2 *infra*. The government thus determined after extensive consultation that issuing a subpoena was the "████████████" in this case, JA953, which it did in late-December 2017. Nonetheless, when the Chinese government advised ████ in March 2018 that it could not lawfully comply with the subpoena, the government did not immediately commence an enforcement action. Instead, understanding that ████ had already "████████" all responsive documents, JA758, in April 2018 U.S. representatives traveled to China, met with Chinese government officials, and explained that China's "████████" to respond to U.S. MLAA requests had "████████" the subpoenas in this case and, further, encouraged China to permit the Banks to comply with them. JA952; *see also* JA1629. These U.S. representatives traveled to China again in August 2018. JA952. When China nonetheless declined to allow the Banks to comply with the subpoenas, in September and October 2018 the United States prepared its motions to compel, which were then reviewed by numerous government components and filed in late-December 2018. *See* JA953. This chronology, the district court correctly concluded, demonstrates that the United States

MATERIAL UNDER SEAL DELETED

treaded "lightly" in a "matter implicating delicate diplomatic considerations," JA1774-75, not that the subpoenaed records are unimportant.

> ### b. China has never claimed a strong national interest in bank secrecy

While non-enforcement would undermine a critical United States interest, the district court rightly determined that requiring the Banks to comply with the subpoenas would not harm China's purported interest in "maintaining a sound banking system," a national interest that the Banks have claimed (*e.g.,* ▮▮▮ 25-26), but—tellingly— China has not.

Although the Chinese government twice communicated directly with the district court, JA73-77, 964-70, China never claimed that court-ordered compliance would undermine its interest in, as ▮▮▮ puts it (at 45), the "stable growth" of China's "banking and financial systems." China declared only that it was "▮▮▮▮▮▮▮▮" by the United States' "▮▮▮▮▮▮▮▮" because requiring the Banks "▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" would "▮▮▮▮▮▮▮▮▮" China's "▮▮▮▮▮▮▮ and "▮▮▮▮▮ ▮▮▮▮" the "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮" JA74. In its district-court communications, China thus referred to its bank-secrecy laws only to reiterate that, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" the Banks "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" JA75; *see*

*also* JA964-70. Unlike the Banks, then, who broadly claim (*e.g.*, ███ 22) that court-ordered compliance would have "████████████████████████████████ ████" China itself has only ever predicted "██████████████" to: (a) its "████████████" (b) the "██████████████" and (c) "████ ████████████████████" JA76. But those interests, the Restatement (Third) admonishes, are the types of "general" foreign-state interests that courts should not weigh heavily. Restatement (Third) of the Foreign Relations Law of the United States § 442, comment c; *see also Societe Nationale*, 482 U.S. at 544 n.29 (foreign state's "blocking" statute "is relevant" to "comity analysis only to the extent that its terms and its enforcement identify the nature of the sovereign interests in nondisclosure of specific kinds of material.").

China's decision not to adopt the Banks' breathless claims about the demise of that country's financial industry makes sense given China's own bank-secrecy exceptions. Pursuant to Chinese law, a bank may lawfully disclose corporate-account records to a variety of "████████" judicial, military, and administrative ████████"—13 in all—if that organ presents a notice required by Chinese regulation. JA916. "████" the government's expert opined, "████████████████████████████████ ████████████████████████████████" JA916. Accordingly, the district court reasonably concluded, court-ordered disclosure of the Banks' ████ transactional records would not undermine a significant state interest because China itself recognizes that "bank secrecy can co-exist with limited disclosure to government

MATERIAL UNDER SEAL DELETED

agencies." JA1784; *see United States v. Bank of Nova Scotia*, 740 F.2d 817, 827-28 (11th Cir. 1984) ("*Bank of Nova Scotia II*") (rejecting Cayman Islands' claim that "preservation of bank secrecy" was "vital to the expansion" of country's banking industry where governing law did "not operate as blanket guarantee of privacy and has many exceptions"); *Field*, 532 F.2d at 408 (where state's "general rule" was that, for domestic investigations, customer-account information "would be obtainable, we find it difficult to understand how the bank's customers' rights of privacy would be significantly infringed simply because the investigating body is a foreign tribunal.").[24]

* * * * *

"The United States has a strong national interest in the effective enforcement of its criminal laws." *Davis*, 767 F.2d at 1035. The federal courts have thus "consistently" held that the United States' interest in "law enforcement" outweighs the interests of "foreign states in bank secrecy." *In re Grand Jury Subpoena Dated Aug. 9, 2000*, 218 F. Supp. 2d 544, 554 (S.D.N.Y. 2002), *aff'd*, 318 F.3d 379 (2d Cir. 2003).[25] The United

---

[24] ███ and ███████ maintain (at 22, 25-26) that, while it might be true that a Chinese customer would not object to a disclosure to the *Chinese* government, that customer "surely would object if the bank *also* shared it with law enforcement officials from other countries." This argument, however, ignores that ████████████████████ is defunct and, at any rate, this case "involve[s] investigative grand juries which are required by law to maintain the secrecy of their proceedings." *United States v. Rubin*, 836 F.2d 1096, 1102 (8th Cir. 1988); *see also Bank of Nova Scotia II*, 740 F.2d at 828 n.16.

[25] *See, e.g., United States v. Bank of Nova Scotia*, 740 F.2d 817, 827 (11th Cir. 1984) ("*Bank of Nova Scotia I*") (Cayman Islands); *Bank of Nova Scotia II*, 691 F.2d at 1389-91 (Bahamas); *Vetco, Inc.*, 691 F.2d at 1288, 1290-91 (Switzerland); *Field*, 532 F.2d at 407-

MATERIAL UNDER SEAL DELETED

States' law-enforcement interest is magnified exponentially here because the alleged violations relate to the illicit financing of North Korea's weapons programs. The district court did not abuse its discretion in concluding that the "most important factor, the interests of the relevant countries, could not fall more firmly in favor of enforcement." JA1792.

> ### 2. The MLAA Is Not a Viable Alternative Method To Secure the Banks' ████ Records

The district court also correctly found that the United States had no "effective alternative method" of collecting the "critical" ████ records other than by subpoena. JA1792. In particular, the historical record demonstrates, an MLAA request of China for such bank records is not a "viable alternative." JA1781.

---

09 (Cayman Islands); *First Nat'l City Bank*, 396 F.2d at 901-05 (Germany); *In re Grand Jury Subpoena*, 218 F. Supp. 2d at 562-64 (unidentified "Republic"); *United States v. Chase Manhattan Bank, N.A.*, 584 F. Supp. 1080, 1083-87 (S.D.N.Y. 1984) (Hong Kong); *In re Grand Jury 81-2*, 550 F. Supp. 2d 24, 27-30 (W.D. Mich. 1982) (Germany); *SEC v. Banca Della Svizzera Italiana*, 92 F.R.D. 111, 114-19 (S.D.N.Y. 1981) (Switzerland). *But see United States v. First Nat'l City Bank of Chi.*, 699 F.2d 341, 343-47 (7th Cir. 1983) (declining to enforce IRS summons where bank employees "acting in Greece would be exposed to criminal liability, not merely a fine, but imprisonment" and countervailing United States interest was simply "collecting taxes"). Even in the civil context—where private litigants cannot be presumed to have "concern for national interests," Restatement (Third) § 442, reporter's note 9—courts applying the Restatement's comity analysis overwhelmingly order discovery. *See* Note, *The Aerospatiale Dilemma: Why U.S. Courts Ignore Blocking Statutes and What Foreign States Can Do About It*, 106 Cal. L. Rev. 231, 245 (2018) (surveying post-*Societe Nationale* federal authorities and finding "[c]ourts compelled foreign parties to produce discovery in violation of foreign law in thirty-seven of * * * forty-two contemplated orders").

The MLAA—entered into by China and the United States in 2001—is a bilateral agreement that creates an obligation, following one country's request of the other, to provide evidence gathering and other assistance in criminal investigations. JA947-48. The MLAA does not mandate that it be the exclusive mechanism for evidence gathering, and it provides no enforcement mechanism if a country fails to fulfill or respond to a request. JA948. To show that, "███████████████" the MLAA has not been an "███████████" for the United States to secure bank records from China, JA948, the government submitted a declaration from the Associate Director of OIA, which is the United States' designated "███████████████" for MLAA requests, JA946. OIA detailed China's deficient MLAA history, including that, in the last 10 years, the United States has sent approximately 50 bank-record requests to China but China has "████████████████████████" in roughly 35 of those cases. JA948. And, in the 15 cases in which China *has* produced records, "████████████████████████ ████████████████" or have failed to include a business-records certificate. JA948. Most critically, in 2017 and 2018, the United States made 10 bank-record requests of China—at least five of which sought records from the Banks here (albeit in investigations distinct from this one). JA949. "████████" however, China has not "████████████████████" JA949.[26]   Indeed, OIA noted, there are

---

[26] Though China had previously told the district court that it provided bank records in eight cases between 2015 and 2017, JA75-76, OIA explained that four of those productions were in response to 2012 or 2013 MLAA requests, thus demonstrating that

approximately 22 bank-record requests still pending with China, eight of which were delivered to China more than four years ago. JA949-50.

The government's case agent and OIA also provided the details of a strikingly similar front-company case where China refused to honor the United States' multiple MLAA requests. JA884-85, 950. Like the present investigation, this matter concerned a China-based front company (DHID) acting on behalf of a sanctioned North Korean state bank (Korea Kwangson Banking Corp.). JA867, 950; *see also* note 8 *supra*. The United States' August 2016 MLAA request sought records from 25 bank accounts held by 12 Chinese banks—including ███████, ████, and ████—that DHID had "███████████████" and "██████████████████" JA884-86. Because Chinese officials initially "████████" with the United States and "██████████████████" the United States submitted a supplemental MLAA request in April 2017. JA885-86, 950. But, to date, China has not provided any bank records; instead, a Chinese official told United States representatives that they should simply "████████" that DHID and its affiliated front companies "████████████████" JA885-86, 950.

In response to OIA's exhaustive review of the United States' repeated MLAA frustrations, China's own "Central Authority"—the Ministry of Justice—asserted only

---

China regularly sits on MLAA requests for years. JA950-51. Further, as to three other of these productions, China provided an "████████" response in March 2015, failed to provide the necessary certificate with a second response in April 2016, and only provided a response in April 2017 after the government issued a subpoena. JA951.

that it had found ██████" where China had provided bank records in the past two years,[27] and additionally noted that, in two cases where the United States' MLAA requests had languished for years before finally being answered, the nations had had "████████████████" about them during the pendency of the requests. JA969-70.[28]  Thus, of the roughly 50 bank-record requests documented in OIA's ten-year historical review (35 non-responses and 15 untimely or incomplete responses), the MOJ challenged OIA's description of just *one* and offered a mitigating explanation for the delays accompanying *two* others. Even assuming the accuracy of China's description of those three cases, the record still establishes that China has not responded *at all* to 90% (nine of ten) of the United States' 2017-2018 requests and roughly 70% (34 of 50) of the United States' 2008-2018 requests. Further, the record still establishes that "████" of the 16 Chinese responses were "██████████████████" JA948. Finally, the MOJ

---

[27] In the case of "████" other such requests, the MOJ conceded that it has not yet provided the bank records, but noted it had told the United States that it needed ████████████████." JA969.

[28] Other than—as the district court termed it, JA1778—this "meager response" to OIA's detailed declaration, the MOJ generally asserted that China has ████████ " in "██████" and noted that ████████ " due to "████████████████ " and the "████████ " JA966-67. Presumabl████████████████████████████

did not dispute the government's description of China's bait-and-switch in the DHID case. Based on these largely undisputed facts, the district court correctly found that "the MLAA, at least for banking records, is unproductive." JA1761; *see generally Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 841 F. Supp. 2d 769, 793 (S.D.N.Y. 2012) ("'the mere fact [of] an alternative method for obtaining the documents is not proof that it is necessarily effective, or efficient, for doing so in this case'" (citation omitted)).

Essentially conceding the correctness of the district court's finding,[29] the Banks suggest (████ 17-19; ████████ 18) that that history is irrelevant because China has committed to timely providing the bank records *in this case*. The district court, however, properly found that the record reflects no such promise. JA1779-80. To the contrary, consistent with the history described *supra*, the MOJ's own description of how China would handle an MLAA request here suggests that, once again, the United States would be left empty-handed.

Although the MOJ is China's designated "Central Authority" for MLAA requests, JA948, it is apparently not the final arbiter of such a request's propriety. The

---

[29] Only ████████ addresses any of the details in OIA's declaration and it simply repeats (at 17-18) the MOJ's claims that China provided bank records one time in 2018 and that, as to "three [sic: two] other requests," China had asked the United States for additional information. But, as explained in the text, those facts do not render the district court's finding erroneous. ████████ also cites (at 17) what it terms OIA's concession that "the MLAA 'has been helpful' in certain cases." The MLAA, of course, is not concerned solely with bank records and, as the full OIA quotation reveals, it was simply an acknowledgement that ████████████████████████████ ████████████████████████████████████ JA948. As to " ██████████ " however, " ██████████████████████████████████████ " JA948.

MATERIAL UNDER SEAL DELETED

MOJ explained to the district court that, if the United States were to make an MLAA request in this case, the MOJ would "█████████████" and then "██████" it to other ████████████████████████████████████" JA966. But *these* unidentified Chinese "[a]uthorities," the district court rightly noted, have made "zero commitments in this case." JA1780. Further, the MOJ explained, the "███████ ███████████████████████████████████████████████ ████████████" which, the MOJ conceded, could necessitate a "██████████████" to ensure their admissibility. JA966. Based on the historical record documented in OIA's declaration, the district court astutely recognized that such a "back and forth" could take years and might "never culminate in the release of usable records." JA1780. Accordingly, the district court reasonably concluded, the "MOJ's commitments in this case are not so firm," JA1769, and certainly do not mean that the MLAA is a "'substantially equivalent'" method to secure the Banks' █████ transactional records, *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1475 (9th Cir. 1992) (quoting *Vetco*, 691 F.2d at 1290).[30]

---

[30] *See also In re Grand Jury Subpoena*, 646 F.3d 159, 165 (4th Cir. 2011) ("Because the power of letters rogatory may be limited by foreign countries * * * this mechanism does not allow for the same breadth and ease of discovery as do the Federal Rules of Criminal Procedure."); *Bank of Nova Scotia I*, 691 F.2d at 1390 ("Applying for judicial assistance [from the Supreme Court of Bahamas], however, is not a substantially equivalent means for obtaining production because of the cost in time and money and the uncertain likelihood of success in obtaining the order.").

MATERIAL UNDER SEAL DELETED

Despite the numerous caveats in the MOJ's letters and China's problematic MLAA history, the Banks contend (*e.g.*, ▮▮▮ 17) that the district court should have given "more weight" to the MOJ's "assurances." The district court is not the first court to question the *bona fides* of such MOJ "assurances."[31] Moreover, the United States and China have fundamentally different interests as to North Korea. JA889. Whereas the United States is intent on choking off North Korea's access to foreign currency and the U.S. financial system, China, by some estimates, is responsible for 90% of North Korea's hard currency, *see* Hearing 21-22 (Billingslea). Not surprisingly, then, Chinese authorities have repeatedly failed to support either international sanctions of, or U.S. law-enforcement actions related to, North Korea. JA888-89. In fact, the Chinese government has publicly objected to the sanctions already imposed on ▮▮▮▮ ▮▮▮▮▮. JA889. These conflicting interests undoubtedly explain China's false MLAA promise in the DHID case, and predict a similar brush-off here or, at best,

---

[31] *See Nike, Inc. v. Wu*, 349 F. Supp. 3d 346, 366 (S.D.N.Y. 2018) (rejecting Chinese bank's claim that Hague Convention was adequate alternative where MOJ affirmed only that "it will 'execute a [Hague Convention request] according to the . . . Convention and Chinese law' and 'will take [a Hague Convention request] seriously and offer necessary legal assistance'"); *Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 558 (S.D.N.Y. 2012) (rejecting Bank of China's claim that Hague Convention was adequate alternative where MOJ, in past, had denied requests that "were not 'clearly enumerated' and 'of direct and close connection with the subject matter of the litigation'"); *Milliken & Co. v. Bank of China*, 758 F. Supp. 2d 238, 248 (S.D.N.Y. 2010) (rejecting Bank of China's claim that Hague Convention was adequate alternative where "Chinese authorities" affirmed only that "requests would not necessarily be honored, but would only be taken 'seriously'").

MATERIAL UNDER SEAL DELETED

an incomplete production. Thus, the district court appropriately found, the United States "no longer" needs to take "seriously" China's offers of assistance with investigations into North Korea. JA1781; *see also* JA1769.

██████ protests (at 19) that "issuing and enforcing subpoenas" is not necessarily the "proper way" for the United States to "resolve its disagreements with China over MLAA requests." The government agrees, which is why, as OIA explained, over the "██████████" the United States has initiated numerous ministerial-level meetings with China where U.S. Attorneys General have repeatedly advocated "████████ ██████████████████████████████████████████████████████" and "████████████ ████████████████████████████" JA952. Further, OIA officials have regularly "███████" with their Chinese counterparts in an effort to improve China's MLAA "███████████" JA952. Because these efforts failed to improve China's "████████ ████████" however, since 2017 OIA officials have warned China that the United States would take the "████████████████" to further its criminal investigations, including issuing subpoenas for records stored in China. JA952.

"Comity" thus did not  "dictate[]" that the Chinese government "at least" be provided "an opportunity" to comply with an MLAA request in this case, as ████ maintains (at 19). In light of the woeful MLAA history as to bank records documented by OIA, the MOJ's equivocal commitment to that process here, and China's conflicting loyalties, the United States had no reason to expect that China would wholly—if at all— execute an MLAA request in a case like this one, which involves a China-based North

Korean front company that used Chinese banks to illegally launder over $105 million. Indeed, because the broken MLAA channel has, for some time, meant that the "███████ ██████████████████████" once a North Korean front company successfully shifts funds into a Chinese bank, the government properly resolved that subpoenas in this case were essential to communicate to the "████████████████████████████" that a bank's failure to "██████████████████████████████████████████" will, if necessary, be revealed by compulsory legal process. JA890; *see also* JA952.

### 3. The Banks' Claimed Hardships Are Speculative

Though the Banks have recited numerous administrative and criminal provisions that they claim would be violated by court-ordered disclosure (*e.g.*, ██████ 14-15; ██████ 6-7), the district court correctly found that they have not cited a precedent where the Chinese government imposed a "severe" administrative penalty or "criminal punishment" in circumstances such as these. JA1789. The district court thus properly concluded that the Banks' hardship claims were "speculative." JA1792; *see, e.g.*, Restatement (Fourth) of the Foreign Relations Law of the United States § 442, comment b (foreign-state-compulsion defense "requires," *inter alia*, that "risk of punishment must not be purely hypothetical").

Over the past decade, numerous federal courts have ordered a variety of government-controlled Chinese banks to disclose customer records.[32] Nonetheless, the Banks have failed to identify a case "in which a state-owned Chinese enterprise has faced severe repercussions for responding to the order of a foreign court." JA1787. As the district court assiduously chronicled, for example, the Banks' administrative-fine precedents almost exclusively involved instances in which China fined banks for violating anti-pollution and anti-competition laws or for engaging in unlawful billing practices. JA1787-88. And, in the only case cited by the Banks where China imposed a fine for the disclosure of customer information, the bank was not acting pursuant to a foreign-court order. JA1787.

In like fashion, there is not a "historical precedent" where China criminally punished a bank or bank employee for disclosing customer information to another government. JA1789. Although ███ identified four purportedly analogous criminal cases below, in each the bank employee "stole and sold client information for profit," JA1789; *see also* JA913-14. ███ likewise identified "███" of "███" but

---

[32] *See Milliken & Co. v. Bank of China*, 758 F. Supp. 2d 238, 250 (S.D.N.Y. 2010); *Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 560 (S.D.N.Y. 2012); *Tiffany (NJ) LLC v. Forbse*, 2012 WL 1918866, at *11 (S.D.N.Y. May 23, 2012) (nonparty Bank of China), *aff'd in part vacated in part sub nom. Tiffany & Co. v. China Merchants Bank*, 589 F. App'x 550 (2d Cir. 2014); *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 104 (S.D.N.Y. 2015) (nonparty Bank of China); *Nike, Inc. v. Wu*, 349 F. Supp. 3d 310, 317 (S.D.N.Y.), *aff'd*, 349 F. Supp. 3d 346 (S.D.N.Y. 2018) (six nonparty Chinese banks, including ███ and ███).

each of the seven defendants in those cases "██████████████████████████████████████ ██████████████████████████████████████" JA912-13.

It is unsurprising that the Banks have been unable to identify a remotely analogous criminal case given their failure to show that compliance with the subpoenas "██████████████████████████████████" JA895 (████████ Dec.). As the government's expert explained, the information sought by the subpoenas cannot "██ ██████████████████████████████████████ ██████████████████████████" and there could thus be no criminal sanctions for the disclosure of "████████████" JA909-10. Similarly, "██████████████████ ██████████████████████████████████████" pursuant to Article 219 of the Criminal Law because the Banks' records (constituting an account number and records of money movements) do not qualify as ██████████████ ██████████████████████████████████████" *i.e.*, ██████████████████████. JA910-11. In any event, ████████ is now defunct and there is "██████████████" by such a "████████████" disclosure. JA911. Further, information about any corporation, let alone a *foreign* corporation such as ██████████████████████, is ████████████" by Article 253A of the Criminal Laws, which guards only ██████████████████████████████ JA911. Finally, there is no possibility of criminal liability under Article 286(I) of the Criminal Law regarding network security because it is "██████████████████████████████████ ██████████████████" or that the disclosure of customer-account information

MATERIAL UNDER SEAL DELETED

would violate that provision "█████████████████████████ ████████████" as is the case here. JA914-15.[33]

As the district court rightly surmised, the paucity of analogous administrative or criminal precedents makes perfect sense—it is "counter-intuitive" to suppose that the Chinese government would "impose heavy penalties against banks in which the Chinese government has a substantial ownership interest." JA1791. This is presumably why, for example, Bank of China—in which the Chinese government owns a "majority interest," *Wultz*, 910 F. Supp. 2d at 554—has suffered no significant repercussions though it has produced documents in at least two cases pursuant to U.S.-court orders. *See id.* at 553-54; *see also* note 32 *supra*. In those cases, Bank of China—like the Banks here—expressed concerns beforehand that compliance "could result in sanctions" but, "other than a 'severe warning' from Chinese banking regulators" and "$22.00 in court fees," the Chinese government issued no such sanctions. *Wultz*, 910 F. Supp. 2d at 553-54; *Gucci*,

---

[33] Neither ████ nor ██████ (*see* 23-24, 27-28) challenges the district court's conclusion that the record is devoid of relevant Chinese precedents involving either severe administrative sanctions or criminal penalties. For its part, ████ claims only (at 33) that "China repeatedly penalized banks and their responsible employees for violations of banking and privacy laws with fines or even prison sentences" and asserts that "[e]ven state-owned banks" have been "fined" for "violating banking and privacy laws." As the district court correctly found, however, China has not imposed such "fines" or "prison sentences" in circumstances like these, involving a court-ordered disclosure rather than a for-profit theft.

135 F. Supp. 3d at 91-92, 102-04; *see also Forbse*, 2012 WL 1918866, at *11.[34] Just last year, the *Nike* court thus rejected the claims of six Chinese banks (████████████ ████████████████) that complying with civil-discovery subpoenas "would subject the Banks and their employees to civil and criminal liability." 349 F. Supp. 3d at 340 (citations and internal quotation marks omitted). Such a result, the court reasoned, was "highly doubtful" given, among other things, the "quasi-governmental status" of the banks. *Id.*

In sum, even assuming that the Banks have established a hypothetical basis in Chinese law for the imposition of punishment should they be compelled to comply with the subpoenas,[35] the district court properly found that "such penalties, severe or otherwise, would be unprecedented." JA1791. And, contrary to ██████'s claim (at

---

[34] Indeed, the Chinese court levied the $22.00 fine only because the bank improperly froze assets and not because the bank improperly disclosed customer information. *Gucci*, 135 F. Supp. 3d at 102-04.

[35] ████ wrongly asserts (at 14-15) that the government has "conceded" subpoena compliance "would require ████ to violate Chinese laws," including a "state secret" criminal provision. *See* JA895 (████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████). Although ████ maintains (at 15) the state-secret law is triggered by an ongoing Chinese criminal investigation of ████████, ████, sole support for this is a newspaper article (*see* JA976-81). But that article describes a criminal investigation of DHID. Thus, even assuming a Chinese criminal investigation could implicate the state-secret law, the record does not reveal such an ongoing investigation of ████████.

28), all that "matters" is *not* simply "whether the statute or regulations forbids the relevant conduct." The "foreign-state-compulsion defense requires the likelihood of severe criminal or civil sanctions," and the "risk of punishment must not be purely hypothetical." Restatement (Fourth) of Foreign Relations Law § 442, comment b.[36]

The Banks suggest (*e.g.*, ▮▮▮ 33) that the risk of punishment is not hypothetical because the MOJ's letters, JA73-77, 826, prove that the Banks will, in fact, be punished if they comply with the court's order. As the district court rightly found, however, these letters provide minimal support for the Banks' hardship claims because they lack "clarity, thoroughness, and support." *Animal Sci. Prods., Inc. v. Herbei Welcome Pharm. Co., Ltd.*, 138 S. Ct. 1865, 1873 (2018); *see* JA1781. ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮" JA75, 826.[37] Moreover, both letters invoke the specter of ▮▮▮ liability, JA75, 826, without recognizing that there can be no civil suits from account holders because

---

[36] *See also Vetco, Inc.*, 691 F.2d at 1289 ("We are not persuaded that Article 273 poses a great danger to the appellants. * * * No case has been cited in which a person has been prosecuted for complying with a court order enforcing an IRS summons."); *Motorola Credit Corp. v. Uzan*, 73 F. Supp. 3d 397, 405 (D.D.C. 2014) (upon motion for reconsideration, court required compliance with customer-information requests because "Court's attention has now been focused on the total paucity of published prosecutions of banks or their officers in Jordan and the UAE for complying with discovery ordered by a foreign court").

[37] The MOJ's 2019 letter also cites the 2018 Judicial Assistance Law, JA74-75, but that is only a "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" JA909.

"█████████████████████████████████" JA898. Finally, nothing about either letter suggests that any administrative penalties will amount to more than, at worst, the sanctions previously imposed on the similarly situated Bank of China, *viz.*, a "severe warning" or "$22.00 in court fees." *See Wultz*, 910 F. Supp. 2d at 553; *Gucci*, 135 F. Supp. 3d at 104.

In a "world where commercial transactions are international in scope," there will inevitably be occasions where financial entities must "choose between conflicting commands of foreign sovereigns." *Bank of Nova Scotia II*, 740 F.2d at 828. Because the Banks have elected to do business in the United States, they have necessarily "accepted the incidental risk of occasional inconsistent governmental actions." *Id.* Though such an inconsistent governmental action in this case entails the possibility of administrative penalties, the district court correctly found that that possibility is "slim" and this hardship factor tips only "slightly toward" the Banks. JA1791.

    4. *The Banks' ████████ Records Are a Critical Piece of the Grand Jury's Investigation*

Because the Banks' ████████ records will provide investigators a fount of information that cannot be gleaned from correspondent-bank records, the district court properly found that the subpoenaed records "are essential to the investigation underway." JA1774.

Reviewing the Banks' records for cash deposits, for example, is "████████ ████████" because it will help investigators trace ███ cash in and out of ████████

MATERIAL UNDER SEAL DELETED

██████████, and thus facilitate investigators' understanding of this "█████

██████████" form of North Korean money laundering. JA875-80.

Similarly, a review of intrabank transfers—which reflect the movement of foreign and

domestic currency from one account in a bank to another account at the same bank—

is important because it could permit investigators to find potential co-conspirators, such

as companies that deposited U.S. dollars into, for example, their own ████ accounts

knowing that those dollars would be funneled back to ████ via an intrabank transfer to

a ████████ account with ████. JA880. ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

JA881. Further, the Banks' ████████ records will reveal information about the

accounts themselves—including who opened them, how they were initially funded, and

where the funds went when the accounts were closed—that could identify additional

co-conspirators, particularly when law-enforcement agents follow the cashed-out funds

to new entities or persons. JA883-84. Finally, ████████████████████

████████████████████████████████████

JA884. A review of ████████ bank statements "████████████████

████████████" and, concomitantly, determine to what extent other "█

████████████████████████" to evade sanctions. JA884.

MATERIAL UNDER SEAL DELETED

In sum, the above facts will facilitate investigators' understanding of North Korea's many sanctions-evasion schemes, including its use of front companies, bulk-cash distributions, and currency exchanges. These facts will also help investigators identify any co-conspirators who knowingly helped ▮▮▮ use ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ as a way to evade the prohibition on U.S.-dollar transactions and whether any banks facilitated this scheme. The record thus amply supports the district court's conclusion that the subpoenas seek only "critical" records "relevant to its national security investigation." JA1791; *see Vetco, Inc.*, 691 F.2d at 1290.[38]

The Banks erroneously suggest (*e.g.*, ▮▮▮ 16) that the government's "delay in enforcing" the subpoenas "raises some question" about "how important this particular information is." As explained *supra*, however, the 11-month gap between the subpoenas' issuance and the government's motions to compel says nothing about the subpoenaed records' substance. The government first extended the subpoena-return dates so the Banks could consult with Chinese government officials. Next, the government itself consulted with Chinese officials in an effort to secure China's agreement to the Banks' compliance. It was only after all these consultations failed that the government finally turned to federal-court litigation. The government's

---

[38] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ JA875, 880, 881, 883. Contrary to ▮▮▮▮ suggestion (at 36), then, "U.S. correspondent bank[]" records are not an "alternative" source for the important information described in the text.

"caution[ary]" approach to this enforcement action, the district court properly found, JA1775, should not count against the government in the comity analysis, as the Banks—ironically—suggest.

### 5. *The Subpoenas Are Narrowly Focused and Highly Specific*

As ▮▮ and ▮▮ concede (at 17, 23), the grand jury subpoenas are reasonably specific because each seeks only the bank records associated with a single entity (▮▮▮▮▮) for a specified time period. JA404-12.[39] Indeed, the district court rightly noted, the subpoenas "hardly could be narrower" because ▮▮▮▮▮ operated solely as an ▮▮ front company and had no independent—legitimate—business function. JA1775. Thus, all of the Banks' ▮▮ records "relate to the conduct under investigation." JA1775. This factor thus supports enforcement of the subpoenas because they are "tailored to specific financial records for a defined date range, at banks ▮▮ is known to have used to launder funds." JA1775-76.

### 6. *The Banks Demonstrated Good Faith*

As the government conceded below, "none of the banks has acted in bad faith." JA1791; *see Montship Lines, Ltd. v. Fed. Mar. Bd.*, 295 F.2d 147, 156 (D.C. Cir. 1961).

---

[39] ▮▮ argues that the anti-money laundering subpoena exceeds the scope of the relevant statute, a claim addressed in Part III *infra*.

MATERIAL UNDER SEAL DELETED

### 7. *The Documents Did Not Originate in the United States*

The government also acknowledged that the final comity factor weighs against enforcement because the documents originated in China.

* * * * *

"No nation is under an unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum." *Laker Airways v. Sabena*, 731 F.2d 909, 937 (D.C. Cir. 1984). The district court properly determined that the United States' interest in exposing front companies like ████████████ ████—which enable North Korea to fund, among other thing, its myriad weapons programs—would be prejudiced if the grand jury was denied the Banks' records of ████████ transactions on behalf of ████. In particular, the record shows, the district court did not "jettison" the requisite comity analysis in the face of the United States' weighty national-security interest, as ████ asserts (at 21). Adhering to the admonition that a court "should carefully consider a foreign state's views about the meaning of its own laws," *Animal Sci.*, 138 S. Ct. at 1873, for example, the district court gave special attention to the submissions from China's Ministry of Justice, *see* JA1769-71, 1779-80, 1789-91. The court also assiduously reviewed the Banks' voluminous Chinese-law submissions. *See, e.g.,* JA1623 ("████████████████████████ ████"); *see also* JA1585, 1615. Further, after conducting a hearing where all sides presented their comity arguments, the court issued a lengthy opinion addressing each factor in detail. JA135-93. Because the district court conducted the requisite "scrutiny"

MATERIAL UNDER SEAL DELETED

of the "particular facts, sovereign interests, and likelihood that resort [to alternative] procedures will prove effective," *Societe Nationale*, 482 U.S. at 544, this Court should affirm the district court's decision compelling compliance with the subpoenas.

### B. *Sealed Case I* Is Not Controlling Authority

The Banks claim (⬛⬛⬛ 34-40; ⬛⬛⬛ 25-28; ⬛⬛⬛ 14-16) that this case is controlled by *In re Sealed Case*, 825 F.2d 494 (D.C. Cir. 1987) ("*Sealed Case I*"). They are mistaken.

"Whether a case raises a concern with comity is inherently fact-dependent." *SEC v. Banner Fund Int'l*, 211 F.3d 602, 612 (D.C. Cir. 2000). "[C]omity varies according to the factual circumstances surrounding each claim for its recognition." *Laker Airways*, 731 F.2d at 937. *Sealed Case I* recognized the fact-dependent nature of the comity analysis, by emphasizing the "limited nature" of its holding and cautioning that, "[i]f any of the facts we rest on here were different, our holding could well be different." 825 F.2d at 498-9.

This case presents such different facts. *Sealed Case I* concerned an investigation into domestic money laundering. 825 F.2d at 495. The interests implicated by such a domestic law-enforcement matter, the district court appropriately found, "hardly compare[] to the national security interests and associated potential harm caused by non-compliance with a subpoena related to an investigation into funding a state-sponsor of terrorism's nuclear weapons program, which poses catastrophic risks." JA1769.

Further, *Sealed Case I* stressed, the grand jury in that case would not be "left empty-handed by [the] decision," because the bank's manager was "available and able to testify as to many of the facts that the grand jury may wish to ascertain." 825 F.2d at 499. Though the Banks claim that the MLAA offers a similar possibility here, that is not accurate. As detailed *supra*, the MLAA is anything but "a substantially equivalent means of obtaining production." *Bank of Nova Scotia II*, 691 F.2d at 1390; *see also Sealed Case II*, 832 F.2d at 1284 (declining to require resort to treaty mechanism that might prevent government from using documents obtained from abroad "as it desires for prosecutorial purposes").

Finally, *Sealed Case I* was concerned that forcing the state-owned bank in that case "to violate the laws of a different foreign sovereign on that sovereign's own territory" might "hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole." 825 F.2d at 498-99 (citation omitted). There can be no such concern here because the record demonstrates that the United States has thought carefully about this matter. In their September 2017 testimony, for example, Assistant Secretaries Thornton and Billingslea explained that it is a United States "priority" to "target and expose" those financial facilitators who "set up" front companies like ███████████████████████. Hearing 25. If countries such as China do not assist with this priority, they further explained, the United States will act "unilaterally." *Id.* at 21. These subpoenas reflect such an action because, OIA declared, they were issued after ████████████████████████." JA953.

MATERIAL UNDER SEAL DELETED

## C. The Bank's Remaining Challenges To The Contempt Order Lack Merit

The Banks remaining arguments for reversing the contempt order lack merit. First, ▮▮▮▮▮ asserts (at 30), while *it* has "acted in good faith," the "Chinese government has refused to authorize" ▮▮▮▮▮ "to release the requested documents." And, ▮▮▮▮▮ claims (at 29-32), Restatement (Third) § 442(2)(b) precludes a contempt finding in such circumstances because that provision advised that a court "should not ordinarily" impose a contempt sanction "except" where a party concealed information or failed to make a good-faith effort "to secure permission from foreign authorities to make the information available." Apparently in recognition that, even as "of 1987," the "implications of the good faith requirement in the United States were still evolving," *id.* (reporters' note 8), however, the Restatement (Fourth) has dispensed with this provision. Instead, the Restatement (Fourth) advises, courts have "discretion" to "moderate" sanctions imposed for violations of law attributable to the foreign-state-compulsion defense if, among other things, the person "acted in good faith to avoid the conflict." § 442; *see also id.* § 426(3). Here, the district court properly exercised such discretion when it determined that ▮▮▮▮▮s entreaties of China did not excuse compliance with the subpoena. JA1848-53. In any event, even the Restatement (Third) did not *forbid* a contempt sanction if a party had sought "permission from the foreign authorities to make the information available." Instead, it counseled that a court should "not ordinarily impose" such a sanction in those circumstances.

MATERIAL UNDER SEAL DELETED

█████ also complains (at 33-34) that the district court deployed "unduly harsh" language when it declared that █████ was being "'defiant'" and "'flatly disregarding'" a clear court order. Critically, █████ does not claim that conformity with the court's order was impossible because, for example, it "lacked possession or control" of the documents, *United States v. Rylander*, 460 U.S. 752, 757 (1983), just that it believes the order is "improper." █████s assessment of the order's propriety notwithstanding, it is only "unreasonable and unjust to hold in contempt" someone who has "demonstrated that he was powerless to comply." *NRDC, Inc. v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1974) (citations omitted). The purpose of civil contempt, after all, is to compel a reluctant party to do what a court requires of him. *See Maggio v. Zeitz*, 333 U.S. 56, 69 (1948).

## III.  THE ANTI-MONEY LAUNDERING SUBPOENA DID NOT EXCEED THE USA PATRIOT ACT'S SCOPE

Finally, █████ maintains (at 16-32) that "the government lacked the statutory authority to issue" the anti-money laundering subpoena because it "affirmatively calls for records related to *non-U.S.* correspondent accounts, with no directive that those records must be 'related to' 'a correspondent account in the United States.'" Accordingly, █████ asserts (at 32), the district court should have denied the government's motion to compel enforcement of this "unlawful" subpoena. As we demonstrate, the district court properly concluded that the subpoena "is within the authority conferred under 31 U.S.C. § 5318(k)(3)(A)(i)" and should be enforced.

MATERIAL UNDER SEAL DELETED

JA1765. But, even if this Court agrees with ████'s overbreadth claim, the "proper resolution" is not "revers[al]," as ████ claims (at 32), but a remand with narrowing instructions.

As part of its effort to "increase the strength of United States measures to prevent, detect, and prosecute international money laundering," Pub L. No. 107-56, § 302(b)(1), 115 Stat. 272, 297, the USA Patriot Act created a mechanism for securing records from "any foreign bank" that maintains a correspondent account in the United States. 31 U.S.C. § 5318(k)(3)(A)(i).[40]  The Act permits the Attorney General to issue a subpoena to the foreign bank and request records "related to" such correspondent account, "including records maintained outside of the United States relating to the deposit of funds into the foreign bank." *Id.*

"For purposes of the present case, the key phrase, obviously, is 'relating to.'" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). "The ordinary meaning of these words is a broad one—'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Id.* (quoting *Black's Law Dictionary* 1158 (5th ed. 1979)). "Congress characteristically employs the phrase to reach any subject that has 'a connection with, or reference to,' the topics the statute

---

[40] The Patriot Act defines a "correspondent account" more broadly than trade usage to include not simply any account "established to receive deposits from [and] make payments on behalf of a foreign financial institution," but also accounts intended to "handle other financial transactions related to" foreign financial institutions. 31 U.S.C. § 5318A(e)(1)(B); *see also* 31 C.F.R. § 1010.605.

MATERIAL UNDER SEAL DELETED

enumerates." *Coventry Health Care of Missouri, Inc. v. Nevils*, 137 S. Ct. 1190, 1197 (2017); *see also Lamar, Archer & Coffrin, LLP v. Appling*, 138 S. Ct. 1752, 1760 (2018) (Court "has typically read" phrase "'relating to'" "expansively").

Because the district court correctly concluded that "[n]o part" of ███████ ██████████ "can be separated" from ████ "ploy to put money through the United States financial market," JA1763, the anti-money laundering subpoena directed to ████ properly sought ███████████████" to "████████████████ ███████████████████████████████" (and a specified account associated with ████████). JA771. The United States sanctioned █████████, which meant that ████ could not thereafter legally access the U.S. financial system. North Korea (*i.e.*, ████), however, needed dollars, so it created █████████████ ████—a front company—to conduct the U.S.-dollar transactions that it could not. ████████████████████, in turn, set up an ████ account because ████ could use its U.S. correspondent accounts to conduct U.S.-dollar transactions for █████████ (*i.e.*, ████), which ████ did for two-and-one-half years (from 2012 to 2015). Importantly, until 2017, ████ could legally conduct transactions in other currencies (*e.g.*, the euro). ████—in the guise of ██████████████████— only needed an ████ account to conduct prohibited dollar transactions (via U.S. correspondent account). All of ████ █████ records thus "relate[] to" ████ U.S. correspondent account because, for example, a █████ foreign-currency transaction—which could well have passed through what ████ terms (at 24)

MATERIAL UNDER SEAL DELETED

its "multiple correspondent accounts that are not in the U.S."—might have funded the account that ▮▮▮▮▮▮ used to launder money through ▮▮▮▮s U.S. correspondent account. *See* JA881; *Morales*, 504 U.S. at 383 ("relating to" means, *inter alia*, "'to stand in some relation'").

Indeed, Congress presciently anticipated this scenario—*e.g.*, a front company with the singular purpose of illegally securing U.S. dollars—when it provided an example of records "relat[ing] to" a foreign bank's U.S. correspondent account. Section 5318(k)(3)(A)(i) declares that such records "includ[e]" those records maintained outside of the United States "relating to the deposit of funds into the foreign bank." Money being fungible, there are many ways that ▮▮▮▮▮▮▮▮▮▮▮▮▮ could have "fund[ed]" the specific ▮▮▮▮ account that it used to launder money through the United States. ▮▮▮▮▮▮, for example, could have made a cash deposit into a *separate* ▮▮▮▮ account and then shifted those deposits to the ▮▮▮ account that ▮▮▮▮▮▮ used to conduct its illicit U.S.-dollar transactions. *See* JA875-81. The same holds true for foreign-currency deposits and intrabank transfers. Although none of those initial transactions would necessarily have a "direct tie" to ▮▮▮▮s U.S.-correspondent account, JA1763, they are properly covered by the anti-money laundering subpoena because they are fund deposits that "relate[] to" ▮▮▮▮s U.S.-correspondent account given ▮▮▮▮▮s exclusive raison d'etre as a progenitor of U.S. dollars for ▮▮▮.

When considering similar questions in the search-warrant context, courts permit the collection of "all records" when the subject business "is primarily engaged in

unlawful activity and sufficient evidence is presented of the pervasiveness of that unlawful activity within the enterprise," *United States v. Bowen*, 689 F. Supp. 2d 675, 683 (S.D.N.Y. 2010), *aff'd sub nom. United States v. Ingram*, 490 F. App'x 363 (2d Cir. 2012); *see also United States v. Oloyede*, 982 F.2d 133, 139-40 (4th Cir. 1992). Here, the subpoena's request for "all records" is appropriate because ███████ was singularly engaged in unlawful activity. *See* JA864. Thus, the district court correctly held that the requested records "are precisely the type that the statute permits the government to subpoena." JA1763.[41]

███████ seeks to avoid the import of § 5318(k)(3)(A)(i)'s expansive "related to" provision by invoking—again, *see* Part I.B *supra*—the presumption against extraterritoriality and arguing (at 17-23, 31) that "'related'" must "be read narrowly." But, as explained *supra*, that presumption has no force here because there is "clear and independent textual support" to "justify the nature and extent of [§ 5318(k)(3)(A)(i)'s] application abroad." *Validus Reinsurance Ltd. v. United States*, 786 F.3d 1039, 1047 (D.C. Cir. 2015). As part of its wide-ranging offensive on international money laundering,

---

[41] Contrary to ████ s contention (at 28), Congress's failure to act on a Patriot Act amendment "does not provide conclusive evidence of Congressional intent to exclude," *United States v. Anaconda Co.*, 445 F. Supp. 486, 492 (D.D.C. 1977), the collection of foreign-correspondent records in all circumstances. That amendment was meant to allow for record collection in situations such as *United States v. Sedaghaty*, 2010 WL 11643384 (D. Or. Feb. 26, 2010), where "not all [requested] records were necessarily related to the [U.S.] correspondent banking activity," JA1765. The extant request is covered by the statute as written.

MATERIAL UNDER SEAL DELETED

Congress authorized the Attorney General to subpoena certain "foreign bank" records, including records maintained "outside of the United States" relating to deposits into such foreign banks. 31 U.S.C. § 5318(k)(3)(A)(i). Other than the phrase "extraterritorial," it's difficult to imagine a more "clear expression" of Congress's "intent to assert extraterritorial jurisdiction" than the phrase "outside of the United States."[42]

██████ claims (at 14) the "government's position is that it may seek virtually any document, for any reason, from any foreign bank with a U.S. correspondent bank account." This contention is not accurate because it ignores the unique circumstances of this case, which involves a front company created for the sole purpose of executing U.S.-dollar transactions. Moreover, even if somewhat "broad in scope," the Justice Department's inquiry "is a comprehensive one and must be so to serve its purposes." *F.T.C. v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C. Cir. 1977).

---

[42] In contrast, in *Validus*, the United States argued that excise taxes pursuant to the Internal Revenue Code could lawfully be imposed on sales of reinsurance occurring "outside of the United States between foreign reinsurance companies." 786 F.3d at 255-56. *Validus* rejected that argument because the statute declared only that a tax should be "imposed" on "each" policy of insurance or reinsurance "issued by any foreign insurer or reinsurer." *Id.* at 257. And, although the government maintained that "Congress's use of the words 'each' and 'any'" reflected "its intent to assert extraterritorial jurisdiction," *Validus* disagreed: "generic terms like 'any' or 'each' do not rebut the presumption against extraterritorial." *Id.* at 262. Section 3518(k)(3)(A)(i)'s "outside of the United States" language is not such a "generic term[]."

MATERIAL UNDER SEAL DELETED

In any event, this Court should refuse to be "limited to choosing between either one of two extreme positions." *D.C. Human Relations Comm'n v. Nat'l Geographic Soc.*, 475 F.2d 366, 369 (D.C. Cir. 1973). The remedy for an overbroad anti-money laundering subpoena is remand with directions to narrow the scope. *See Dellums v. Powell*, 561 F.2d 242, 249-50 (D.C. Cir. 1977); *Marshall v. Stevens People & Friends for Freedom*, 669 F.2d 171, 177-78 (4th Cir. 1981). Even if some narrowing is necessary, it is in "the interest of justice" to compel enforcement of the subpoena's compliant provisions. *F.T.C. v. Anderson*, 631 F.2d 741, 750 (D.C. Cir. 1979).[43]

---

[43] "[E]nforcement of an agency's investigatory subpoena will be denied *only* when there is 'a patent lack of jurisdiction' in an agency to regulate or to investigate." *F.T.C. v. Ken Roberts Co.*, 276 F.3d 583, 587 (D.C. Cir. 2001) (emphasis added) (quoting *CAB v. Deutsche Lufthansa Aktiengesellschaft*, 591 F.2d 951, 952 (D.C. Cir. 1979)). ███ cites (at 18) two such instances where this Court did not order a remand: *Resolution Trust Corp. v. Thornton*, 41 F.3d 1539 (D.C. Cir 1994), and *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412 (D.C. Cir. 1994). In those cases, there was no statutory authority for either request. Yet, as even ███ appears to concede (at 31), at least "*some* of [the subpoenaed] documents" here fall within the statute's ambit.

## CONCLUSION

The orders of the district court should be affirmed.

Respectfully submitted,


JESSIE K. LIU
United States Attorney

ELIZABETH H. DANELLO
ZIA M. FARUQUI
Assistant United States Attorneys

_____/s/_____
DAVID B. GOODHAND
Assistant United States Attorney
555 4th Street, NW
Washington, DC 20530
(202) 252-6601

66

# CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2019, I served the foregoing Brief for the United States on counsel for appellants by electronic mail.

<u>**s/ David Goodhand**</u>
**DAVID B. GOODHAND**
**Assistant United States attorney**

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, I hereby certify that this brief contains 17,163 words, excluding the parts of the record exempted by Rule 32(f), and thus complies with this Court's May 3, 2019, Order granting appellee 26,000 words. I further certify that this brief has been prepared in a proportionally spaced, 14-point Garamond typeface using Microsoft Word.

**DATED:**      **JUNE 28, 2019**

**s/ David Goodhand**

**DAVID B. GOODHAND**
**Assistant United States Attorney**