ORAL ARGUMENT SCHEDULED FOR JULY 2, 2019

Nos. 19-5068 & 19-5103

In The

𝕾𝖚𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘 𝖋𝖔𝖗 𝖙𝖍𝖊 𝕯𝖎𝖘𝖙𝖗𝖎𝖈𝖙 𝖔𝖋 𝕮𝖔𝖑𝖚𝖒𝖇𝖎𝖆 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

IN RE: SEALED CASE

On Appeal from the United States District Court
for the District of Columbia

BRIEF FOR APPELLANT ███████████████████

Sarah Levine
Hank B. Walther
Alex Potapov
Cormac Early
Daniel D. Benson
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
Ph: 202.879.3939
Fx: 202.626.1700
sllevine@jonesday.com

Christopher K. Pelham
Lillian He
Qiang Xue
JONES DAY
4th Floor
27 Zhongshan Dong Yi Road
Shanghai 200002, China
Ph: +86.21.2201.8000
Fx: +86.21.5298.6569
cpelham@jonesday.com

Henry Klehm III
Samidh Guha
JONES DAY
250 Vesey Street
New York, NY 10281-1047
Ph: 212.326.3939
Fx: 212.755.7306
hklehm@jonesday.com

*Counsel for Appellant* ████████████████

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**Parties and Amici.**  The following parties appeared before the district court and are parties to Appeal Nos. 19-5068 and 19-5103:

- 

- The United States of America

**Rulings Under Review.**  The following rulings of the district court in Case No. 18-mc-177 are under review in this appeal:

- March 18, 2019, Order of Chief Judge Beryl A. Howell (Dkt. 26)

- March 18, 2019, Memorandum Opinion of Chief Judge Beryl A. Howell (Dkt. 27)

- April 10, 2019, Memorandum Opinion & Order of Chief Judge Beryl A. Howell (Dkt. 39)

No official citation exists for these documents.

**Related Cases:**  The case on review was not previously before this court or any other court.  There are no related cases other than those already consolidated with these appeals.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND
    RELATED CASES......................................................................i

TABLE OF AUTHORITIES ..............................................................v

GLOSSARY ....................................................................................ix

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT ...................................................4

STATEMENT OF THE ISSUES........................................................5

STATUTES AND REGULATIONS...................................................6

STATEMENT OF THE CASE...........................................................6

    A.    The Bank ...........................................................................6

    B.    The Government Bypasses Traditional Diplomatic
          Channels And Subpoenas Documents From ███.............7

    C.    ███ Attempts To Comply With The Subpoena.............10

    D.    The Government Takes No Enforcement Action For
          Nearly A Year ...............................................................12

STANDARD OF REVIEW ..............................................................14

SUMMARY OF ARGUMENT .........................................................14

ARGUMENT ..................................................................................16

I.    THE SUBPOENA EXCEEDS STATUTORY
    AUTHORIZATION ..................................................................16

    A.    The Relevant Statutory Provision, 31 U.S.C. § 5318(k)(3),
          Must Be Considered In Light of the Presumption Against
          Extraterritoriality .........................................................17

    B.    The Subpoena Facially Violates The Statute ....................23

    C.    The District Court's Contrary Conclusion Was Mistaken ................29

II.    ENFORCING THE SUBPOENA WOULD VIOLATE
    INTERNATIONAL COMITY ..................................................32

    A.    *Sealed Case I* Dictates The Outcome Of This Case.............34

Material Under Seal Deleted

**TABLE OF CONTENTS**
(continued)

|  |  | Page |
|---|---|---|

| B. | This Violation Of International Comity Is Even More Egregious Than In *Sealed Case I* | 38 |
| C. | The Government's Own Actions Undercut Its Proffered Interests In Forcing The Bank To Violate Chinese Law | 40 |
| D. | Applying The Restatement Test Yields The Same Conclusion | 43 |
| III. | THE DISTRICT COURT LACKED PERSONAL JURISDICTION OVER THE BANK | 46 |
| | CONCLUSION | 54 |
| | CERTIFICATE OF COMPLIANCE | 56 |
| | CERTIFICATE OF SERVICE | 57 |

Material Under Seal Deleted

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ag-Tronic, Inc. v. Frank Paviour Ltd.*,
    No. 74-0-340, 1976 WL 21024 (D. Neb., Mar. 12, 1976) ................................49

*CFTC v. Nahas*,
    738 F.2d 487 (D.C. Cir. 1984)..........................................................................19

*Consumer Fin. Prot. Bureau v. Accrediting Council for Indep.*
*Colleges & Sch.*,
    854 F.3d 683 (D.C. Cir. 2017)....................................................................18, 21

*Cyan, Inc. v. Beaver Cty. Emps. Ret. Bd.*,
    138 S. Ct. 1061 (2018)......................................................................................52

*Flynn v. C.I.R.*,
    269 F.3d 1064 (D.C. Cir. 2001).......................................................................54

*FTC v. Compagnie de Saint-Gobain-Pont-A-Mousson*,
    636 F.2d 1300 (D.C. Cir. 1980).......................................................................19

*FTC v. Ken Roberts Co.*,
    276 F.3d 583 (D.C. Cir. 2001)....................................................................18, 32

*GTE New Media Servs. Inc. v. BellSouth Corp.*,
    199 F.3d 1343 (D.C. Cir. 2000).......................................................................51

*In re Papst Licensing GMBH & Co. KG Litig.*,
    590 F. Supp. 2d 94 (D.D.C. 2008)....................................................................49

*In re Sealed Case*,
    42 F.3d 1412 (D.C. Cir. 1994)..........................................................................18

*In re Sealed Case*,
    825 F.2d 494 (D.C. Cir. 1987)...................... 3, 15, 16, 34, 35, 36, 38, 39, 40, 44

*In re Subpoena Served Upon Comptroller of Currency*,
    967 F.2d 630 (D.C. Cir. 1992)..........................................................................14

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945)..........................................................................................46

*Kemp v. Gay*,
    947 F.2d 1493 (D.C. Cir. 1991)..........................................................................5

\*Authorities upon which we chiefly rely are marked with asterisks.

-v-

Material Under Seal Deleted

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Kiobel v. Royal Dutch Petroleum Co.,
  569 U.S. 108 (2013)......................................................................48

Liff v. Office of Inspector Gen.,
  881 F.3d 912 (D.C. Cir. 2018)......................................................54

Microsoft Corp. v. AT&T Corp.,
  550 U.S. 437 (2007)......................................................................20

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.,
  484 U.S. 97 (1987)...................................................................50, 51

Resolution Tr. Corp. v. Thornton,
  41 F.3d 1539 (D.C. Cir. 1994)..................................................18, 32

*RJR Nabisco, Inc. v. European Cmty.,
  136 S. Ct. 2090 (2016)..................................................................19

Roosevelt v. E.I. Du Pont de Nemours & Co.,
  958 F.2d 416 (D.C. Cir. 1992)......................................................54

S.E.C. v. Bilzerian,
  378 F.3d 1100 (D.C. Cir. 2004)....................................................47

Sunshine Distribution, Inc. v. Sports Auth. of Mich., Inc.,
  157 F. Supp. 2d 779 (E.D. Mich. 2001) ......................................50

Sunward Elecs., Inc. v. McDonald,
  362 F.3d 17 (2d Cir. 2004) ..........................................................50

Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.,
  940 F.2d 685 (D.C. Cir. 1991)......................................................54

U.S. Int'l Trade Comm'n v. ASAT, Inc.,
  411 F.3d 245 (D.C. Cir. 2005)......................................................14

United States v. R. Enters., Inc.,
  498 U.S. 292 (1991)........................................................................8

United States v. Sedaghaty,
  No. 6:05-cr-60008, 2010 WL 11643384
  (D. Or. Feb. 26, 2010)..................................................10, 19, 25, 26

*Validus Reinsurance, Ltd. v. United States,
  786 F.3d 1039 (D.C. Cir. 2015)....................................................20

Material Under Seal Deleted

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Yee v. City of Escondido*,
  503 U.S. 519 (1992).......................................................................53

*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017)..................................................................40

**STATUTES**

7 U.S.C. § 13a-1.............................................................................51

7 U.S.C. § 13a-2.............................................................................51

7 U.S.C. § 18..................................................................................51

15 U.S.C. § 1051............................................................................49

28 U.S.C. § 1291..............................................................................4

28 U.S.C. § 1331..............................................................................4

*31 U.S.C. 5318........... 1, 2, 3, 4, 5, 8, 10, 12, 14, 15, 16, 17, 18, 19, 21, 22, 23, 25,
  ................................. 26, 27, 28, 29, 30, 31, 37,44, 46, 47, 48, 50, 51, 52, 53, 54

35 U.S.C. § 293..............................................................................49

Pub. L. No. 107-56, 115 Stat. 272 ...................................................1

**OTHER AUTHORITIES**

147 Cong. Rec. (Oct. 25, 2001) ......................................................30

Dep't of Justice, Attorney General Jeff Sessions' China Initiative Fact
  Sheet at 1 (Nov. 1, 2018), https://www.justice.gov/opa/speech/
  file/1107256/download ...............................................................42

Dep't of Justice, Title III,
  ANTI-CORRUPTION LEGISLATIVE PROPOSALS,
  114TH CONGRESS (May 5, 2016)................................................28, 38

Merriam-Webster Dictionary, "Including".........................................30

*Restatement (Fourth) on Foreign Relations Law of the United States*
  § 426...........................................................................................43

S. 1241, 115th Cong. § 15 (2017)....................................................28

Statement of John C. Demers Before the Senate Judiciary Committee,
  (Dec. 12, 2018) ...........................................................................42

Material Under Seal Deleted

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Statement of Kenneth A. Blanco, Deputy Assistant Attorney General, Criminal Division, U.S. Department of Justice, Before the Senate Judiciary Committee (Nov. 28, 2017) ................................................................28

Material Under Seal Deleted

# GLOSSARY

**JA**                          Joint Appendix

████                          ████████████

██                            ██████████

**Dkt**.                       Docket in Case No. 18-mc-177 (D.D.C.)

**MLAA**                        Mutual Legal Assistance Agreement

**MOJ**                         Chinese Ministry of Justice

████ **(or "the Bank")**        ████████████████

Material Under Seal Deleted

## INTRODUCTION

The government has demanded that a Chinese company with no physical presence in the United States turn over a broad category of documents that were created and are maintained in China, despite the fact that doing so would violate Chinese law. And it has done so pursuant to a statutory provision—31 U.S.C. § 5318(k)—which has only been used once before, and which simply does not authorize the subpoena's expansive scope. The district court's decision to grant the government's motion to compel was error several times over.

██████████████████████ is a large Chinese bank. It has no branches or employees in the United States, but does have several correspondent accounts in the U.S. (that is, accounts with U.S. financial institutions that enable ████ to process transactions in U.S. dollars). Unlike the other two banks in these consolidated appeals, it is not subject to the jurisdiction of the grand jury, and as a result was not served with a grand jury subpoena. Instead, the government utilized a Patriot Act[1] provision which—as far as is publicly known—has only been used once, and which has never been considered by this Court.

That provision allows the government to seek only records "related to" "a correspondent account in the United States." 31 U.S.C. § 5318(k)(3)(A)(i).

---

[1] Uniting and Strengthening America by Providing Appropriate Tools Required To Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001, Pub. L. No. 107-56, 115 Stat. 272.

Material Under Seal Deleted

Disregarding this statutory limitation, the subpoena does not limit the documents it demands to the category authorized by Congress, but instead *facially* seeks documents that are related only to ███████ *non*-U.S. correspondent accounts. And the government has confirmed that the subpoena is intended to collect *all* documents relating to one of the Bank's former accountholders, and that the subpoena's scope is coextensive with the full permissible scope of a grand jury subpoena.

In other words, the subpoena directly exceeds its purported statutory authorization. This is all the more apparent given that Section 5318(k) must be construed *narrowly* in light of the presumption against extraterritoriality. Indeed, this case is an unusually vivid illustration of the presumption's importance. Under the government's theory, it is entitled to obtain, for any reason, and without regard to the laws of any foreign country, virtually *any* document from any foreign bank that maintains a correspondent account in the United States. This is precisely the kind of heavy-handed deployment of extraterritorial regulatory power that courts should not sanction without making *certain* that Congress intended to allow it. But remarkably, the district court did not even mention the presumption against extraterritoriality in its ruling on the motion to compel.

Enforcing the subpoena also runs afoul of well-established principles of international comity. This Court has long expressed its "considerable discomfort" with the prospect of "order[ing] action in violation of foreign laws, … particularly

Material Under Seal Deleted

on the territory of the sovereign whose law is in question." *In re Sealed Case*, 825 F.2d 494, 498 (D.C. Cir. 1987). Yet that is precisely what the district court did here. The district court ordered ▮▮▮—a Chinese bank with no physical presence or employees in the United States—to produce bank records that were created in and have always been maintained in China, regardless of whether those documents are related to ▮▮▮ U.S. correspondent accounts. And it ordered production despite the undisputed facts that this will force ▮▮▮ to violate Chinese law, that the Chinese government has expressly told ▮▮▮ that it will be sanctioned if it violates these laws, and that DOJ has not even attempted to use the diplomatic process that was put in place to allow the two countries to cooperate in investigating crime ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" JA 316— *i.e.*, to protect international comity—even after repeated assurances from the Chinese government that it would respond in a timely fashion to such a request.

Finally, the district court's exercise of personal jurisdiction over the Bank violated due process. The Bank lacks the requisite "minimum contacts" with the District of Columbia. Accordingly, the government has suggested that minimum contacts *with the entire United States* are sufficient, because Section 5318(k) is a nationwide service provision. In reality, however, Section 5318(k) does *not* authorize nationwide service of process. This much is clear from its language, from

Material Under Seal Deleted

the structure of the Patriot Act, and from relevant precedents from both this Court and the Supreme Court.

These three distinct errors combined to produce a disconcerting result. The district court's ruling leaves the government free to compel foreign banks with only the most tenuous connection to the United States to produce virtually any document, regardless of what foreign law requires. This power, which Congress did not grant, is rife with potential for abuse, and threatens to create significant international relations problems. Unfortunately, the government has proven unwilling to comply with the legal limitations on its Section 5318(k) powers, so it is now up to this Court to require it to do so.

## JURISDICTIONAL STATEMENT

This is an action to enforce an administrative subpoena issued by the U.S. Department of Justice pursuant to a federal statute, 31 U.S.C. § 5318(k)(3). Thus, the action arises under federal law, and the district court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. On March 18, 2019, the district court ordered the Bank to comply with the subpoena. JA 1733-34. On March 22, 2019, the Bank filed a timely notice of appeal. JA 1794. The March 18 order was final and appealable because ███████ was ordered to comply with

an administrative subpoena rather than a grand jury subpoena. *See, e.g.*, *Kemp v. Gay*, 947 F.2d 1493, 1496-97 (D.C. Cir. 1991).

On April 10, 2019, the district court entered an order holding ███ in civil contempt for failing to comply with the March 18 order. JA 1857. The court imposed contempt sanctions, but stayed their accrual pending appeal. JA 1857-58. Though ███ maintains that its March 22 notice of appeal was proper, out of an abundance of caution, ███ filed a second timely notice of appeal on April 12, 2019. JA 1862-64. Even if the March 18 order was not final and appealable, the April 10 contempt order was a final order that disposed of all parties' claims.

## STATEMENT OF THE ISSUES

1.    Did the subpoena issued to the Bank on December 24, 2017, pursuant to 31 U.S.C. § 5318(k)(3)(A)(i), exceed the scope of the Attorney General's authority to subpoena documents from a foreign bank with no physical presence in the United States by failing to limit its demands to "records related to" "a correspondent account in the United States" as the statute expressly requires?

2.    Did enforcing the subpoena against a Chinese bank with no physical presence or employees in the United States violate principles of international comity when (1) DOJ acknowledges that Chinese law prohibits the Bank from producing the documents except through the Mutual Legal Assistance Agreement process; (2) the Chinese government has expressed willingness to cooperate with a MLAA

Material Under Seal Deleted

request, including in letters sent to the district court during the litigation; (3) DOJ has refused to make such a request; and (4) compelling production will require a Chinese bank to violate Chinese law on Chinese soil by producing documents which originated and resided exclusively in China?

3.    Did the district court err in exercising personal jurisdiction over the Bank, which has no physical presence or employees in the United States?

## STATUTES AND REGULATIONS

Pertinent statutory provisions are set forth in the Addendum to this brief.

## STATEMENT OF THE CASE

### A.    The Bank



. JA 757 ¶ 5, JA 761 ¶ 26(a)-(b).

. JA 757 ¶ 5.

. JA 757 ¶ 8, JA 761 ¶ 26(e).

. JA 757 ¶ 6.  It also maintains several "correspondent accounts" in the United States —that is, accounts with banks in those countries that allow to process transactions in foreign currencies.  JA 757 ¶¶ 5-6, 10, JA 761 ¶ 26(b), JA 1537.

. JA 761 ¶ 26(a).

-6-

Material Under Seal Deleted

The Bank has no branches, other physical presence, or employees in the United States. JA 757 ¶ 7. It does, however, maintain correspondent accounts in the United States that allow it to process U.S.-dollar transactions. JA 761 ¶ 26(a). None of the correspondent accounts are located in the District of Columbia. JA 757 ¶ 10.

### B.    The Government Bypasses Traditional Diplomatic Channels And Subpoenas Documents From ████



████████████████████, ████ received an administrative subpoena issued by the DOJ for records from a closed account that a Hong Kong company, ████████████████████, had previously maintained at ████. JA 758 ¶¶ 13, 16, JA 764-774. ████████████████████ ████████████. JA 758 ¶ 14. DOJ alleges that ████████ was a "front company" for North Korea's state-run ████████████. Dkt. 1 at 1-2.

Traditionally, when the United States has sought documents located in China for law-enforcement purposes, it has made a diplomatic request to the Chinese government under the bilateral treaty between the countries known (colloquially) as the "Mutual Legal Assistance Agreement." *See* JA 315-32. Under the MLAA, each country has agreed to cooperate in the investigation and prosecution of criminal matters by, among other things, responding to the other country's requests for assistance in "providing … documents, records or articles of evidence." JA 317, Art. 1(2)(c). If the responding government does not already have the requested

Material Under Seal Deleted

documents, it collects them from their custodian and then provides them to the requesting government. JA 324, Art. 9(1). The MLAA thus provides an official channel for the sharing of records with the goal of "improv[ing] the effectiveness of cooperation between the two countries in respect of mutual legal assistance in criminal matters on the basis of mutual respect for sovereignty, equality and mutual benefit." JA 316.

Rather than submit an MLAA request here, however, on December 24, 2017, DOJ issued a subpoena to ███ for the records at issue. JA 769. Due to ███ lack of physical presence in and limited connection with the United States, the government was unable to serve ███ with a grand jury subpoena.[2] Instead, the government served ███ with an administrative subpoena pursuant to a provision of the Patriot Act that authorizes DOJ to issue a subpoena to a "foreign bank that maintains a correspondent account in the United States." 31 U.S.C. § 5318(k)(3)(A)(i). Unlike a grand jury subpoena, which may extend to any matter related to a grand jury investigation, *United States v. R. Enters., Inc.*, 498 U.S. 292, 301 (1991), administrative subpoenas under Section 5318(k) must be limited to "records related to" "a correspondent account in the United States." 31 U.S.C. § 5318(k)(3)(A)(i). The provision states in full:

---

[2] The other two banks in these consolidated appeals—███ and ███— *do* have a physical presence in the United States, and therefore received grand jury subpoenas. JA 407-09.

-8-

Material Under Seal Deleted

> The Secretary of the Treasury or the Attorney General may issue a summons or subpoena to any foreign bank that maintains a correspondent account in the United States and request records related to such correspondent account, including records maintained outside of the United States relating to the deposit of funds into the foreign bank.

*Id.* Despite that statutory limitation, nothing in the subpoena indicated that it was limited to "records related to" ███████ U.S. correspondent accounts.

Instead, the subpoena demanded, first, "[a]ll documents relating to correspondent banking transactions for ███████████████████████████" JA 771. This document demand was not limited to ███████ U.S. correspondent accounts or "record related to" those accounts. Second, the subpoena demanded "[a]ll documents relating to correspondent banking transactions for Account Number ███████████████ the number of ██████████ closed account. *Id.* This demand was also not limited to documents "related to" ██████ U.S. correspondent accounts. Finally, the subpoena made clear that it encompassed a variety of bank records that seem likely to exist for an ordinary domestic account regardless of whether a bank maintains *any* correspondent accounts or whether a particular accountholder has made a single foreign transaction through that bank—such as "signature cards" and "periodic account statements." *Id.* The subpoena did not indicate that these materials must be "related to" "a correspondent account in the United States."

This is only the second publicly available instance of a Section 5318(k) subpoena being issued.  *See United States v. Sedaghaty*, No. 6:05-cr-60008, 2010 WL 11643384, at *6 (D. Or. Feb. 26, 2010).

### C.   ▇▇ Attempts To Comply With The Subpoena



. JA 758 ¶ 17.

. JA 783.

Chinese counsel set out in detail the Chinese laws that prohibit compliance with the subpoena as well as the liability and penalties that the Bank would be subject to if it violated those laws.  JA 784-97.  Chinese counsel also provided examples of penalties—including heavy fines from Chinese regulators—that state-owned banks and their officers have incurred for violating those laws. JA 789-90, 792, 797. ▇▇

JA 783.

JA 759 ¶ 18.  Employees from the Bank met with officials from the China Banking Regulatory Commission, the

-10-

Material Under Seal Deleted

People's Bank of China, and the Ministry of Justice—the Chinese agency responsible for handling MLAA requests. JA 759-60 ¶¶ 18-20, 24; JA 318, Art. 2. The three regulatory agencies directed the Bank to ask DOJ to request the subpoenaed records through the MLAA process, and represented that they were willing to respond in a timely manner to such a request. JA 760 ¶ 20(a), (b).

The Bank conveyed the message from the Chinese government agencies to DOJ. JA 829. ███████████████████████████████████████████
███████████████████████████████████████████████████ JA 830. The Bank outlined the "significant effort" it had made "to identify and preserve documents responsive to the DOJ subpoena ████████████████████████
███████████████████████████████████████████ JA 829. ████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████ JA 830.

Days later, ████████ received a letter from the Chinese Ministry of Justice. JA JA 760 ¶ 21. The letter stated that if the Bank "provide[s] relevant client information to … DOJ directly, the banking regulatory authorities will impose administrative penalties and fines on [the Bank], and [the Bank] may bear civil or criminal liabilities depending on [its] situation." JA 826. At the same time, the letter stated that ████████

-11-

Material Under Seal Deleted

███████████████████████████████████████████████████

████ and that if MOJ "receive[s] a request from the U.S., [it] will review and handle such request timely in accordance with the [MLAA] and relevant PRC laws." *Id.* The Bank sent a copy of the letter to DOJ and again asked DOJ to request the documents through the MLAA process. JA 760 ¶ 23. But at no time—then or any time after—did DOJ submit an MLAA request.

### D.    The Government Takes No Enforcement Action For Nearly A Year

██████ heard nothing more from DOJ until November 29, 2018—eleven months after the subpoena issued—when █████ was served with a copy of a motion to compel that the government had filed in the district court. JA 4, Dkt. 1. █████ opposed the government's motion to compel on three grounds. First, █████ argued that the subpoena facially exceeded the statutory authorization under Section 5318(k). Dkt. 4 at 33-36. Second, █████ argued that enforcing the subpoena would violate international comity, especially given that (as DOJ later acknowledged) providing the documents outside the MLAA process would force █████ to violate Chinese law. *Id.* at 17-33. Third, █████ argued that the district court lacked jurisdiction because █████ did not have sufficient contacts with the relevant forum, the District of Columbia. *Id.* at 11-17.

The Chinese Ministry of Justice took the unusual step of sending a letter directly to the district court to address the Chinese government's interests. JA 70,

Material Under Seal Deleted

1573.  In the letter, the MOJ reiterated that Chinese law prohibits the banks from producing confidential financial records except through the MLAA process, and that the banks would be sanctioned if they violated these laws.  JA 70-77.  It again noted that DOJ had not submitted an MLAA request, and pledged to "timely review and handle" a request for the subpoenaed records if DOJ would make one.  JA 76.  The Ministry of Justice subsequently sent the district court a second letter reaffirming its commitment to the MLAA process.  JA 964-67.  The Ministry stated that "if the DOJ makes a MLAA request in the present case, the MOJ will promptly review and process it," and if the request "complies with the applicable provisions of [the Chinese law governing international legal assistance] and the MLAA, the MOJ will promptly transfer the request to Competent Authorities of China for further review and execution."  JA 966.

The district court held a combined hearing with ████, ████, and ████████.  JA 1556-57.  The court rejected the banks' arguments and granted the government's motion to compel in its entirety.  JA 1793.  When the banks were unable to produce the documents—because to do so would violate their home country's laws and the specific order they had been given by their legal authorities regarding production of these documents—the district court held them in contempt.  JA 1857.  With the government's consent, the court stayed the contempt sanctions pending appeal.  JA 1857-58.

Material Under Seal Deleted

## STANDARD OF REVIEW

"This court typically reviews a district court's decision to enforce an administrative subpoena for abuse of discretion." *U.S. Int'l Trade Comm'n v. ASAT, Inc.*, 411 F.3d 245, 253 (D.C. Cir. 2005). But where—as here—the appellant "contends the district court applied the wrong legal standard, [this Court's] review is *de novo*." *Id.*; *accord In re Subpoena Served Upon Comptroller of Currency*, 967 F.2d 630, 633 (D.C. Cir. 1992) (ruling on a motion to compel "is not entitled to deference … if it rests upon a misapprehension of the relevant legal standard or is unsupported by the record").

## SUMMARY OF ARGUMENT

The district court erred in granting the motion to compel, for three separate reasons.

*First*, the subpoena exceeds its statutory authorization. The administrative subpoena that was issued to ███ is valid only insofar as it complies with the applicable statutory limits—that is, if it seeks only "records related to" "a correspondent account in the United States." 31 U.S.C. § 5318(k)(3)(A)(i). This statutory language must be read narrowly in light of the presumption against extraterritoriality. And the presumption is especially important in this case. The government's position is that it may seek virtually any document, for any reason, from any foreign bank with a U.S. correspondent account, regardless of whether compliance with the subpoena would violate foreign law. This is precisely the kind

-14-

Material Under Seal Deleted

of aggressive extraterritorial assertion of regulatory power that must be unambiguously authorized by Congress. And yet, the district court made no mention of the presumption against extraterritoriality in its ruling.

Worse, the subpoena facially violates the terms of the statute. It nowhere *restricts* the scope of its demands to records which are related to a U.S. correspondent account, and it affirmatively seeks records which are related to ▮▮▮▮ *non*-US correspondent accounts. The government made no serious attempt to reconcile the scope of the subpoena with the terms of the statute and instead took the position that Section 5318(k)(3) subpoenas are interchangeable with grand jury subpoenas. That is a misconception which ignores both the statutory language and the presumption against extraterritoriality.

*Second*, granting the motion to compel violates principles of international comity. The simplest way to resolve the case is by applying binding precedent—"*Sealed Case I*"—where this Court declined to enforce a subpoena issued to a foreign bank under similar circumstances. *See In re Sealed Case*, 825 F.2d 494 (D.C. Cir. 1987). The district court recognized that *Sealed Case I* remains good law. The factual distinctions between *Sealed Case I* and this case—that ▮▮▮▮ has no physical presence in the United States, that the Chinese government has explicitly directed ▮▮▮▮ not to produce the documents in violation of Chinese law, and that the Chinese government has committed to responding in a timely manner to a

-15-

Material Under Seal Deleted

diplomatic request for the documents—make this violation of international comity even more severe.

The district court distinguished *Sealed Case I* on the basis that the government in this case has asserted vital national interests that require urgent access to the subpoenaed records. But looking to what the government has actually done (rather than what it has said) since issuing the subpoena in December 2017 reveals that the issue is not so urgent after all and does not merit forcing a Chinese bank to violate Chinese law on Chinese soil.

*Finally*, the district court violated the Bank's due process rights in exercising personal jurisdiction over the Bank. The Bank lacks sufficient minimum contacts *with the District of Columbia*, so the government must show that the appropriate forum for the minimum contacts analysis is the entirety of the United States. This, in turn, would be true only if Section 5318(k) provided for nationwide service of process. It does not—both by its terms and in light of the structure of the Patriot Act and the relevant precedents from this Court and the Supreme Court.

## ARGUMENT

## I.     THE SUBPOENA EXCEEDS STATUTORY AUTHORIZATION

The government's interpretation of 31 U.S.C. § 5318(k)(3)—which was endorsed by the district court—has sweeping extraterritorial application. DOJ asserts that it can subpoena documents from any foreign bank with a U.S. correspondent account, but no physical presence in the United States, and obtain all

-16-

Material Under Seal Deleted

documents related to an accountholder, even when the documents originated and reside exclusively outside the United States and producing the documents requires a foreign bank to violate foreign law on foreign soil.  The statute must be construed narrowly in light of the presumption against extraterritoriality.  The district court failed to do so, and this was error.

Even in the absence of that presumption, however, the subpoena is invalid because it facially exceeds its statutory authorization.  The subpoena does not confine its requests to "records related to" "a correspondent account in the United States."  Instead, the subpoena affirmatively calls for records related to *non-U.S.* correspondent accounts, with no directive that those records must be "related to" "a correspondent account in the United States."  The subpoena thus seeks documents related to non-U.S. correspondent accounts, whether or not the documents are related to a U.S. correspondent account.  The government lacked the statutory authority to issue the subpoena, and the district court erred in granting the motion to compel.

### A.    The Relevant Statutory Provision, 31 U.S.C. § 5318(k)(3), Must Be Considered In Light of the Presumption Against Extraterritoriality

**1.**  The subpoena issued to █████ was not a grand jury subpoena and was not issued pursuant to the traditional authority of the grand jury.  Instead, it is an *administrative* subpoena, based on a statutory source of authority.  JA 769 (noting that the subpoena was "[i]ssued under the authority of" 31 U.S.C. § 5318(k)(3)).  And, as this Court has consistently emphasized, courts must make an independent

-17-

Material Under Seal Deleted

assessment of whether an administrative subpoena exceeds an agency's statutory authorization. *See, e.g.*, *FTC v. Ken Roberts Co.,* 276 F.3d 583, 586-87 (D.C. Cir. 2001) (explaining that "a court asked to enforce a subpoena will refuse to do so if the subpoena exceeds an express statutory limitation on the agency's investigative powers" and that therefore "a court *must assure itself* that the subject matter of the investigation is within the statutory jurisdiction of the subpoena-issuing agency" (internal quotation marks omitted and emphasis added)); *In re Sealed Case*, 42 F.3d 1412, 1415 (D.C. Cir. 1994); *Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colleges & Sch.,* 854 F.3d 683, 688 (D.C. Cir. 2017); *Resolution Tr. Corp. v. Thornton*, 41 F.3d 1539, 1549 (D.C. Cir. 1994).

Here, the purported statutory authority for the subpoena comes from the Patriot Act, which allows the "Secretary of the Treasury or the Attorney General [to] issue a summons or subpoena to any foreign bank that maintains a correspondent account in the United States." 31 U.S.C. § 5318(k)(3)(a)(i). But this power is strictly limited. In particular, Section 5318(k) subpoenas may seek only "records *related to such correspondent account*, including records maintained outside of the United States relating to the deposit of funds in to the foreign bank." *Id.* (emphasis added). Under the plain text of the statute, then, the government is authorized to seek *only* "records related to" "a correspondent account in the United States."

Material Under Seal Deleted

   **2.** The proper construction of this statutory language is a question of first

impression in this Circuit (and indeed, in every circuit—it appears that only one

district court has previously analyzed this provision, *see Sedaghaty*, 2010 WL

11643384, at *6). In approaching this issue, it is crucial to remember that—in light

of the subpoena's self-evident extraterritorial impact—the language of Section

5318(k) must be read *narrowly. See, e.g.*, *FTC v. Compagnie de Saint-Gobain-Pont-*

*A-Mousson*, 636 F.2d 1300, 1322 (D.C. Cir. 1980) ("Liberal judicial interpretations

of agency power are not justified when agency action threatens to have

extraterritorial … impact."); *CFTC v. Nahas*, 738 F.2d 487, 495 (D.C. Cir. 1984)

("A clear congressional mandate authorizing the Commission to serve investigative

subpoenas on foreign citizens in foreign nations is lacking in [the relevant statute],

and inferring such a mandate would run contrary to established canons of statutory

construction.").

   To be sure, Section 5318(k) indisputably contemplates *some* extraterritorial

application. But this does not mean that the presumption against extraterritoriality

has no effect. Instead, the presumption demands that the extraterritorial reach be

*cabined* tightly to the text of the statute. As the Supreme Court has recently

reiterated, "'when a statute provides for some extraterritorial application, the

presumption against extraterritoriality *operates to limit that provision to its terms*.'"

*RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2102 (2016) (quoting

*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010)) (emphasis added); *see also Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 456 (2007) (explaining that, even where a statute expressly addresses extraterritorial applications, the presumption against extraterritoriality "remains instructive in determining the *extent* of the statutory exception").

This Court, too, has emphasized this point. In *Validus Reinsurance, Ltd. v. United States*, the government suggested that the presumption against extraterritoriality did not undercut its broad reading of a statute which concededly had extraterritorial applications. But this Court disagreed, noting that "[t]he government does not confront the Supreme Court's direction that 'when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms.'" 786 F.3d 1039, 1046 (D.C. Cir. 2015) (quoting *Morrison*, 561 U.S. at 265). Accordingly, this Court curbed the extraterritorial reach of the statute at issue, noting that "'courts must find clear and independent textual support—rather than relying on mere inference—to justify *the nature and extent of each statutory application abroad*.'" *Id.* at 1047 (quoting *Keller Found./Case Found. v. Tracy*, 696 F.3d 835, 845 (9th Cir. 2012)) (emphasis added and internal alterations omitted). Here, too, the government must identify clear and unambiguous textual support for the broad scope of its subpoena.

Material Under Seal Deleted

**3.** Indeed, the presumption against extraterritoriality has an especially important role to play in this case. The Patriot Act gave the government a significant new power: obtaining documents from foreign banks that have no physical presence in the United States. And this power came with few constraints. To begin, the statute does not limit the *purposes* for which the documents can be obtained. For example, while the government asserts a national security justification for this subpoena, the Patriot Act does not limit Section 5318(k) subpoenas to the national security context. Nor does it require that the foreign bank be accused of any wrongdoing (as indeed, ███ is not). Moreover, as with administrative subpoenas generally, there is no probable cause standard or warrant requirement that must be met before DOJ or Treasury issues the document demand. *See, e.g.*, *Accrediting Council*, 854 F.3d at 688 (noting that, in evaluating administrative subpoenas, courts consider only whether the subpoena is within the agency's authority, whether "the demand is … too indefinite," and whether "the information sought is reasonably relevant" (internal quotation marks omitted)). In addition, Section 5318(k) allows the government to demand documents which were created and retained entirely in the foreign country (such as the ███ documents at issue in this case). And Section 5318(k) makes no exception for situations where providing the documents would require the subject of the subpoena to violate the law of the foreign country (as the government concedes would be the case here).

-21-

Material Under Seal Deleted

Unsurprisingly, given the striking implications of this new power, Congress carefully cabined it by limiting the permissible scope of Section 5418(k) subpoenas to "records related to" "correspondent account[s] in the United States." This language must be read narrowly to ensure that the Court does not sanction an aggressive extraterritorial application of subpoena power that Congress did not authorize.

This case illustrates the dangers of failing to heed the presumption against extraterritoriality. As discussed below, under the government's theory—which the district court endorsed—the government can, for any reason, obtain *essentially any document or record* from any foreign bank with a U.S. correspondent account (that is, any bank that wishes to process transactions in U.S. dollars). This is precisely the sort of aggressive extraterritorial impact that courts should never attribute to a statute absent clear textual support.

Remarkably, in reaching its startling conclusion, the district court *made no mention* of the presumption against extraterritoriality (despite the fact that the issue had been extensively briefed by ██████, Dkt. 4 at 34, Dkt. 12 at 6-7, 9-10). To the contrary, the district court made clear that its analysis of the statute was *not* confined to the text of Section 5318(k). Instead, the court repeatedly made reference to the broader purposes behind the Patriot Act—as revealed by a "Senate report from February 2001," the Congressional findings accompanying the Patriot Act, and ██████

-22-

Material Under Seal Deleted

████████████████████████████████████████

███████████████████████████████████ JA 1764, 1824;

*see also* JA 1825 █████████████████████████████

████████████████████████████████████████

███████████████████████

In short, the district court disregarded the presumption against extraterritoriality.  This was error.

### B.    The Subpoena Facially Violates The Statute

**1.**  As noted above, the Patriot Act limits subpoenas issued under Section 5318(k) to "records related to" "a correspondent account in the United States."  The subpoena that was issued to ████, however, plainly exceeds these limits.  To begin, nothing in the text of the subpoena *restricts* its demands to records related to a U.S. correspondent account.  In other words, the subpoena does not expressly confine itself to what is permitted by the statute.

Worse, the subpoena expressly *transgresses* the statutory limits.  First, Item 1 of the subpoena seeks "[a]ll documents related to correspondent banking transactions for ██████████████████████".  JA 771.  That demand plainly extends to *all* ████████ correspondent banking transactions—that is, transactions involving *any* correspondent account, rather than solely ██████ United States correspondent account.  As a large bank ████████████████

-23-

Material Under Seal Deleted

███████████████████████████ ██████ ███████████████████████████

████████████████████    JA 757 ¶ 5-6, JA 1537.  In conflict with the statute, the subpoena would capture responsive records related to any of the Bank's correspondent accounts, in any country, whether they were "related to" a "correspondent account in the United States" or not.

Similarly, Item 2 of the subpoena seeks "[a]ll documents related to correspondent banking transactions for Account Number ████████████████████" JA 771.  Once again, the language is not limited to United States correspondent banking transactions, and would apply to responsive records related to any correspondent account anywhere in the world, whether "related to" a "correspondent account in the United States" or not.

Finally, the subpoena clarifies that it is meant to capture a variety of records including signature cards, documentation of account opening, account ledger cards, customer account statements, and due diligence and bank records.  *Id.*  But there is no reason to believe that *all* of these records are related to the Bank's U.S. correspondent account, and nothing in the subpoena limits the request to only such records.

In short, the subpoena facially violates the limits imposed by the Patriot Act. This is all the more striking in light of the presumption against extraterritoriality.  It

-24-

Material Under Seal Deleted

is simply impossible to conclude that the text of Section 5318(k) clearly and expressly authorizes the full extent of this subpoena.

Notably, the only previous court to construe the scope of Section 5318(k) gave it an appropriately narrow construction. In *Sedaghaty*, the court limited the government's overbroad requests to records which were "directly related" to checks issued by U.S. banks. 2010 WL 11643384, at *5-6. Further, the court barred the government from seeking any "signature cards" or "customer applications"—in other words, customer records that are akin to the records the government expressly seeks here. *Id.*

**2.** Remarkably, the government made no serious effort to reconcile the scope of the subpoena with the statutory language. Instead, the government appears to have disregarded the actual text of Section 5318(k). The government argued that, regardless of what Section 5318(k) actually *says*, the permissible scope of Section 5318(k) subpoenas is the same as for grand jury subpoenas. For example, the government insisted that the subpoena is permissible because ████████████

████████████████████████████████████

████████████ Dkt. 10 at 29; *see id.* at 28 ████████████████

████████████████████████████████████; JA 1646

████████████████████████████████

-25-

█████████████████████████████████████████████████████

████████████████████████████████████████

Needless to say, this view is entirely incompatible with the statutory language. No element of Section 5318(k) even remotely suggests that the permissible scope of *administrative* subpoenas issued to banks *with no physical presence in the United States* is intended to be as broad as the permissible scope of grand jury subpoenas issued to banks that do have a physical presence in the U.S. This is especially true in light of the presumption against extraterritoriality.

Nevertheless, the government consistently made clear that the subpoena sought all ████████ documents that a grand jury subpoena would be able to obtain from a bank that was subject to the grand jury's jurisdiction—indeed, the government stated flatly that it █████████████████████████████████ ██████ Dkt. 10 at 29 █████████████████████████ ████████████████ *id. at* 28 ████████████████ ████████████████████████ JA 1647 ████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████

---
[3] ███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

-26-

In short, the government adopted an interpretation of Section 5318(k) that was both untethered from the statutory text, and startlingly broad. Under the government's theory, Section 5318(k) would allow the government to obtain virtually *any* document from ███████, or any other foreign bank with a U.S. correspondent account.

This aggressive conception of the government's Section 5318(k) powers is all the more remarkable in light of the fact that the government itself previously recognized that Section 5318(k)'s language imposes meaningful limits on the government's access to foreign bank records. In 2016, DOJ asked Congress to expand the provision to allow DOJ to subpoena "any record relating to [the U.S. correspondent account] *or any related account at the foreign bank*, including records maintained outside of the United States, that are the subject of any investigation of



JA 880 ¶ 50 (emphasis added); *see also* JA 881 ¶ 55

*See* Dkt. 10 at 18

While it is possible that some of these documents are related to a U.S. correspondent account, the government has not given any reason to believe that *all* of them are (and nothing in the subpoena requires them to be).

Material Under Seal Deleted

a criminal violation of United States law or a civil forfeiture action." Dep't of Justice, Title III, ANTI-CORRUPTION LEGISLATIVE PROPOSALS, 114TH CONGRESS, at 4 (May 5, 2016), https://www.justice.gov/opa/file/849986/download (emphasis added). DOJ explained that this would "[e]nhance law enforcement's authority to access foreign bank or business records." *Id*.

More recently, a bill was introduced in Congress that would have granted DOJ's wish, amending Section 5318(k) along the lines DOJ had suggested. The Combatting Money Laundering, Terrorist Financing, and Counterfeiting Act of 2017, S. 1241, 115th Cong. § 15 (2017). And a DOJ representative testified in favor of the bill, noting that the amendment to Section 5318(k) would, among other things, "expand the types of foreign bank records that could be obtained through [Section 5318(k)] subpoenas." Statement of Kenneth A. Blanco, Deputy Assistant Attorney General, Criminal Division, U.S. Department of Justice, Before the Senate Judiciary Committee at 12 (Nov. 28, 2017), https://www.judiciary.senate.gov/ imo/media/doc/Blanco%20Testimony.pdf. But Congress has not enacted S. 1241 (and has not otherwise adopted DOJ's proposal). And now, the government has adopted a reading of Section 5318(k) that is not meaningfully distinguishable from its proposed *amendment* to Section 5318(k). The government must exercise its authority under the scope of the statute that Congress enacted, and not extend its reach beyond those limits.

-28-

Material Under Seal Deleted

## C.    The District Court's Contrary Conclusion Was Mistaken

The district court offered two rationales for its conclusion that the subpoena was authorized by the statute.  Neither one survives close examination.

**1.**  First, the district court suggested that the subpoena is permissible under the Section 5318(k) clause which addresses "records … relating to the deposit of funds into the foreign bank."  The district court suggests that, pursuant to that clause, the government is entitled to obtain any documents relating to the deposit of funds into ▮▮▮▮▮.  JA 1762-63.  This reading misinterprets the statute, and would not justify the subpoena in any event.

The relevant portion of Section 5318(k) allows the government to obtain "records related to [a U.S.] correspondent account, *including records maintained outside of the United States relating to the deposit of funds into the foreign bank*."  31 U.S.C. § 5318(k)(3)(A)(i) (emphasis added).  As a matter of plain text, this statutory language does not suggest that the government may obtain *any* record which is maintained outside the United States and relates to the deposit of funds into the foreign bank.  Instead, this phrasing indicates that the government may obtain *some* documents "relating to the deposit of funds into the foreign bank"—namely,

-29-

those which also meet the necessary criterion of being "related to" a U.S.

correspondent account.[4]

   This reading of the statute follows from the plain meaning of the common

term "including."    *See*    "Including," Merriam-Webster Dictionary,

https://www.merriam-webster.com/dictionary/including ("to take in or comprise as

part of a whole or group").  The legislative history of Section 5318(k) supports this

reading as well.  *See* 147 Cong. Rec. at S11008 (Oct. 25, 2001) (section-by-section

analysis of Patriot Act noting that "[t]he new 31 U.S.C. 5318(k) authorizes the

Attorney General and the Secretary of the Treasury to issue a summons or subpoena

to any such foreign bank seeking records, wherever located, *relating to such a*

*correspondent account … .*" (emphasis added)).  This reading also comports with

the presumption against extraterritoriality.

   Moreover, even if the government *were* entitled to obtain all records relating

to the deposit of funds into ███ the subpoena would still be overbroad.  The

government acknowledges that the subpoena encompasses ████████████

████████████ Dkt. 10 at 29, and the subpoena by its terms seeks a broad

swath of documents relating to correspondent banking transactions involving any of

---

[4] Far from a license to read Section 5318(k) broadly, the "including" clause is a reminder that it must be read narrowly.  After all, if it were already apparent that "records related to [a U.S.] correspondent account" could encompass records "relating to the deposit of funds into the foreign bank," the "including" clause would be superfluous.

Material Under Seal Deleted

████████ correspondent accounts.  It may well be, as the district court noted, that

*some* of these documents are related to deposits of funds into ██████ JA 1763.  But

there is simply no reason to believe—and certainly the government has never offered

a reason to believe—that *all* of those documents relate to the deposit of funds into

██████

**2.**  Second, the district court suggested that the subpoena was justified because

█████████ was merely a "front" for ████, and therefore ███████████ cannot "be

separated from the ploy to put money through the United States financial market."

*Id.*  But even assuming that ██████████*was* merely a "front" for illegitimate activity,

and that it *was* part of ██████ effort to "put money through the United States financial

market," the subpoena would still need to have been limited to what Congress

authorized—"records related to" "a correspondent account in the United States."  If

all ███████████ records "related to" ████████ "correspondent account[s] in the

United States," presumably they would all be covered; if not, all █████████████

records would not be subject to the subpoena.  There simply is no basis to bypass

the condition that Congress mandated—DOJ can issue a subpoena for █████████████

records only if those records are "related to" "a correspondent account in the United

States."  This is especially true given that every term in Section 5318(k), including

"related," must be read narrowly in light of the presumption against

extraterritoriality.

-31-

Material Under Seal Deleted

Congress, of course, is free to enact statutory language along the lines suggested by the district court.  It could adopt a kind of "bad man" theory of subpoena power, and allow the government to subpoena documents from any foreign bank with a U.S. correspondent account solely on the basis that a particular account holder is a "front" for a bad actor.  But Congress has not done so.  Instead, Congress required that the document sought must be "related to" "a correspondent account in the United States," regardless of the accountholder.

*    *    *    *    *

In sum, the subpoena is unlawful and the district court erred in granting the motion to compel.  As this Court has made clear, an administrative subpoena which exceeds its statutory authorization should not be enforced.  *See, e.g., Ken Roberts Co.,* 276 F.3d at 586-87 (noting that courts "will refuse to [enforce a subpoena] if the subpoena exceeds an express statutory limitation"); *Thornton*, 41 F.3d at 1549 (declining to enforce a subpoena where agency had exceeded its "statutory authority").  Indeed, the government did not dispute that, assuming the subpoena is not authorized by statute, the proper resolution would be a denial of the motion to compel.  Accordingly, the district court's decision should be reversed.

## II.    ENFORCING THE SUBPOENA WOULD VIOLATE INTERNATIONAL COMITY

The basic fact pattern in this case—the government seeking to require a foreign bank to produce documents that originated and reside abroad, in violation of

-32-

Material Under Seal Deleted

foreign law—raises grave questions of international comity.  And while the parties

have some disagreements about certain factual details, the key facts that pertain to

the comity inquiry are actually undisputed.

Complying with the subpoena would force ▇▇▇ to violate Chinese banking

and privacy laws.  JA 1585 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇ JA 895 ¶ 10(a) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ China has repeatedly penalized

banks and their responsible employees for violations of banking and privacy laws

with fines ▇▇▇▇▇▇▇▇▇▇▇▇ JA 899-914 ¶¶ 26-28, 31, 36, 44-47, 81-90.

Even state-owned banks have been fined by Chinese regulatory agencies and courts

for violating banking and privacy laws.  JA 904-07 ¶¶ 44-46, 57.  Furthermore, the

Chinese government has stated that it will impose administrative penalties and fines

on the Bank and warned that the Bank may be subject to criminal and civil liability

if it produces bank records without the Chinese government's permission.  JA 897

¶ 8.

There is an established process for the U.S. government to acquire Chinese

bank records without forcing Chinese banks to violate Chinese law—the Mutual

Legal Assistance Agreement process.  The Chinese government has repeatedly

requested in writing that DOJ make an MLAA request for the subpoenaed

-33-

Material Under Seal Deleted

documents, and committed to respond in a timely fashion to an MLAA request for the subpoenaed documents if DOJ simply makes the request. Dkt. 10 at 25. But DOJ has repeatedly refused to make an MLAA request for the documents it seeks from the Bank. *See id.* at 23-34.

In light of these undisputed facts, this case is controlled by *In re Sealed Case*, 825 F.2d 494 (D.C. Cir. 1987) ("*Sealed Case I*"), in which this Court declined to enforce a subpoena on comity grounds under very similar circumstances.

## A.      *Sealed Case I* Dictates The Outcome Of This Case

In *Sealed Case I*, this Court reversed the district court's order holding a bank owned by the government from "Country X" in contempt for failing to comply with a grand jury subpoena to produce documents from its branch located in "Country Y." 825 F. 2d at 495. The government subpoenaed the documents as part of a grand jury investigation into alleged money laundering. *Id.* The bank argued that the district court erred in holding it in contempt because complying with the subpoena would force it to violate Country Y's "banking secrecy laws." *Id.* Though this Court did not "decide the general issue of whether a court may ever order action in violation of foreign laws," several "peculiar facts" in that case led the Court to conclude that enforcing the subpoena and forcing the foreign bank to violate foreign law would violate "basic principles of international comity." *Id.* at 498-99. Those same facts are present here.

-34-

Material Under Seal Deleted

First, and "[m]ost important to [the Court's] decision," the contempt order was "an attempt by an American court to compel a foreign person to violate the laws of a different foreign sovereign on that sovereign's own territory." *Id.* As the Court recognized, "our government and our people would be affronted if a foreign court tried to compel someone to violate our laws within our borders." *Id.* Here, the district court found—and the government conceded—that the Bank would violate Chinese law complying with the subpoena. JA 1766; JA 1585; Dkt. 10 at 20.

Second, the subpoenaed bank was "not itself the focus of the criminal investigation." *Sealed Case I*, 825 F. 2d at 498. Likewise, this is a third-party subpoena; ████████████████████████████████████████ ████████████████ Dkt. 1 at 5; JA 1570-71.

Third, the bank was "not merely a private foreign entity, but [was] an entity owned by the government of Country X." *Sealed Case I*, 825 F. 2d at 498. Similarly, ██████ two largest shareholders are owned by the Chinese government and together hold nearly ████ of ██████ shares. JA 757 ¶ 9. Accordingly, forcing ████ to violate Chinese laws on Chinese territory would be a particularly problematic imposition on China's sovereign interests.

Fourth, "the bank had acted in good faith throughout th[e] proceedings." *Sealed Case I*, 825 F.2d at 498. Here, the district court likewise found—and the

government repeatedly conceded—that ███ has acted in good faith.  JA 1779;

Dkt. 10 at 31.

Fifth, the court found that its decision would not leave the government

"empty-handed" in its investigation.  *Sealed Case I*, 825 F.2d at 499.  The

government was able to depose the manager of the bank's branch in Country Y, and

the court expressed optimism that the government might "find alternative means to

obtain additional information from or through the bank."  *Id.*  Notably, however, the

court did not say that the government would be able to obtain *all* the information it

wanted through these other means.  To the contrary—the court "recognize[d] that

the grand jury's investigation may nonetheless be hampered, perhaps significantly."

*Id.*

Here, the government also has alternative means to obtain at least some—if

not most or all—of the information it is seeking from ███  ████████

████████████████████████████████████████

████████████████████████████████████

Dkt. 1 at 1-4, 6 n.3; *see also* ECF No. 1, ██████████████████

████████████████████████████████████████

███  And the government can also request any additional records it needs through

the MLAA process—something the Chinese government has repeatedly urged it to

do.  *See, e.g.*, JA 159-60 ¶¶ 18-23.

-36-

The government has argued (and the district court agreed) that the facts here are different because these alternative methods are unlikely to give the government the full scope of bank records it wants. Dkt. 1 at 22-23; JA 1770-81. Specifically, the government discounts the value of submitting an MLAA request because it argues that China has not always responded to such requests to the satisfaction of U.S. officials, either by failing to produce the requested records or by omitting the type of authentication required to make the records admissible in federal court. Dkt. 10 at 23-26. But this argument misses the mark in several ways.

The district court ignored the fact that the government's own declarant ███████. JA 951 ¶ 14(e). And, as discussed further below, *see infra* II.B, China's Ministry of Justice has committed in writing to respond in a timely manner to an MLAA request if DOJ will simply submit one in this matter. JA 838, 966. ██████████ JA 966-67. At any rate, using a Patriot Act subpoena, rather than an MLAA request, does not guarantee that the government will receive authenticated records. ██████████ JA 770, nothing in Section 5318(k) gives DOJ that power. DOJ knows this, having unsuccessfully

-37-

Material Under Seal Deleted

petitioned Congress to add just such a requirement to the statute.  Title III, ANTI-

CORRUPTION LEGISLATIVE PROPOSALS at 6.  A need for authenticated records, then,

cannot justify the government's refusal to submit an MLAA request.

Finally, given the government's ongoing refusal to even attempt to use the

MLAA process in this matter, the government should bear the burden of any

remaining uncertainty about how such a request would fare.  The government

unsuccessfully argued in *Sealed Case I*, just as it does now, that requiring it to use

other means to acquire the foreign bank records was "inappropriate and would be

ineffective."  825 F.2d at 495.  But, as in *Sealed Case I*, it is sufficient here that the

available alternatives mean the government will not be left "empty-handed."  *Id.* at

499.

### B.    This Violation Of International Comity Is Even More Egregious Than In *Sealed Case I*

The district court agreed that *Sealed Case I* "is still good law in this circuit,"

but sought to distinguish it.  JA 1768-71.  The factual distinctions between this case

and *Sealed Case I*, however, make the violation of international comity *worse* in this

case.

First, because ▇▇▇▇ has no physical presence or employees in the United

States, the government's interest in forcing the Bank to violate foreign law is even

weaker.  The bank in *Sealed Case I* had a branch in the United States.  825 F.2d at

495.  It received a grand jury subpoena and never contested personal jurisdiction.

-38-

*Id.* ████ by contrast, has no physical presence in the United States, cannot be subpoenaed by the grand jury, and has vigorously contested the district court's exercise of personal jurisdiction over it.  JA 757 ¶ 7.  With ███████████

branches in China, and none of them in the United States, *id.* ¶¶ 5-7, the balance of sovereign interests tips even further toward China and away from the United States.

Second, the Chinese government has given the Bank express instructions not to produce these documents outside the MLAA process in violation of Chinese law. JA 826.  And it has warned the Bank that it *will* be sanctioned if it ignores these instructions.  *Id.*  There is no indication that the foreign government in *Sealed Case I* did anything similar.

Third, the Chinese government has committed in writing *in this very matter* that it will cooperate with a request from the United States to produce bank records through the MLAA process.  In a letter to the district court, China's Ministry of Justice, the agency responsible for processing requests under the MLAA process, stated that it will "timely review and handle the requests for assistance" if DOJ submits one.  JA 838.  This highly unusual step shows just how important this issue is to China's interests.  The district judge even noted that ███████████

████████████████████████████

████████   JA 1573.

-39-

Material Under Seal Deleted

This Court was deeply concerned in *Sealed Case I* with exercising the "troublesome authority" to order a violation of foreign law on foreign soil. 825 F.2d at 498. Enforcing this subpoena is even more troublesome.

## C. The Government's Own Actions Undercut Its Proffered Interests In Forcing The Bank To Violate Chinese Law

The district court's primary reason for distinguishing *Sealed Case I* was the government's assertion that immediate access to the subpoenaed records is essential to national security. JA 1769; Dkt. 1 at 24-26; Dkt. 10 at 17-18. But simply asserting a national security interest is not dispositive. As the Supreme Court recently stated, "[t]here are limitations … in the powers authorized by congressional enactments, even with respect to matters of national security." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017). "And national-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'" *Id.* at 1862 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 523 (1985)). The Court must consider the government's actions, not just its litigation assertions, in weighing the government's interests in the comity analysis. Many of the government's actions since it issued this subpoena demonstrate that the government does not appear to believe that immediately collecting the subpoenaed documents from the Bank is necessary to protect national security.

DOJ issued the subpoena in December 2017. JA 769. The government waited nearly a year after issuing the subpoena before filing its motion to compel the Bank's

Material Under Seal Deleted

compliance.  It was not until November 2018 that the government finally took action to enforce the subpoena.  JA 4, Dkt. 1.

The government showed no significant urgency even after filing the motion to compel.  The government never asked the district court to expedite its consideration of the motion to compel.  At the contempt hearing, the district court noted that ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ JA 1808. ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████ JA 1805-07.

Finally, the government never requested these documents through the MLAA process.  As the district court noted, ██████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████ JA 1579.  After the Chinese Ministry of Justice repeatedly committed to cooperate with an MLAA request, the government had even less reason to refuse to make a request.

-41-

Material Under Seal Deleted

Even if China had denied the request, the government could still pursue the documents with the subpoena.

The government's repeated refusals to make an MLAA request indicate that it has not viewed acquiring these documents from the Bank as an urgent matter, but rather, perhaps, as a "test case" to see just how far the courts will allow the government to stretch the limits of its subpoena power under the Patriot Act.  Even the district court noted that the government appeared to view the district court proceedings ████████████████████████████████████████████

████  JA 1618-19.

Indeed, DOJ's actions appear to be part of former Attorney General Jeff Sessions' "China Initiative," a DOJ-wide effort to make countering China a "strategic priority."  Dep't of Justice, Attorney General Jeff Sessions' China Initiative Fact Sheet at 1 (Nov. 1, 2018), https://www.justice.gov/opa/speech/file/1107256/download.  Assistant Attorney General John Demers testified before Congress that one of the initiative's "principal goals" was "to improve Chinese responses to [DOJ's] requests for assistance in criminal investigations under the Mutual Legal Assistance Agreement we have with China."  Statement of John C. Demers Before the Senate Judiciary Committee, at 7-8 (Dec. 12, 2018), http://bit.ly/DemersStmt.  The government's admissions at the hearing on the motion to compel further show that DOJ's refusal to make an MLAA request here is likely

Material Under Seal Deleted

an effort to expand DOJ's subpoena power in order to gain an advantage in negotiating *future* MLAA requests. When pressed to explain DOJ's refusal, government counsel stated that ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████ JA 1581. ███

████████████████████████████████████████████

███████ JA 1583. ███████████████████████████

████████████████████████████████████████████

and of course this would moot the dispute over the subpoena before DOJ established the precedent it is seeking.

Judging by DOJ's actions spanning nearly two years, there is no urgent need to compel ███████ a Chinese bank with no physical presence in the United States, to violate Chinese law on Chinese soil. The government has not acted as though critical interests are at stake in enforcing this subpoena, and, consequently, this Court should not do so either.

## D.    Applying The Restatement Test Yields The Same Conclusion

The government argued below that the comity analysis must focus on the five factors identified in the Restatement on Foreign Relations Law. *See Restatement (Fourth) on Foreign Relations Law of the United States* § 426, comment a.[5] The

---

[5] The five italicized headings below are quotations from this comment.

-43-

Restatement approach is not meaningfully different from this Court's analysis in *Sealed Case I*.[6]

**1.** *The documents' "importance to the ... investigation."*

The government's actions undercut its assertions that it urgently needs the subpoenaed documents for its grand jury investigation. *See supra* Part II.C. The district court even asked the government ████████████████████

████████████████████ JA 1807. The district court further noted that ████████████████████

████████████████████ JA 1808.

**2.** *The "degree of specificity of the request."*

Far from a focused request, the subpoena facially exceeds its statutory authorization because it is not limited to "records related to" "a correspondent account in the United States." 31 U.S.C. § 5318(k)(3)(A)(i); *see also supra* PartI.B.

**3.** *"[W]hether the information originated in the United States."*

---

[6] The other two banks also address the Restatement approach. In order to avoid repetitive briefing, ████ adopts their arguments as relevant on these points. ████ also specifically joins Part II.D.1 of ████ brief (which further explains why this Court should not rely on the Restatement factors in analyzing the international comity issue) and Part III of ████ brief (which explains why the district court erred in holding the Banks in contempt).

All the requested documents were created in China and have always been maintained in China.  The government has never disputed this, ███████████ ████████████████████████████████ Dkt. 1; *accord* Dkt. 10 at 29.

**4.**  *The "availability of alternative means of securing the information."*

As explained above, *supra* Part II.A-B, the types of documents the government seeks are reasonably available through the MLAA process, which the government has not even attempted to use.

**5.**  "*The extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located."*

As described above, *supra* Part II.C, the government's actions since it issued the subpoena in 2017 undercut its asserted urgent need for the subpoenaed records, and the district court erred in accepting the assertions at face value.  By contrast, China has significant sovereign interests in enforcing banking privacy laws that "ensure depositor … confidence" and "support[] stable growth of the banking and financial systems."  JA 840.  It also has a sovereign interest in maintaining respect for the MLAA process, which was put in place specifically to allow China and the United States to cooperate in investigating crime "on the basis of mutual respect for sovereignty, equality and mutual benefit."  JA 316.

-45-

## III.   THE DISTRICT COURT LACKED PERSONAL JURISDICTION OVER THE BANK

**A.**   As discussed above, Section 5318(k) is unusual in that it allows the government to seek documents from entities, such as the Bank, which have no physical presence in—and virtually no contacts with—the United States.  As such, the statute unsurprisingly gives rise to difficult questions of personal jurisdiction.

The courts' exercise of personal jurisdiction must be consistent with the limits imposed by due process.  Those limits require the plaintiff to demonstrate sufficient "minimum contacts" with the forum to ensure that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  The key question here is identifying the relevant forum for the minimum contacts analysis—the District of Columbia, or the United States in its entirety.

This question matters because the Bank lacks the requisite minimum contacts with the District of Columbia.  *See* Dkt. 12 at 21-22 ████████████████ ████████████████████████████████████ None of its correspondent accounts are in the District of Columbia, and its designated representative for accepting service of process is located in New York.  Accordingly, *if* the District of Columbia is the correct forum for the minimum contacts analysis, the district court's exercise of personal jurisdiction was improper.  The only way the

-46-

Material Under Seal Deleted

government can prevail is by showing that the relevant forum is the United States as a whole.

The government offers only one argument for this proposition.  It notes that, as this Court has held, the traditional "requirement of 'minimum contacts' with a forum state is inapplicable where the court exercises personal jurisdiction by virtue of a federal statute authorizing nationwide service of process." *S.E.C. v. Bilzerian*, 378 F.3d 1100, 1106 n.8 (D.C. Cir. 2004) (emphasis added).  In such cases, "minimum contacts with the United States suffice." *Id.*  The government asserts that it can take advantage of this principle because, in its view, Section 5318(k) authorizes nationwide service of process.

In other words, the district court's exercise of personal jurisdiction could be consistent with due process *only if* Section 5318(k) is a nationwide service of process provision.  As demonstrated below, it is not.

**B.**  By its terms, Section 5318(k) does not allow for nationwide service of process.  Specifically, Section 5318(k)(3)(A)(ii) provides that a subpoena for foreign bank records "may be served on the foreign bank in the United States if the foreign bank has a representative in the United States, or in a foreign country pursuant to any mutual legal assistance treaty, multilateral agreement, or other request for international law enforcement assistance."  There is no blanket declaration authorizing nationwide service of process.  Instead, this language allows service in

Material Under Seal Deleted

the United States *only if* the foreign bank has a representative in the United States—with no indication that service can be accomplished in a forum where that representative is not located.

The provision requiring foreign banks to appoint agents for service of subpoenas clarifies that Congress intended to allow for service in the judicial district where that agent resides, not anywhere in the country.  Subsection 5318(k)(3)(B)(i) requires U.S. banks that maintain any correspondent account for a foreign bank to "maintain records … identifying the owners of such foreign bank and the name and address of a person who resides in the United States and is authorized to accept service of legal process for records regarding the correspondent account."  Read together, these provisions contemplate the appointment of an agent at one specified address, and service on that agent at that address.  The statute's reference to service "in the United States" makes sense in light of the foreign bank's prerogative to appoint an agent anywhere in the country, but it does not suggest, let alone require, the possibility of nationwide service.

Even if this were not the most natural reading of the provision, it is certainly a reasonable one.  As a result, this Court should adopt it in light of the presumption against extraterritoriality.  *See, e.g.*, *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115-17 (2013).  After all, allowing courts anywhere in the United States to exercise jurisdiction over every foreign financial institution that maintains a U.S.

-48-

Material Under Seal Deleted

correspondent account, but has no physical presence in the United States, would

vastly expand the extraterritorial scope of federal regulatory power.

Unsurprisingly, courts have construed similar statutory schemes as *not*

authorizing nationwide service.  For example, the Patent Act, 35 U.S.C. § 293,

allows foreign patentees to designate an agent for service, and allows for service on

that agent "at the address given in the last designation."  The district court in this

circuit has understood that section to preclude nationwide service.  *See In re Papst*

*Licensing GMBH & Co. KG Litig.*, 590 F. Supp. 2d 94, 100 (D.D.C. 2008) (holding

that personal jurisdiction over the defendant was available only in the district in

which its agent resided, not in D.D.C. (formerly the default district)); *accord, e.g.*,

*Ag-Tronic, Inc. v. Frank Paviour Ltd.*, No. 74-0-340, 1976 WL 21024, at *2 (D.

Neb., Mar. 12, 1976) ("Although Congress has the power to provide for nationwide

service of process … limited only by the fifth amendment and national contacts, it

has not done so" in the Patent Act).

Likewise, the Lanham Act allows a foreign resident to designate an agent for

service of process in proceedings relating to a registered trademark; if no agent is

designated, or "[i]f the person so designated cannot be found at the address given in

the last designation," "process may be served on the Director" of the Patent and

Trademark Office.  15 U.S.C. §1051(e).  Courts have consistently understood this

provision to authorize process in the agent's judicial district rather than nationwide.

-49-

Material Under Seal Deleted

*See, e.g.*, *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004) ("the Lanham Act does not provide for national service of process"); *Sunshine Distribution, Inc. v. Sports Auth. of Mich., Inc.*, 157 F. Supp. 2d 779, 787 (E.D. Mich. 2001).

So too here. Section 5318(k) authorizes service in the judicial district in which a foreign bank maintains an agent for service of Patriot Act subpoenas, not nationwide.[7]

**C.** Moreover, the structure of this section of the Patriot Act makes clear that Section 5318(k) does not authorize nationwide service of process. Specifically, another subsection of the statute expressly provides for nationwide service, thereby bolstering the conclusion that Section 5318(k) does not.

The Supreme Court applied just such an inference in *Omni Capital International, Ltd. v. Rudolf Wolff & Co.*, where it considered the limitations on service for an implied (and subsequently enacted) private right of action under the Commodity Exchange Act. 484 U.S. 97 (1987). Petitioners asked the Court to infer nationwide service of process from a statute that was silent on the matter, both before and after Congress expressly codified the private right of action. The Court

---

[7] To be sure, the mere fact that Section 5318(k) provides for service in New York does not guarantee that service there would satisfy the minimum guarantees of due process. But the question at hand is not whether ▮▮▮▮ could be validly served in New York, but rather whether Section 5318(k) is a nationwide service provision.

refused to do so.  It noted "that Congress expressly provided for nationwide service of process in [other] sections," *id.* at 106, which allowed for service "wherever the defendant may be found," 7 U.S.C. §§ 13a-1(e), 13a-2(4), or "anywhere in the United States," *id.* § 18(d)(1).  Those provisions showed that "Congress knows how to authorize nationwide service of process when it wants to provide for it." *Omni Capital*, 484 U.S. at 106.  Its "fail[ure] to do so here argues forcefully that such authorization was not its intention." *Id.*  The structure of the Act's service provisions, with separate "section by section" authorizations, further confirmed that Congress had not intended a blanket authorization of nationwide service for actions under the statute. *Id.* at 107.

Just so here.  Another provision of the Patriot Act, 31 U.S.C. § 5318(e)(5), states that "[a]ll process in any case *under this subsection* may be served in any judicial district in which such person may be found." 31 U.S.C. § 5318(e)(5) (emphasis added).  This Court, as well as the Supreme Court, have held that near-identical language authorizes nationwide service. *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1350 (D.C. Cir. 2000) (service allowed in "any district wherein [a corporation] may be found"); *Omni Capital*, 484 U.S. at 105 (service allowed "wherever the defendant may be found").  If Congress had intended to allow service on foreign banks' U.S.-resident agents "in any judicial district in

-51-

Material Under Seal Deleted

which such person may be found," rather than only in the judicial district in which that person resides, it could have said so.

Moreover, Congress's decision to limit its authorization to one particular *sub*section is telling, because "Congress often drafts statutes with hierarchical schemes—section, subsection, paragraph, and on down the line," and the Supreme Court has noted that "[w]hen Congress want[s] to refer only to a particular subsection or paragraph, it sa[ys] so." *Cyan, Inc. v. Beaver Cty. Emps. Ret. Bd.*, 138 S. Ct. 1061, 1070 (2018) (quoting *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 938-39 (2017) (alterations in original)). As in *Omni*, Congress knew perfectly well how to authorize nationwide service, and did so on a subsection-by-subsection basis in other parts of the statute, but it decided not to do so in Section 5318(k)(3).

**D.**    The district court's rationales for exercising jurisdiction were unpersuasive. First, the district court sought to draw the opposite conclusion from Section 5318(e)(5) and an accompanying provision, Section 5318(e)(2). JA 1754-55. The court suggested that the phrasing of these provisions—the first of which refers to "any judicial district in which such person may be found," and the second of which refers to any jurisdiction where "the person summoned carries on business or may be found"—is, if anything, *narrower* than the language of Section 5318(k)(3). JA 1754-55. However, this view is simply at odds with the governing case law. As noted above, both this Court and the Supreme Court have interpreted

-52-

Material Under Seal Deleted

similar language—referring to any location where an individual or corporation "may be found"—as expressly providing for nationwide service.[8]

The district court held in the alternative that the Bank had forfeited its argument on personal jurisdiction because it did not put forward this analysis of Section 5318(k) until its surreply.  JA 1753.  This is error.  A party forfeits *claims*, not *arguments*.  *See, e.g.*, *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992) ("Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.").  The bank has consistently advanced the *claim* that the district court lacked personal jurisdiction over it, and indeed it has also consistently advanced the *argument* that the proper forum for the minimum contacts analysis is the District of Columbia.  Dkt. 4 at 15-16 & n.4; Dkt. 12 at 20-22.  Thus, what is at issue here is at most a subpoint within that argument—which cannot be forfeited under *Yee.*

In any event, even if the Bank *had* forfeited this point below, it would still be appropriate for the Court to consider it on appeal.  This case has several features that have previously caused this Court to exercise its "discretion to determine what

---

[8] The district court also discussed Section 5318(c)(1), which allows the government to require that certain records "be produced at any designated location … not more than 500 miles distant from any place where the financial institution … operates or conducts business in the United States."  JA 1754.  This provision is actually broader than Section 5318(k).  But even if it were narrower, that would hardly imply that Section 5318(k) allows for nationwide service.

Material Under Seal Deleted

questions to consider and resolve for the first time on appeal." *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419 n.5 (D.C. Cir. 1992).  First, this is a pure question of law, namely whether Section 5318(k) is a nationwide service provision. *Liff v. Office of Inspector Gen.*, 881 F.3d 912, 919 (D.C. Cir. 2018); *Roosevelt*, 958 F.2d at 419 n.5.  Second, the question is an important and novel issue of federal law, which could provide important guidance in future cases involving Patriot Act subpoenas. *Flynn v. C.I.R.*, 269 F.3d 1064, 1069 (D.C. Cir. 2001).  Third, this is "a threshold question" that would completely resolve the appeal. *Liff*, 881 F.3d at 919. Fourth, the government has a full opportunity to brief the issue on the merits. *Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 697 (D.C. Cir. 1991).

In short, even if the Bank's personal jurisdiction argument had been forfeited below, the Court should not hesitate to consider it now.

## CONCLUSION

For the foregoing reasons, this Court should reverse the orders of the district court compelling ███ to comply with the administrative subpoena, holding ███ in civil contempt, and imposing sanctions.

-54-

Dated:        May 16, 2019                    Respectfully submitted,

                                              /s/ Sarah Levine
                                              Sarah Levine
                                              Hank B. Walther
                                              Alex Potapov
                                              Cormac Early
                                              Daniel D. Benson
                                              JONES DAY
                                              51 Louisiana Ave. NW
                                              Washington, DC 20001
                                              Ph: 202.879.3939
                                              Fx: 202.626.1700
Christopher K. Pelham                         sllevine@jonesday.com
Lillian He
Qiang Xue                                     Henry Klehm III
JONES DAY                                     Samidh Guha
4th Floor                                     JONES DAY
27 Zhongshan Dong Yi Road                     250 Vesey Street
Shanghai 200002, China                        New York, NY 10281-1047
Ph: +86.21.2201.8000                          Ph: 212.326.3939
Fx: +86.21.5298.6569                          Fx: 212.755.7306
cpelham@jonesday.com                          hklehm@jonesday.com

                *Counsel for* ███████████████████████

Material Under Seal Deleted

# CERTIFICATE OF COMPLIANCE

1.      This document complies with the word limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Cir. R. 32(e)(1), this document contains 12,828 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ Sarah Levine*
Sarah Levine
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
Ph: 202.879.3939
Fx: 202.626.1700
sllevine@jonesday.com

-56-

# CERTIFICATE OF SERVICE

I certify that on May 16, 2019, I caused to be served a copy of the foregoing

documents via electronic mail to:

Zia M. Faruqui
David Goodhand
Assistant United States Attorneys
555 4th Street NW
Washington, D.C. 20530
zia.faruqui@usdoj.gov
david.goodhand2@usdoj.gov

*Counsel for Appellee
the United States*

Daniel Levin
WHITE & CASE LLP
701 Thirteenth Street NW
Washington, DC 20005
daniel.levin@whitecase.com

*Counsel for Appellant* ▮

Leslie Paul Machado
Brian W. Stolarz
LECLAIRRYAN, PLLC
2318 Mill Road, Suite 1100
Alexandria, VA 22314
brian.stolarz@leclairryan.com
leslie.machado@leclairryan.com

*Counsel for Appellant* ▮

/s/ Sarah Levine
Sarah Levine
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
Ph: 202.879.3939
Fx: 202.626.1700
sllevine@jonesday.com

Material Under Seal Deleted

**STATUTORY ADDENDUM**

Material Under Seal Deleted

### 31 U.S.C. § 5318. Compliance, exemptions, and summons authority

…

**(k) Bank records related to anti-money laundering programs**.—

**(1) Definitions.**—For purposes of this subsection, the following definitions shall apply:

**(A) Appropriate Federal banking agency.**—The term "appropriate Federal banking agency" has the same meaning as in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813).

**(B) Incorporated term.**—The term "correspondent account" has the same meaning as in section 5318A(e)(1)(B).

**(2) 120-hour rule.**—Not later than 120 hours after receiving a request by an appropriate Federal banking agency for information related to anti-money laundering compliance by a covered financial institution or a customer of such institution, a covered financial institution shall provide to the appropriate Federal banking agency, or make available at a location specified by the representative of the appropriate Federal banking agency, information and account documentation for any account opened, maintained, administered or managed in the United States by the covered financial institution.

**(3) Foreign bank records.**—

**(A) Summons or subpoena of records.**—

**(i) In general.**—The Secretary of the Treasury or the Attorney General may issue a summons or subpoena to any foreign bank that maintains a correspondent account in the United States and request records related to such correspondent account, including records maintained outside of the United States relating to the deposit of funds into the foreign bank.

**(ii) Service of summons or subpoena.**—A summons or subpoena referred to in clause (i) may be served on the foreign bank in the United States if the foreign bank has a representative in the United States, or in a foreign country pursuant to any mutual legal assistance treaty, multilateral agreement, or other request for international law enforcement assistance.

**(B) Acceptance of service.**—

**(i) Maintaining records in the United States.**—Any covered financial institution which maintains a correspondent account in the United States for a foreign bank shall maintain records in the United States identifying

1a

Material Under Seal Deleted

the owners of such foreign bank and the name and address of a person who resides in the United States and is authorized to accept service of legal process for records regarding the correspondent account.

**(ii) Law enforcement request.**—Upon receipt of a written request from a Federal law enforcement officer for information required to be maintained under this paragraph, the covered financial institution shall provide the information to the requesting officer not later than 7 days after receipt of the request.

**(C) Termination of correspondent relationship.**—

**(i) Termination upon receipt of notice.**—A covered financial institution shall terminate any correspondent relationship with a foreign bank not later than 10 business days after receipt of written notice from the Secretary or the Attorney General (in each case, after consultation with the other) that the foreign bank has failed—

(I) to comply with a summons or subpoena issued under subparagraph (A); or

(II) to initiate proceedings in a United States court contesting such summons or subpoena.

**(ii) Limitation on liability.**—A covered financial institution shall not be liable to any person in any court or arbitration proceeding for terminating a correspondent relationship in accordance with this subsection.

**(iii) Failure to terminate relationship.**—Failure to terminate a correspondent relationship in accordance with this subsection shall render the covered financial institution liable for a civil penalty of up to $10,000 per day until the correspondent relationship is so terminated.

…